**No. 26-1938**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

CITY OF COLUMBUS, *et al.*,
*Plaintiffs-Appellees,*

v.

ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the
United States Department of Health and Human Services, et al.*,
*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Maryland

---

**BRIEF FOR APPELLANTS**

---

*Of Counsel:*

ROBERT FOSTER
  *Acting General Counsel*

ELIZABETH C. KELLEY
  *Deputy General Counsel
  Chief Legal Officer for CMS*

JOCELYN S. BEER
  *Acting Deputy Associate
    General Counsel for Litigation*

JILL BRADLEY
BENJAMIN FISCHER
  *Attorneys*

  *U.S. Department of Health and
    Human Services*

BRETT A. SHUMATE
  *Assistant Attorney General*

KELLY O. HAYES
  *United States Attorney*

CHARLES W. SCARBOROUGH
MAXWELL A. BALDI
  *Attorneys, Appellate Staff
  Civil Division, Room 7513
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 532-0211*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

STATEMENT OF JURISDICTION ................................................... 6

STATEMENT OF THE ISSUES ........................................................ 6

PERTINENT STATUTES AND REGULATIONS ............................... 7

STATEMENT OF THE CASE ........................................................... 7

      A.     Statutory and Regulatory Background ................................7

      B.     Factual Background and Prior Proceedings ...................16

SUMMARY OF ARGUMENT .........................................................25

STANDARD OF REVIEW ..............................................................29

ARGUMENT ..................................................................................29

I.     Plaintiffs lack standing to challenge of any of HHS's policies ...............29

      A.     The municipal plaintiffs have not demonstrated standing ...........30

      B.     Main Street Alliance has not demonstrated standing .................36

      C.     Doctors for America has not demonstrated standing...................38

II.     The district court erred in vacating four policies modified in the Final Rule .........................................................................................39

      A.     HHS lawfully expanded the permissible range for actuarial values ...........................................................................40

B.     HHS lawfully required enrollees to comply with the Reconciliation Requirement to maintain eligibility for advance premium tax credits ...................................................................47

C.     HHS lawfully rescinded an automatic 60-day extension of an income-verification period ...........................................................53

D.     HHS lawfully standardized and shortened the open-enrollment period for Exchanges. ....................................................................58

CONCLUSION......................................................................................................64

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                              **Page(s)**

*Alabama Power Co. v. Costle,*
    636 F.2d 323 (D.C. Cir. 1979) ...................................................... 41

*Alaska Dep't of Env't Conservation v. EPA,*
    540 U.S. 461 (2004) ......................................................... 40, 61

*Allen v. Wright,*
    468 U.S. 737 (1984) ............................................................... 33

*American Hosp. Ass'n v. NLRB,*
    499 U.S. 606 (1991) ............................................................... 52

*Appalachian Voices v. State Water Control Bd.,*
    912 F.3d 746 (4th Cir. 2019) ................................................... 39

*Beck v. McDonald,*
    848 F.3d 262 (4th Cir. 2017) ........................................... 29-30, 35

*City of Chicago v. Fulton,*
    592 U.S. 154 (2021) ............................................................... 55

*City of Columbus v. Kennedy,*
    No. 25-2012, 2025 WL 4948067 (4th Cir. Sep. 18, 2025)................24
    No. 25-2012, 2026 WL 2057411 (4th Cir. June 23, 2026)..............24

*City of Columbus v. Kennedy,*
    No. 26-cv-2215-BAH, 2026 WL 2058183, (D. Md. July 16, 2026)................30

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ......................................................... 33, 35

*Department of Educ. v. Brown,*
    600 U.S. 551 (2023) ............................................................... 34

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ................................................................ 63

*FDA v. Alliance for Hippocratic Med.,*
  602 U.S. 367 (2024) ................................................................ 39

*FERC v. Electric Power Supply Ass'n,*
  577 U.S. 260 (2016) ............................................................. 39-40

*Fernandez v. RentGrow, Inc.,*
  116 F.4th 288 (4th Cir. 2024) ................................................. 36

*Frank Krasner Enters., Ltd. v. Montgomery County,*
  401 F.3d 230 (4th Cir. 2005) ................................................... 31

*Friends for Ferrell Parkway, LLC v. Stasko,*
  282 F.3d 315 (4th Cir. 2002) ................................................... 36

*Hollingsworth v. Perry,*
  570 U.S. 693 (2013) ................................................................ 39

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.,*
  78 F.4th 622 (4th Cir. 2023) ................................................ 31-32

*King v. Burwell,*
  576 U.S. 473 (2015) .................................................................. 7

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ................................................ 41, 43, 50, 51

*Maryland Shall Issue, Inc. v. Hogan,*
  971 F.3d 199 (4th Cir. 2020) ................................................... 38

*Michigan v. EPA,*
  576 U.S. 743 (2015) ..................................................... 43, 45, 56

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,*
  463 U.S. 29 (1983) .................................................................. 39

iv

*Mullin v. Doe,*
  146 S. Ct. 2121 (2026) ........................................................... 49

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ................................................................ 37

*National Ass'n of Home Builders v. EPA,*
  682 F.3d 1032 (D.C. Cir. 2012) .......................................... 63

*National Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ........................................................ 59, 61

*Navy Fed. Credit Union v. LTD Fin. Servs., LP,*
  972 F.3d 344 (4th Cir. 2020) .............................................. 52

*NLRB v. SW Gen., Inc.,*
  580 U.S. 288 (2017) .............................................................. 52

*Ohio Valley Env't Coal., Inc. v. Pruitt,*
  893 F.3d 225 (4th Cir. 2018) .............................................. 29

*Pennsylvania v. New Jersey,*
  426 U.S. 660 (1976) .............................................................. 34

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) ........................................................ 43, 50

*Spencer v. Kemna,*
  523 U.S. 1 (1998) .................................................................. 33

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) .............................................................. 32

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ........................................................ 29, 34

*United States v. Miller,*
  604 U.S. 518 (2025) .............................................................. 53

*United States v. Texas,*
  599 U.S. 670 (2023) ................................................................ 34

**Statutes:**

Patient Protection and Affordable Care Act, Pub. L. No. 111-148,
  124 Stat. 119 (2010)
  § 1411(c)(4), 124 Stat. at 226 .................................................. 54

Pub. L. No. 119-21, tit. VII, subtitle B, 139 Stat. 72 (2025)
  § 71305, 139 Stat. at 324 ........................................................ 12

26 U.S.C. § 36B ................................................................ 10, 51

26 U.S.C. § 36B(b)(2)-(3) .................................................... 10, 51

26 U.S.C. § 36B(b)(3)(a)(i) ......................................................46

26 U.S.C. § 36B(b)(3)(a)(iii) ....................................................46

26 U.S.C. § 36B(d) .............................................................. 51

26 U.S.C. § 36B(e) .............................................................. 51

26 U.S.C. § 36B(f) .............................................................. 33

26 U.S.C. § 36B(f)(1) ................................................ 11, 37, 47-48, 49

26 U.S.C. § 36B(f)(2) ............................................................ 12

26 U.S.C. § 36B(h) .............................................................. 51

28 U.S.C. § 1291 .................................................................. 6

28 U.S.C. § 1331 .................................................................. 6

42 U.S.C. § 300gg-1(a) ............................................................ 7

42 U.S.C. § 300gg-2(a) ............................................................ 7

42 U.S.C. § 300gg-2(b)(1) ......................................................... 7

vi

42 U.S.C. § 18021(a)(1)(B) ............................................................. 8

42 U.S.C. § 18022(a)(3) ................................................................. 8

42 U.S.C. § 18022(d) ..................................................................... 8

42 U.S.C. § 18022(d)(2) ................................................................. 9

42 U.S.C. § 18022(d)(3) ........................................... 1, 9, 40, 42, 43

42 U.S.C. § 18031(c)(6) ................................................................. 8

42 U.S.C. § 18031(c)(6)(B) ..................................................... 15, 58

42 U.S.C. § 18031(d) ..................................................................... 7

42 U.S.C. § 18041(a) ................................................................... 20

42 U.S.C. § 18041(a)(1) ................................................ 8, 48, 49, 50

42 U.S.C. § 18041(b) ..................................................................... 7

42 U.S.C. § 18041(c)(1) ................................................................. 7

42 U.S.C. §§ 18081-18082 ........................................................... 48

42 U.S.C. § 18081(a) ................................................................... 12

42 U.S.C. § 18081(b)(3)(A) .......................................................... 13

42 U.S.C. § 18081(c) ................................................................... 54

42 U.S.C. § 18081(c)(3) ............................................................... 13

42 U.S.C. § 18081(c)(4) ............................................................... 54

42 U.S.C. § 18081(c)(4)(A) .......................................................... 54

42 U.S.C. § 18081(c)(4)(B) ............................................... 53, 54, 57

42 U.S.C. § 18081(e)(4)(A)(i) ...................................................... 14

42 U.S.C. § 18081(e)(4)(A)(ii) ............................................... 14, 55

42 U.S.C. § 18081(e)(4)(A)(ii)(II) ........................................ 14, 55

42 U.S.C. § 18082 ....................................................................... 11

42 U.S.C. § 18082(a) .................................................................. 51

42 U.S.C. § 18082(b)(2)(B) ...................................................... 48

49 U.S.C. § 32902(a) .................................................................. 41

**Regulations:**

26 C.F.R. § 1.36B-4(a)(1)(i) ......................... 11, 33, 37, 48, 49

26 C.F.R. § 1.6011-8 ....................................................... 13, 33, 37

26 C.F.R. § 1.6011-8(a) ............................................................ 11

45 C.F.R. § 155.305(f)(4) ......................................................... 13

45 C.F.R. § 155.315(f)(3) ......................................................... 14

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ........................................................ 6

**Other Authorities:**

Ctrs. for Medicare & Medicaid Servs., HHS, *Failure to File and Reconcile
   Operations Frequently Asked Questions*
   (Apr. 19, 2024), https://perma.cc/K3LK-A778................................12

76 Fed. Reg. 51,202 (Aug. 17, 2011) ..................................... 13

77 Fed. Reg. 18,310 (Mar. 27, 2012) ................. 12, 15, 48, 49, 59

77 Fed. Reg. 30,377 (May 23, 2012) ...................................... 12

78 Fed. Reg. 12,834 (Feb. 25, 2013) ........................... 9, 10, 44

81 Fed. Reg. 12,204 (Mar. 7, 2016) ..................................................... 61

81 Fed. Reg. 94,058 (Dec. 22, 2016) ....................................... 9, 10, 46

82 Fed. Reg. 18,346 (Apr. 18, 2017) ................................. 9, 10, 44, 62

86 Fed. Reg. 35,156 (July 1, 2021) ..................................................... 15

86 Fed. Reg. 53,412, (Sep. 27, 2021) ........................................... 15, 16

87 Fed. Reg. 27,208 (May 6, 2022) ....................................... 9, 10, 44

88 Fed. Reg. 25,740 (Apr. 27, 2023) ................................... 13, 14, 48

90 Fed. Reg. 12,942 (Mar. 19, 2025) ................. 16, 17, 18, 19, 20, 21, 22, 42, 48

90 Fed. Reg. 27,074 (June 25, 2025)..................... 1, 15, 18, 19, 20, 21, 22, 23, 26, 41, 42, 47, 48, 54, 56, 58, 59, 60, 61, 62, 63

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ....................................................................... 52

**INTRODUCTION**

The Affordable Care Act (ACA) established health insurance Exchanges, which allow millions of Americans to purchase individual coverage. In 2025, the Department of Health and Human Services (HHS) made several technical changes to the rules for consumers to access and for issuers to offer coverage through the Exchanges. *See* 90 Fed. Reg. 27,074 (June 25, 2025) (Final Rule). At issue in this appeal are four of those changes.

First, issuers offer plans on and off the Exchanges at various "metal tiers," from bronze to platinum, based on an estimate of the average percentage of covered healthcare expenses for which the plan will pay. This percentage is known as the plan's "actuarial value." The ACA authorizes HHS to "provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan." 42 U.S.C. § 18022(d)(3). Previously, the lower bound for variation was between 0% and 2% below the target level for each tier. In the Final Rule, HHS allowed most plans to vary by as much as 4% below the target. The district court determined that this decision was arbitrary and capricious and vacated the actuarial-value policy.

Second, the ACA provides means-tested subsidies to Exchange enrollees in the form of refundable tax credits to help them afford premiums.

Enrollees ordinarily may receive these credits either in advance of the plan year based on their projected income for that year or in arrears when they file their tax returns. Those who receive advance tax credits based on projected income are obligated annually to reconcile on their federal income tax returns their actual eligibility for subsidies against the advance credits they received. From 2015 to 2023, enrollees became ineligible to receive tax credits in advance if they failed to meet this Reconciliation Requirement in a prior year. In 2023, HHS amended the regulation to deny enrollees advance premium tax credits only if they failed to meet the Reconciliation Requirement in two consecutive years. In the Final Rule, HHS reverted back to the longstanding one-year failure-to-file-and-reconcile policy. The district court determined that HHS lacked statutory authority to tie eligibility for advance premium tax credits to the Reconciliation Requirement and vacated the failure-to-file-and-reconcile policy.

Third, when applicants for tax credits supply inconsistent or unverified information about their income to an Exchange, the ACA provides for a 90-day period during which applicants must present evidence to resolve any inconsistencies. HHS has long permitted *ad hoc* extensions of that period upon a showing of good cause. In 2023, HHS issued a regulation providing

2

that Exchanges must automatically extend the 90-day period by an additional 60 days for applicants to verify their household incomes with additional documentation, creating in effect a 150-day income-verification period. In the Final Rule, HHS rescinded the mandatory 60-day extension, explaining that the policy was both beyond its statutory authority and ineffective. The district court concluded that HHS has authority to require a blanket 60-day extension and that HHS had acted arbitrarily and capriciously in eliminating the automatic extension.

Fourth, every year Exchanges have open-enrollment periods during which any eligible beneficiary may enroll in or change health insurance coverage. Since 2015, the open-enrollment period has varied from 45 to 93 days. Prior to the Final Rule, the open-enrollment period lasted at least 75 days from November 1 to January 15; State-based Exchanges had the option to extend it. In the Final Rule, HHS shortened the period to 61-63 days starting no later than November 1 and ending no later than December 31. The district court determined that HHS acted arbitrarily and capriciously in standardizing and shortening the open-enrollment period.

The district court erred in prohibiting HHS from making each of these modifications to existing policies. To begin with, plaintiffs lack standing to

3

challenge these policies. None of the plaintiffs can say that the Final Rule will harm them directly. They rely instead on conjecture and an attenuated series of events to assert that many steps down a causal chain they may suffer some incidental harm. But the path from an insurance policy covering 77% as opposed to 78% of an average consumer's expenses to an uncompensated ride in a City of Columbus ambulance is far too speculative to give rise to an Article III case or controversy.

The district court also erred on the merits, going far beyond the narrow judicial role permitted under the Administrative Procedure Act (APA) and second-guessing HHS's reasonable policy judgments in a variety of ways. HHS has express statutory authority to provide for a de minimis range of variation in actuarial values, and it properly exercised that authority here, explaining why it believed a broader range would benefit consumers in the long run through lower premiums and greater plan choice. The district court was not free to second guess the policy judgment embodied in the actuarial-value policy. As for the failure-to-file-and-reconcile policy, the ACA broadly empowers HHS to fill in the details of the advance premium tax credit scheme. HHS validly used that power to modify a policy—in effect for over a decade now—tying eligibility for advance premium tax credits to

4

meeting the Reconciliation Requirement. Similarly, HHS properly rescinded the automatic 60-day extension of its income-verification period. Not only did the automatic policy exceed HHS's statutory power, but it increased federal expenditures by $170 million per year while providing no discernable benefits. And HHS also properly exercised its broad authority to determine the length of the open-enrollment period.

HHS now has more than a decade of experience in the technically challenging work of regulating the Exchanges and subsidizing premiums. When dealing with both insurers and consumers, second-order risks abound. HHS considered those risks, weighed its options, and implemented the policies it determined would best promote coverage, strengthen insurance markets, and avoid waste and fraud. The district court not only flyspecked those decisions, it also disabled HHS from addressing critical issues in the future. The district court repeatedly faulted HHS for considering the entire scope of the problem in front of it, dismissing as irrelevant key issues like whether a policy's costs outweigh its benefits or whether a policy would assist insurers in designing plans. HHS cannot properly exercise its policy discretion if it is forbidden from considering those factors. The judgment should be reversed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. § 1331. JA81. The district court entered final judgment on June 12, 2026, JA62-64, and entered an amended final judgment on June 16, 2026, JA65-67. The government filed a timely notice of appeal on July 16, 2026. JA854; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether plaintiffs have failed to establish Article III standing to challenge each of these policies.

2. Whether HHS lawfully expanded the permissible range for actuarial values.

3. Whether HHS lawfully required enrollees to comply with the Reconciliation Requirement to maintain eligibility for advance premium tax credits.

4. Whether HHS lawfully rescinded an automatic 60-day extension of the period for verifying income-eligibility data.

5. Whether HHS lawfully standardized and shortened the open-enrollment period.

6

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

Enacted in 2010, the ACA "adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market" and "to make insurance more affordable." *King v. Burwell*, 576 U.S. 473, 478-79 (2015). To "ensure that anyone can buy insurance," *id.* at 493, the ACA generally prohibits health insurance issuers in the individual or group markets from denying coverage to applicants because of their health, 42 U.S.C. § 300gg-1(a). And to promote continuous coverage, the ACA generally requires issuers to "renew or continue in force" an enrolled customer's coverage "at the option of … the individual," provided they pay their premiums. *Id.* § 300gg-2(a), (b)(1).

Among its many provisions, the ACA provides for the creation of "Exchanges," which are State-specific marketplaces where consumers can compare and purchase private health insurance. 42 U.S.C. § 18031(d). Some Exchanges are operated by individual States. *Id.* § 18041(b). Other Exchanges are operated by the federal government within the States. *Id.* § 18041(c)(1). In each State, individuals typically can enroll in health

7

insurance plans through the state Exchange for the upcoming plan year during an annual "open enrollment period[ ]," or for the current plan year during "special enrollment periods" that become available if certain triggering events occur (*e.g.*, marriage). *Id.* § 18031(c)(6).

HHS has broad authority under the ACA to issue regulations implementing and "setting standards for" the ACA's requirements, including regulations regarding the "establishment and operation of Exchanges," the "offering of qualified health plans through such Exchanges," and "such other requirements as [HHS] determines appropriate." 42 U.S.C. § 18041(a)(1). Four sets of regulations are relevant here.

**1. Actuarial-Value Policy.** Under the ACA, most health insurance plans must cover certain "essential health benefits" and adhere to certain "level[s] of coverage" specified in the statute. 42 U.S.C. §§ 18021(a)(1)(B), 18022(a)(3). These plans are categorized into different "metal tiers" (bronze, silver, gold, and platinum) based on their "level of coverage"; "gold plans," for instance, must have an actuarial value of 80%— *i.e.*, the plan is designed such that the issuer will pay, on average, 80% of covered medical expenses, and the enrollee will pay the remaining expenses through out-of-pocket spending, *id.* § 18022(d). Generally, higher actuarial

8

value correlates with higher premiums and lower actuarial value correlates with lower premiums.

Actuarial values are calculated under regulations issued by HHS. *See* 42 U.S.C. § 18022(d)(2). The statute also instructs HHS to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." *Id.* § 18022(d)(3). HHS initially allowed all plans to vary from the target actuarial value by up to 2% in either direction. 78 Fed. Reg. 12,834, 12,868 (Feb. 25, 2013). In a 2016 regulation, HHS allowed certain bronze plans to vary by between 5% above or 2% below the target. 81 Fed. Reg. 94,058, 94,181 (Dec. 22, 2016). In 2017, HHS expanded the range to allow most plans to deviate by 2% above or 4% below the target and permitted certain bronze plans to deviate by 5% above or 4% below the target. 82 Fed. Reg. 18,346, 18,368, 18,382 (Apr. 18, 2017). It made this change to "provid[e] issuers increased [actuarial value] flexibility to improve the health and competitiveness of the markets." *Id.* at 18,369. Finally, starting in 2023, HHS narrowed the de minimis range for most plans. 87 Fed. Reg. 27,208 (May 6, 2022). For most plans the range was set to 2% above or below the target; some bronze plans were allowed to vary by between 5%

9

above or 2% below the target; and some silver plans were allowed to vary only by up to 2% above the target. *Id.* at 27,391. The agency made this change because it believed it would allow consumers to more meaningfully compare plans in different tiers. *Id.* at 27,306-07. HHS acknowledged that this change would render unavailable plans used by more than 500,000 enrollees. *Id.* at 27,306.

None of these prior changes were challenged in court. In each prior iteration of this policy, HHS expressly weighed factors like plan design and issuer flexibility. *See* 78 Fed. Reg. at 12,851; 81 Fed. Reg. at 94,142-43; 82 Fed. Reg. at 18,369-71; 87 Fed. Reg. at 27,305-10. And HHS has long rejected the position that "the de minimis range is to account for differences in actuarial estimates only." 82 Fed. Reg. at 18,369.

**2. Failure-to-File-and-Reconcile Policy.** To help make insurance more affordable, the ACA provides subsidies to eligible Exchange enrollees in the form of premium tax credits. *See* 26 U.S.C. § 36B. The availability and amount of these subsidies turns on an enrollee's income for the taxable year. *Id.* § 36B(b)(2)-(3) (providing for subsidies based on annual household income and monthly premium cost of a "benchmark" silver plan on the relevant Exchange). Enrollees may obtain their premium tax credit when they file

10

their annual federal income-tax returns, but they also have the option of receiving premium tax credits in advance and paid directly to their insurance providers to offset premium costs, *see* 42 U.S.C. § 18082.

Because advance premium tax credits are based on an enrollee's projected annual household income, however, recipients must file a federal income tax return and "reconcile" the advance premium tax credits they received with the tax credit they ultimately qualify for based on their actual income during the applicable tax year. *See* 26 U.S.C. § 36B(f)(1); 26 C.F.R. § 1.36B-4(a)(1)(i). Section 36B address the "[r]econciliation of credit and advance credit," and requires that "[t]he amount of the credit allowed under this section for any taxable year shall be reduced (but not below zero) by the amount of any advance payment of such credit." 26 U.S.C. § 36B(f)(1). To implement that requirement, since 2015 the Secretary of the Treasury has required that any taxpayer who receives "advance payments" must "file an income tax return for that taxable year," 26 C.F.R. § 1.6011-8(a), and "must reconcile the amount of credit allowed under section 36B with advance credit payments on the taxpayer's income tax return for a taxable year," *id.* § 1.36B-4(a)(1)(i).[1] We refer to this obligation to file tax returns and reconcile

---

[1] Plaintiffs do not challenge the validity of these regulations.

11

as the "Reconciliation Requirement." An enrollee who receives more advance premium tax credits than he is ultimately eligible for is required to repay the excess amount to the Treasury though his taxes. 26 U.S.C. § 36B(f)(2). At the time the Final Rule was promulgated, the ACA capped the amount of this repayment obligation, but Congress has since eliminated that cap effective from January 1, 2026, *see* Pub. L. No. 119-21, tit. VII, subtitle B, § 71305, 139 Stat. 72, 324-25 (2025).

The ACA directs HHS to "establish a program … for determining" whether individuals claiming premium tax credits meet the applicable income and other eligibility requirements. 42 U.S.C. § 18081(a). Starting in 2015, HHS has prohibited an Exchange from "determin[ing] a tax filer eligible for" advance premium tax credits if (1) the filer received advance premium tax credits the prior year and (2) the filer (or the filer's spouse) failed to comply with the Reconciliation Requirement for that year.[2] 77 Fed. Reg. 18,310, 18,453 (Mar. 27, 2012); *see also* 77 Fed. Reg. 30,377, 30,394 (May 23, 2012).[3]

---

[2] Due to the COVID-19, HHS "did not act on" data indicating an enrollee had failed to comply with the Reconciliation Requirement in 2021-2023. Ctrs. for Medicare & Medicaid Servs., HHS, *Failure to File and Reconcile Operations Frequently Asked Questions* 1 (Apr. 19, 2024), https://perma.cc/K3LK-A778.

[3] These regulations, promulgated in 2012, first took effect in 2015.

In implementing this regulation, HHS explained that it was meant to facilitate compliance "with the requirement to file a tax return" in 26 C.F.R. § 1.6011-8. 76 Fed. Reg. 51, 202, 51,208 (Aug. 17, 2011). The rule was "intended to prevent a [taxpayer] who has failed to comply with tax filing rules from accumulating additional Federal tax liabilities due to advance payments of the premium tax credit." *Id.* HHS emphasized that "[a]n individual may remove this restriction by filing a tax return for the year in question." *Id.* In 2023, HHS amended the failure-to-file-and-reconcile regulations such that a taxpayer becomes ineligible for advance premium tax credits only after failing to meet the Reconciliation Requirement for two consecutive years. *See* 88 Fed. Reg. 25,740, 25,918 (Apr. 27, 2023).

Taxpayers who are determined ineligible for advance premium tax credits due to their failure to reconcile can still claim on their tax returns the full amount of the subsidies they are otherwise eligible for, but they cannot receive credits in advance. *See* 45 C.F.R. § 155.305(f)(4).

**3. Income-Verification Period.** The ACA requires applicants for tax credits to supply income information, and it requires HHS to verify that information with the Treasury Department. *See* 42 U.S.C. § 18081(b)(3)(A), (c)(3). If applicants supply inconsistent or unverified information, HHS must

13

notify the relevant Exchange, and the Exchange must "make a reasonable effort to identify and address the causes of such inconsistency." *Id.* § 18081(e)(4)(A)(i). If those efforts fail, the Exchange notifies applicants of such issues and provide the applicants an opportunity "to either present satisfactory documentary evidence or resolve the inconsistency" within 90 days of receiving such notice. *Id.* § 18081(e)(4)(A)(ii). The ACA provides that HHS "may extend the 90-day period … for enrollments occurring during 2014." *Id.* By regulation, HHS authorizes Exchanges to extend the 90-day period "if the applicant demonstrates that a good faith effort has been made to obtain the required documentation during the period." 45 C.F.R. § 155.315(f)(3).[4]

In 2023 HHS issued a regulation providing that Exchanges must automatically extend the 90-day period by an additional 60 days for applicants who still need to verify their household incomes with additional documentation. 88 Fed. Reg. at 25,918.

**4. Open-Enrollment Period.** The ACA provides for "annual open enrollment periods, as determined by the Secretary" during which any eligible person may enroll in or change from a health insurance plan.

---

[4] Plaintiffs do not challenge the validity of this regulation.

42 U.S.C. § 18031(c)(6)(B). HHS has varied the length of this period over time. *See* 90 Fed. Reg. at 27,136. After the initial year of operation for the Exchanges, the open-enrollment period stretched for 92 or 93 days in 2015-2017 before contracting to 45 days in 2018-2021. *Id.* HHS has long explained that in setting these periods it seeks to "balance the risk of adverse selection—a situation where individuals with higher risk are more likely to select coverage than healthy individuals—with the need to ensure that consumers have adequate opportunity to enroll in [plans] through an Exchange." *Id.* at 27,136; *see* 77 Fed. Reg. at 18,388-89; 86 Fed. Reg. 35,156, 35,168 (July 1, 2021); 86 Fed. Reg. 53,412, 53,430-32 (Sep. 27, 2021).

Starting in 2022, HHS expanded the open-enrollment period from 45 days to 76 days. 86 Fed. Reg. at 53,430. In so doing, HHS noted considerable benefits from the 45-day period including that "the majority of new consumers to the Exchange select plans prior to December 15 so as to have coverage beginning January 1," while also noting that an open-enrollment period stretching into the next calendar year could lead to consumer confusion. *Id.* at 53,429-31. HHS also hypothesized, however, that extending open enrollment by one month could benefit some consumers who automatically reenroll in plans subject to unexpected cost increases because

15

those consumers may have an opportunity to switch to cheaper plans; HHS noted that a longer period would also provide consumers more time "to make informed plan choices." *Id.* at 53,430. HHS also permitted State-run exchanges to further extend their own open-enrollment periods. *Id.* at 53,431.

## B.    Factual Background and Prior Proceedings

1. In 2025, HHS proposed a variety of changes to the way Exchanges operate aiming to "provide relief from rising health care costs" by "strengthening the integrity of [ACA] eligibility and enrollment systems to reduce waste, fraud, and abuse." 90 Fed. Reg. 12,942, 12,942. (Mar. 19, 2025). Again, four sets of policies are relevant here.

**a. Actuarial-Value Policy.** One of the proposals was to expand the permissible range of variation for plans' actuarial values. HHS proposed allowing all standard tiers of plans to vary up to 4% below their target levels. 90 Fed. Reg. at 12,995-97.

HHS proposed these expanded ranges because, since the last change in 2023, the agency had "received considerable feedback from issuers that indicates narrower de minimis ranges substantially reduce issuer flexibility in establishing plan cost sharing." 90 Fed. Reg. at 12,996. While HHS acknowledged that plans under the narrower range were easier to compare,

16

issuers were prohibited from designing plans to provide for optimal cost sharing. *Id.* The agency further noted that "issuers have also voiced concern about their ability to continue to participate in the market generally" and explained that "[s]ustained, robust issuer participation in the market is key to ensuring overall market stability and keeping costs down." *Id.* Under the expanded ranges, issuers could choose between issuing plans with higher actuarial values to "attract enrollment" with lower copays per visit and plans with lower actuarial values to "appeal to wide segments of the population" with lower premiums. *Id.*

In allowing for plan offerings with greater actuarial value flexibility, HHS acknowledged that average premiums will be reduced. As a result, HHS explained that it expected overall spending on premium tax credits to decline because they are calculated using a benchmark silver-level plan. 90 Fed. Reg. at 12,996-97. HHS noted that the change could diminish affordability for some subsidized consumers, at least in the short term. *Id.* But it also projected that the change would increase affordability for unsubsidized consumers, which in turn would attract this group to expand the risk pool and reduce premiums as a whole. *Id.* at 12,997. HHS thus proposed to reject "a short-sighted approach to regulating the [actuarial

17

value] de minimis ranges" in favor of ensuring that in the long-term "a sufficient choice of affordable plans" remains available. *Id.*

After considering more than 26,000 comments on the proposed rule, HHS finalized the actuarial-value policy as proposed. 90 Fed. Reg. at 27,076, 27,176. HHS reiterated that reverting to the wider de minimis range "would result in lower premiums" and "will significantly improve issuer flexibility in plan design." *Id.* at 27,176, 27,178. The agency projected three primary benefits from this increased flexibility. First, "these expanded ranges allow issuers to design plans that better promote competition in the market" by offering plans more responsive to consumer needs. *Id.* Second, "the wider ranges provide flexibility for issuers to make adjustments to their plans within the same metal level," resulting in "greater continuity for consumers." *Id.* Third, the "expanded ranges help maintain robust issuer participation" by "reducing compliance burdens." *Id.* The agency noted that this third goal was "particularly important considering that several issuers have publicly announced their intent to end participation in the Exchange in [Plan Year] 2026." *Id.*

As tax credits are calculated as the difference between the maximum amount a consumer is required to pay based on her income and her gross

18

premiums, HHS again acknowledged that the new actuarial-value policy could reduce the amount of tax credits available to some subsidized consumers because they are calculated using a benchmark silver plan. 90 Fed. Reg. at 27,176. But, pointing to its rationale in the notice of proposed rulemaking, the agency explained that it was choosing to prioritize "access and affordability in the long term." *Id.* HHS determined that "this change will better incentivize unsubsidized enrollees to enroll in coverage, which [it] expect[s] to lower overall costs and further drive down premiums as the risk pool improves." *Id.* at 27,177.

**b. Failure-to-File-and-Reconcile Policy.** HHS also proposed to reinstate its policy of deeming enrollees ineligible for advance premium tax credits for failing to comply with the Reconciliation Requirement for the prior year. 90 Fed. Reg. at 12,944. The agency explained that it was concerned about a "substantial risk of improper enrollment" for advance premium tax credits and, as a result, a "greater risk of [enrollees'] accumulating increased tax liabilities." *Id.* at 12,959. HHS looked to evidence suggesting that some brokers improperly enrolled in a plan with advance premium tax credits people who had incomes too low to qualify. *Id.* at 12,960. It indicated that the one-year policy would help to detect such improper

19

enrollments because people below the income threshold for advance premium tax credits are generally earn less than the required threshold to file federal tax returns. *Id.* HHS also noted that more than half of those who do comply with the Reconciliation Requirement receive excess advance premium tax credits and, as a result, are subject to repayment obligations and potentially penalties and interest. *Id.* at 12,960-61. HHS explained that a one-year failure-to-file-and-reconcile policy would limit the amount of those tax liabilities. *Id.* at 12,961.

After considering comments, HHS finalized the one-year failure-to-file-and-reconcile policy through the end of 2026. 90 Fed. Reg. at 27,077, 27,115. In response to comments questioning the agency's authority to promulgate the rule, HHS invoked its "general rulemaking authority under [42 U.S.C. § 18041(a)]" to "facilitate compliance" with filing and reconciliation "requirements." *Id.* at 27,117.

**c. Income-Verification Period.** HHS further proposed to rescind its mandatory 60-day extension of the period to resolve income verification issues. 90 Fed. Reg. at 12,962. HHS first explained that it had concluded that the mandatory extension exceeded its statutory authority. *Id.* at 12,963. But the agency also explained that even if the ACA permitted such a policy, "the

automatic 60-day extension did not provide a meaningful benefit to consumers and weakened program integrity." *Id.*

After considering comments, HHS finalized its recission of the automatic extension. 90 Fed. Reg. at 27,119-20. HHS accepted that it could continue to implement *ad hoc* extensions of the income-verification period "when an applicant demonstrates a good faith effort to obtain documentation," but it concluded that the automatic extension "falls well outside [the agency's authority] because it, "in effect, categorically suspends the 90-day period and replaces it with a 150-day period." *Id.* at 27,119. HHS "emphasize[d] that this change does not prevent consumers from receiving an [*ad hoc*] extension" upon a showing of good faith. *Id.* at 27,120.

HHS's experience with the automatic extension showed that it did not meaningfully improve resolution of income verification issues. 90 Fed. Reg. at 27,119. Instead, data "suggest[ ] that[ ] before the automatic 60-day extension, anyone who needed a 60-day extension was granted one under [the good-faith provision]." *Id.* While the automatic extension did not offer significant benefits, it did impose costs by permitting people not eligible for subsidies to keep them for a longer period of time. *See id.* HHS estimated that the automatic extension increased advance premium tax credit

21

expenditures by $170 million in 2024. *Id.* Thus, HHS concluded that it would rescind the automatic extension "even if the statute allowed [it]." *Id.*

**d. Open-Enrollment Period.** HHS also proposed to standardize and shorten the open-enrollment period to 45 days starting on November 1 and ending on December 15. 90 Fed. Reg. at 12,976-79. To justify this change, HHS explained that the new period would decrease consumer confusion and ameliorate the risk of adverse selection. *Id.* at 12,978-79.

After considering comments, HHS finalized an open-enrollment period of no longer than 63 days starting no later than November 1 and ending no later than December 31. 90 Fed. Reg. at 27,138. This policy allows Exchanges some flexibility in setting the exact dates of their open-enrollment periods. *Id.* HHS explained that the open-enrollment period "plays a crucial role in protecting the stability of the individual market risk pool within the structure of the ACA." *Id.* at 27,137. A longer open-enrollment period exacerbates risk of adverse selection because it allows "consumers … to switch plans in January based on emergent health needs or delay enrollment by forgoing January coverage with the option of enrolling later instead." *Id.* at 27,139.

HHS explained that it previously believed that the benefits of the longer period outweighed those risks, but, after reexamining the question,

22

HHS concluded that those "benefits did not materialize." 90 Fed. Reg. at 27,137. HHS had thought that a longer period would increase enrollment and allow enrollees to switch to cheaper plans if costs rose unexpectedly. *Id.* In the preceding cycle, however, "fewer than 3 percent of enrollees" terminated or switched coverage between December 15 and January 15. *Id.* "[W]ithout any clear benefit," the risks of adverse election counseled against a longer period. *Id.*

HHS concluded that a nine-week open-enrollment period would not hamper enrollment. Pointing to data showing that "97 percent of all Exchange enrollments occurred by the end of the ninth week" of the open-enrollment period, HHS predicted that a nine-week period "provides more than sufficient time for consumers to submit an application, compare their plan options, and enroll in advance of the new year." 90 Fed. Reg. at 27,138.

2. Plaintiffs are the cities of Baltimore, Chicago, and Columbus, Ohio; Main Street Alliance, a group representing small business owners; and Doctors for America, a group of physicians. JA81-82. They sued to challenge 10 provisions of the Final Rule. JA102-105.

a. Plaintiffs sought preliminary relief against nine provisions of the Final Rule. *See* JA280-281. Under § 705 of the APA, the district court stayed

23

the effective date of seven of those provisions. JA351-352. The government appealed and sought a stay pending appeal with respect to the actuarial-value policy, which this Court denied without explanation. *City of Columbus v. Kennedy*, No. 25-2012, 2025 WL 4948067, at *1 (4th Cir. Sep. 18, 2025).

b. While the government's interlocutory appeal was pending, the district court largely granted plaintiff's motion for summary judgment.[5] The district court vacated nine of the challenged policies and sustained one of them. Four of those policies are relevant here.

First, the district court rejected HHS's change to the actuarial value policy. JA27-31. The district court found that HHS acted arbitrarily and capriciously in expanding the de minimis range because it relied on factors other than "differences in actuarial estimates." JA29 (quotation marks omitted). It also concluded that the agency failed to explain how this change could make plans more affordable over time. JA30.

---

[5] After the district court entered final judgment, the government and plaintiffs stipulated to dismiss the interlocutory appeal. *See City of Columbus v. Kennedy*, No. 25-2012, 2026 WL 2057411, at *1 (4th Cir. June 23, 2026).

24

Second, the district court concluded that HHS may not impose its failure-to-file-and-reconcile policy because it lacks any authority to impose any conditions on eligibility for advance premium tax credits. JA43-44.

Third, the district court concluded that HHS improperly rescinded its policy requiring an automatic 60-day extension of the income-verification period. JA53. Although it characterized this issue as "a close call," JA49, the district court held that HHS could uniformly modify the statutory period for verifying income, JA49-51. The district court rejected HHS's alternate rationale for rescinding the automatic extension—that it was bad policy—as insufficiently reasoned. JA51-53.

Fourth, the district court concluded that HHS improperly shortened the open-enrollment period. JA38-40. The district court determined that HHS had not adequately explained how a shorter, standardized open-enrollment period would mitigate adverse-selection concerns. JA39-40.

## SUMMARY OF ARGUMENT

I. None of the plaintiffs has established an Article III injury sufficient to challenge any of HHS's policies. The municipal plaintiffs claim standing based on their assertion that the policies will cause consumers to lose coverage, pushing uncompensated expenses on to their budgets. That theory

25

relies on far too much conjecture about how insurers and consumers will respond to policy changes and how those reactions may be felt in those three municipalities. Moreover, the municipalities' alleged injuries are wholly self-inflicted and are not adequately established by competent evidence.

The organizational plaintiffs' attempts to establish their standing fare no better. Main Street Alliance relies exclusively on a single member who has not established that any of the challenged policies will cause her health insurance costs to rise. And Doctors for America relies solely on asserted harms to third parties, which cannot establish their standing to challenge any of the policies at issue here.

II. Even assuming plaintiffs have standing, the district court erred in vacating the challenged policies.

A. HHS reasonably exercised its discretion in setting the actuarial-value policy. The agency acknowledged that its decision involved trade-offs but concluded that a broader de minimis range was worth the costs because it would lower overall premiums, increase consumer choice, "promote competition" by allowing issuers to be more responsive to consumer needs, allow "greater continuity for consumers," and encourage issuers to continue participating in the Exchanges. 90 Fed. Reg. at 27,176.

26

The district court erred in vacating the actuarial-value policy because the court construed HHS's express statutory authority too narrowly and misunderstood the record before the agency. Contrary to the district court's understanding of the statute, HHS was authorized to consider the de minimis range in a more holistic light, taking into account appropriate policy concerns such as the cost of premiums and the choices available to consumers. At a minimum, HHS was entitled to consider effects like the overall health of the risk pool and the insurance market when it established the de minimis range, and the agency had ample record support for its decisions.

B. HHS also had authority to adopt a failure-to-file-and-reconcile policy identical to its longstanding previous policy. Congress authorized the Reconciliation Requirement, and it authorized HHS to issue regulations to effectuate that policy. Since 2015, HHS has appropriately used that authority to issue failure-to-file-and-reconcile policies in several different forms, and it properly invoked that power in issuing the policy challenged here.

The district court incorrectly concluded that the ACA prohibits HHS from tying advance premium tax credit eligibility to the Reconciliation Requirement. But the statute neither expressly nor impliedly prohibits such a policy; indeed, HHS previously adopted an identical policy and no one

27

challenged the agency's authority to do so. Congress set out the basic terms of the tax credit program, leaving the details to HHS, and HHS has the authority to implement the Reconciliation Requirement by making it a condition of eligibility for advance premium tax credits.

C. HHS also lawfully rescinded its policy requiring an automatic 60-day extension of the income-verification period for two independent reasons. The ACA does not grant HHS authority to permit blanket modifications of the statutory 90-day period. And even if it did, HHS independently concluded that the mandatory-extension policy should be rescinded because it imposes $170 million in costs on the fisc and provides few discernable benefits. The district court rejected that reasoning because it believed HHS was not free to consider those costs but rather was required to maintain any policy that reduces costs and burdens on consumers. That interpretation of the statute is untenable.

D. HHS also adequately explained its decision to shorten the open-enrollment period. When determining the appropriate length of the open-enrollment period, HHS has always sought to balance the risk of adverse selection against the risk of depriving consumers of an adequate opportunity to enroll in plans. Looking at the data, HHS pointed out that only 3% of

28

consumers took advantage of the additional time to switch plans—the ostensible benefit of the longer open-enrollment period. HHS thus made a policy judgment that the longer open-enrollment period was not worth the costs. The district court determined that HHS did not adequately explain how the shorter open-enrollment period would mitigate adverse selection, but both the Final Rule and the agency's longstanding positions spell out why a shorter period would be effective.

## STANDARD OF REVIEW

This Court reviews de novo a grant of summary judgment. *Ohio Valley Env't Coal., Inc. v. Pruitt*, 893 F.3d 225, 229 (4th Cir. 2018).

## ARGUMENT

### I.      Plaintiffs lack standing to challenge of any of HHS's policies

To establish Article III standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the defendant's conduct and likely to be redressed by a favorable decision. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). A plaintiff must meet this requirement for each claim and each form of relief it seeks. *Id.* at 431. At the summary-judgment stage, it is not enough simply to rely on mere allegations; plaintiffs "must set forth by affidavit or other evidence specific facts" establishing their standing. *Beck v.*

29

*McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). None of the plaintiffs has established standing to bring this suit.

Standing is, of course, a constitutional bedrock; it is required in every case. But the importance of the standing requirement has particular salience here. Baltimore and a set of out-of-circuit litigants have repeatedly asked a single district court to micromanage the highly technical rules HHS promulgates for managing the Exchanges. *See City of Columbus v. Kennedy*, No. 26-cv-2215-BAH, 2026 WL 2058183, at *2 n.1 (D. Md. July 16, 2026) (collecting cases). Such judicial second-guessing would be inappropriate even if plaintiffs were directly affected by HHS's regulations. The district court's interventions are particularly problematic here, however, because plaintiffs' asserted injuries with respect to each of the policies are entirely speculative Although plaintiffs may prefer other insurance regulations to the ones HHS has issued, such policy preferences do not rise to the level of cognizable injuries under Article III sufficient to allow the district court to superintend the Exchanges at plaintiffs' behest.

## A.    The municipal plaintiffs have not demonstrated standing

The municipal plaintiffs claim standing based on their assertion that the policies in the Final Rule will cause some individuals somewhere to lose

coverage, which in turn will result in the municipalities' "shouldering the expense of uncompensated care." JA296. That theory is untenable for several reasons.

1. The Final Rule does not regulate the municipalities in any way. Instead, the municipalities must rely on an attenuated chain of speculation to demonstrate that any of the policies will injure them. The municipalities assume that the policies they challenge may cause some people to disenroll from health insurance; that these consumers will require medical care in Baltimore, Chicago, or Columbus; that they will obtain emergency medical transportation or care from the city; that they will not pay for that care; and that the city will be stuck with uncompensated costs. A party, however, lacks standing when "an independent third party … st[ands] between the plaintiff and the challenged actions." *Frank Krasner Enters., Ltd. v. Montgomery County*, 401 F.3d 230, 235 (4th Cir. 2005). Here, insurers and consumers must make a very large number of independent choices for the municipalities to experience any harm.

Moreover, this chain of causation "requires guesswork" about what third parties will do and thus does not suffice to establish standing. *See John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 631

31

(4th Cir. 2023). Take, for example, the actuarial-value policy. Among other things, some issuers did not plan to take advantage of the actuarial-value policy adopted in the Final Rule. Plaintiffs offer no basis to conclude that the plans available in Columbus, Chicago, or Baltimore will differ at all as a result of the policy. They then speculate about how potential enrollees might respond to different plan offerings. Similarly, plaintiffs posit that some people may not enroll in insurance if the open-enrollment period concluded at year end rather than on January 15. But such speculation is not enough to establish standing; indeed, the Supreme Court has held that potential injuries based on statistical probabilities are insufficient to establish standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). These flaws alone defeat plaintiffs' theory of standing.

Plaintiffs' chains of causation are also untenable for other reasons. Even assuming that a person declines to enroll in health insurance because a plan available to him is projected to cover only 77% as opposed to 78% of an average consumer's expenses or because he has to enroll by December 31 rather than January 15, and even assuming that person has a medical emergency in Chicago, plaintiffs still fail to show that they will bear the costs of that treatment. The uninsured patient could take a taxi to a Cook County-

32

run hospital, imposing no costs at all on the City. He could go to a City-run hospital, obtain treatment, and pay his bill in cash before being discharged. Or any one of a number of other events could intervene. A chain of reasoning this speculative cannot establish the municipalities' standing to sue. *See Allen v. Wright*, 468 U.S. 737, 759 (1984) (rejecting "chain of causation" that depends on choices of "numerous third parties … who may not even exist in respondents' communities and whose independent decisions may not collectively have a significant effect on" the challenged action).

The standing problem is even more pronounced when it comes to the failure-to-file-and-reconcile provision because individuals who receive advance premium tax credits are obligated to meet the Reconciliation Requirement. *See* 26 U.S.C. § 36B(f); 26 C.F.R. §§ 1.36B-4(a)(1)(i), 1.6011-8. Failure to reconcile is unlawful, and a party may not establish standing by speculating that a third party may act unlawfully. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *cf. Spencer v. Kemna*, 523 U.S. 1, 15 (1998) (no standing to pursue a claim "contingent upon respondents' violating the law" in the future).

These same flaws permeate all of plaintiffs' claims. To challenge the mandatory 60-day extension of the income-verification period or the

33

shortened open-enrollment period, plaintiffs posit an attenuated chain of events that would ultimately result in the provision of uncompensated emergency care in one of their facilities. They have not established such a causal chain with respect to any of the challenged policies, much less all of them. *See TransUnion*, 594 U.S. at 431 (explaining that the plaintiff must establish standing for each claim and each form of relief it seeks).

2. The municipalities' theory also has another crucial flaw: their choice to provide uncompensated emergency care cannot constitute a cognizable injury. It is well-established that the incidental effects of policies do not confer standing. *See, e.g.*, *Department of Educ. v. Brown*, 600 U.S. 551, 568 (2023). If the cities choose to provide services to their residents, they cannot complain that federal policy causes more residents to seek those services. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 662-64 (1976) (per curiam). As the Supreme Court has explained, a local government's desire to "supply social services such as healthcare," *United States v. Texas*, 599 U.S. 670, 674 (2023), is not a cognizable injury.

3. Even if plaintiffs could establish standing to challenge some portions of the Final Rule, they have not met their obligations to establish standing to challenge the provisions primarily at issue in this appeal.

34

For two of the policies, plaintiffs have not introduced sufficient evidence to establish that the regulatory changes will have the effects they purport to fear. For the actuarial-value policy, plaintiffs' only evidence is a declaration from health-policy researcher Christen Linke Young in which she opines that the policy "*may* reduce Marketplace enrollment." JA119 (emphasis added). Even assuming that conclusory statement suffices, Young's prediction fails to meet Article III's "requirement that 'threatened injury must be certainly impending to constitute injury in fact.'" *Clapper*, 568 U.S. at 410. On its face, plaintiffs' assertion of harm is inadequate. And Young's declaration is devoid of any analysis of the effects of rescinding the mandatory 60-day extension of the income-verification period. *Cf.* JA107-126. Because plaintiffs have not introduced competent evidence that these policies will harm them, they lack standing to challenge them. *See Beck*, 848 F.3d at 270.

Plaintiffs also failed to demonstrate their standing to challenge the failure-to-file-and-reconcile policy and the shortening and standardization of the open-enrollment period. While they have submitted a declaration asserting that the policies will decrease enrollment, *see* JA120, JA124, they still have not met their burden because mere "conclusory allegations" will not

suffice at this stage of the litigation. *See Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 300 (4th Cir. 2024).

### B.      Main Street Alliance has not demonstrated standing

Main Street Alliance invokes associational standing, which requires it to establish that a member could sue in her own right. *See Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002). Main Street Alliance points to a single member, Brooke Legler, who asserts that she relies on insurance purchased through an Exchange to pay for expensive medicines and that the Final Rule "will cause [her] health insurance coverage costs to increase." JA136, JA138. These allegations do not establish that any of the policies in the final rule will cause Legler certainly impending harm.

Legler's assertion of injury rests on contingency and conjecture. Her declarations reference no specific policies, *see* JA136-138, JA353-355, and any impact on her insurance coverage or costs will turn on decisions made by insurers who choose to offer plans on the Exchange in Wisconsin and by other consumers in the relevant risk pools.

Again, take the actuarial-value policy as an example. Main Street Alliance has not offered any details to establish that *Legler's* premiums or cost sharing will increase because of the actuarial-value policy. Plaintiffs

36

offered no information about what plans are available in Legler's county, the actuarial value of her current plan, or whether her issuer would take advantage of the wider de minimis range. And even if Legler ends up with a plan with a lower actuarial value, she has not shown that such a change will harm her. Actuarial values derive from a complex balancing of benefits, premiums, and cost sharing. If Legler's issuer decreases the projected value of her silver plan from 70% to 69%, there could be no effect at all on her total costs. For example, her issuer might achieve that reduction by increasing the copay for a service Legler never uses; if so, her total out-of-pocket expenses would remain the same. And Main Street Alliance has not provided any evidence about the benchmark silver plan in Legler's county, so it has not shown that her net premiums are likely to increase. Main Street Alliance, therefore, fails to "make a 'clear showing,'" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024), that the lone member on which it relies for associational standing will face higher costs.

Nor has Main Street Alliance demonstrated standing to challenge the failure-to-file-and-reconcile policy. Legler is obligated to file a federal tax return, and she is required to reconcile her advance credits when she files. 26 U.S.C. § 36B(f)(1); 26 C.F.R. §§ 1.36B-4(a)(1)(i), 1.6011-8. Because she has

37

no cognizable interest in violating either of these legal obligations and has

not claimed that she intends to violate them, she cannot assert any harm

from a policy that imposes consequences for such violations. *Cf. Maryland*

*Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020) (plaintiffs may

not challenge prohibition on conduct when they "have no intention of

engaging in such conduct in the first place").

As for the income-verification period, Main Street Alliance offers no

details about the impact of that regulatory change. *Cf.* JA107-126. In any

event, Legler could only speculate that she would need to avail herself of the

automatic extension and be unable to obtain a discretionary extension, and

she has not even made those allegations. Finally, Legler does not assert that

she will be unable to enroll in insurance during the new standardized open-

enrollment period. Because Legler has not identified concrete harms flowing

from these policies and because Main Street Alliance has identified no other

member who could have standing, Main Street Alliance lacks standing to

challenge them.

### C.    Doctors for America has not demonstrated standing

Doctors for America's attempt to establish standing relies on an even

more attenuated chain of speculation. The organization submitted

declarations from two physician members, neither of whom asserts any cognizable injuries to themselves. *See* JA143-146, JA161-164. They mostly rely on asserted injuries to their patients, but they cannot raise claims on behalf of third parties. *See Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013). Neither physician directly asserts a personal loss of income as a result of the Final Rule, much less as a result of any of the challenged policies. Finally, while one of the physicians asserts that he will need to spend more time counseling his patients about paying for care, *see* JA163, the Supreme Court has decisively rejected diversion-of-resources theories as grounds for standing, *see FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

## II.    The district court erred in vacating four policies modified in the Final Rule

Arbitrary and capricious review "is highly deferential, with a presumption in favor of finding the agency action valid." *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 753 (4th Cir. 2019) (quotation marks omitted). Under this standard, "a court is not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), and "is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives," *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 292

39

(2016). "Rather, the court must uphold a rule if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (cleaned up). That requirement is satisfied when the agency's explanation is clear enough that its "path may reasonably be discerned." *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004) (quotation marks omitted).

HHS satisfied that deferential standard in adopting each of the policies at issue here, some of which simply reverted to earlier policies, and all of which reflected policy judgments on complex questions concerning the operation of the Exchanges that Congress authorized HHS to regulate.

## A.    HHS lawfully expanded the permissible range for actuarial values

1. HHS's decision to revert to a broader de minimis range similar to prior rules was not arbitrary or capricious. The ACA instructs HHS to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3). The statute necessarily calls for the agency to exercise discretion in how much variation to permit. The phrase "de minimis" implies some play in the joints.

40

*Cf. Alabama Power Co. v. Costle*, 636 F.2d 323, 360 (D.C. Cir. 1979) ("Determination of when matters are truly de minimis naturally will turn on the assessment of particular circumstances … ."). Congress did not, for example, demand that HHS select the "maximum feasible" standard. *Cf.* 49 U.S.C. § 32902(a) (setting such a requirement for fuel economy standards). Instead, it used an open-textured phrase to assign to HHS responsibility for setting the range, thus delegating to the agency the discretion to make reasonable policy judgments in carrying out that duty. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). In accounting for "differences in actuarial estimates," therefore, HHS may consider differences in cost-sharing and other components between plans.

HHS reasonably exercised its discretion here. HHS explained that it sought to lower premiums and enhance consumer choices. 90 Fed. Reg. at 27,175. It also sought to "significantly improve issuer flexibility in plan design." *Id.* at 27,176. The agency predicted that this increase in flexibility would have three key benefits. It would "promote competition" by allowing issuers to be more responsive to consumer needs, allow "greater continuity for consumers," and encourage issuers to continue participating in the

41

Exchanges. *Id.* The agency therefore provided a reasoned explanation for its decision to alter the actuarial-value policy.

HHS also acknowledged that its decision involved trade-offs. The agency recognized that expanding the de minimis range would likely reduce tax credits for subsidized consumers because the tax credit is keyed to a benchmark premium. 90 Fed. Reg. at 27,076. But the reason for that reduced subsidy is that premiums would be cheaper, thus increasing affordability for unsubsidized consumers. *See id.* HHS decided to prioritize getting these unsubsidized consumers into risk pools because it believed that, in the long-term, the risk pools would be more stable and coverage would be more affordable. *See id.*; *see also* 90 Fed. Reg. at 12,997 (warning that "healthier, unsubsidized enrollees are [being] priced out of the market" and criticizing "short-sighted approach" of focusing only on maximizing subsidies). HHS did not act unreasonably in making that policy choice, especially because some subsidized consumers may not experience any increase in net premiums.

2. In vacating the actuarial-value policy, the district court construed HHS's authority under 42 U.S.C. § 18022(d)(3) too narrowly. That provision instructs HHS to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to

42

account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3). The district court read that provision to permit the agency to consider *only* "differences in actuarial estimates." *See* JA29 (quotation marks omitted). By that logic, HHS would be required to select the narrowest technically feasible range regardless of the consequences. Thus, if HHS concluded that issuers should be able to project their actuarial values within 0.01% of a benchmark plan, it would be required to set that range—even if most issuers fled the Exchanges because of the overly restrictive policy. But if HHS actually tried to implement such a policy and steadfastly refused to consider the resulting loss of coverage, a reviewing court would likely conclude that the agency failed to consider an important aspect of the problem. *Cf. Michigan v. EPA*, 576 U.S. 743, 759 (2015) (holding unreasonable agency's failure to consider costs of regulation). It follows, therefore, that HHS has authority (and indeed an obligation) to consider more than just the technical limits of actuarial analysis when it sets the de minimis range.

The agency has consistently understood its statutory obligation in this more holistic light. *See Loper Bright*, 603 U.S. at 388 (consistency in agency interpretation bolsters its "power to persuade" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))). Indeed, every time that HHS has set or

43

adjusted the de minimis range, it has looked to factors beyond "differences in actuarial estimates." When HHS set the range initially in 2013, it sought to "strik[e] a balance between ensuring comparability of plans within each metal level and allowing plans the flexibility to use convenient cost-sharing metrics," and sought to "allow[ ] plans to retain the same plan design year to year." 78 Fed. Reg. at 12,851. When the agency subsequently adjusted the range, it also based its reasoning on these factors, 87 Fed. Reg. at 27,307, as well as others such as market competitiveness, 82 Fed. Reg. at 18,369. Under plaintiffs' restrictive reading of the statute, which the district court adopted, all of these prior decisions were unlawful. But none of those prior adjustments was ever challenged, and the district court erred in invalidating HHS's most recent adjustment to the actuarial-value range.

The district court's unprecedented and narrow reading of HHS's authority to establish actuarial ranges ignores the agency's obligation to consider more than differences in actuarial estimates when it sets the de minimis range. The court's ruling also has the perverse effect of forcing the agency to ignore critical elements of a problem that Congress gave HHS wide latitude to address. In order to fulfill their obligation to engage in reasoned decision making under the APA, agencies must consider all

44

important parts of the relevant problem. *See Michigan*, 576 U.S. at 750. Setting a permissible range for actuarial values is one element of ensuring access to affordable healthcare—a complex and multifaceted problem with various overlapping elements. Not only was HHS allowed to consider effects like affordability to unsubsidized consumers and the overall health of the risk pool and the insurance market when it established the de minimis range, it was required to consider those factors. The district court erred in overruling the agency's reasonable policy judgments in setting a new actuarial-value policy.

3. In finding that HHS lacked evidence for its conclusions, the district court misunderstood the record before the agency. *See* JA29-31. The district court concluded that because widening the de minimis range will reduce subsidies, HHS lacked "data to back up the claim and reasoning that coverage would become 'more affordable' over time." JA30.

*First*, the district court failed to consider that subsidized consumers will be able to buy less expensive plans. A decreased subsidy, therefore, does not necessarily mean that the consumer will be worse off. The ACA's premium tax credit system is designed to ensure that certain consumers can obtain insurance and pay no more than a fixed portion of their income

45

(between 0% and 8.5%) for a benchmark plan. For example, consider an individual who is entitled to pay no more than $3,000 per year in premiums. If this year he purchased the benchmark silver plan in his Exchange for $6,000, he would be entitled to a $3,000 tax credit and would effectively pay $3,000. And if, under the new actuarial-value policy, his issuer charges only $5,500 in premiums for the same plan, he will get only a $2,500 tax credit but will still effectively pay $3,000. Consumers who choose to purchase more expensive plans may be slightly worse off in the short run, but they too will benefit in the long-term from a healthier, broader risk pool. Contrary to the assumption undergirding the district court's conclusion, it does not inexorably follow that when premiums decrease and thus subsidies decrease, plans become less affordable. In fact, the calculation of actuarial value is not designed "for pricing purposes": it is solely for determining "the level of coverage (metal tier) of a plan." 81 Fed. Reg. at 94,142.

*Second*, the district court erred by assuming that all consumers benefit from subsidies to purchase their plans. Only some consumers are eligible for tax credits. *See* 26 U.S.C. § 36B(b)(3)(A)(i), (iii). Unsubsidized consumers will have plans available to them with lower premiums. After all, the reason that subsidies will decline is that the premiums will decrease for the second-

46

cheapest silver plans. HHS did not face a choice between offering higher or lower subsidies in a vacuum, as the district court believed. Rather, HHS had to decide as a matter of policy whether higher subsidies were worth a risk pool with a less robust risk profile and higher premiums for everyone. HHS recognized this tradeoff and explained that it was choosing the long-term health of the risk pools over a short-term increase in subsidies for a portion of the population. 90 Fed. Reg. at 27,076. The district court was not free to second guess that policy judgment.

**B.    HHS lawfully required enrollees to comply with the Reconciliation Requirement to maintain eligibility for advance premium tax credits**

1. A basic principle animates the failure-to-file-and-reconcile policy: when means-tested subsidies are provided in advance based on projected income, there must be some way to reconcile the estimated subsidy paid with the amount a beneficiary is actually entitled to receive. Congress recognized this need by authorizing the Reconciliation Requirement—that is, by requiring those who obtain advance premium tax credits to file a federal income tax return and "reconcile" the advance premium tax credits they received with the tax credit they ultimately qualify for. *See* 26 U.S.C.

47

§ 36B(f)(1); 26 C.F.R. § 1.36B-4(a)(1)(i). The failure-to-file-and-reconcile policy applies to those who do not meet the Reconciliation Requirement.

In establishing the failure-to-file-and-reconcile policy—both in its one-year form in 2015-2023 and 2026-2027 and in its two-year form in 2024-2025—HHS relied on its general rulemaking authority under 42 U.S.C. § 18041(a)(1).[6] 77 Fed. Reg. at 18,444; 88 Fed. Reg. at 25,917; 90 Fed. Reg. at 27,117. As relevant here, the provision authorizes HHS to "issue regulations setting standards for meeting the requirements under [Title I of the ACA] … with respect to" four categories including "the establishment and operation of Exchanges" and "such other requirements as the Secretary determines appropriate." 42 U.S.C. § 18041(a)(1). Thus, to fit within this section a regulation must meet three criteria: (1) the regulation must point to a requirement under Title I of the ACA, (2) the requirement must have a

---

[6] Although HHS did not expressly cite other sources of statutory authority in responding to comments about the failure-to-file-and-reconcile policy, *see* 90 Fed. Reg. at 27,117, HHS also has statutory authority to "establish a program" to determine eligibility for Exchange participation, premium tax credits, and other benefits. *See* 42 U.S.C. §§ 18081-18082. As HHS has explained, the Reconciliation Requirement is integral to the agency's program for making those eligibility determinations. *See* 90 Fed. Reg. at 12,957; *see also id.* at 12,961 (discussing 42 U.S.C. § 18082(b)(2)(B) as additional basis for the failure-to-file-and-reconcile policy). These other sources of statutory authority underscore HHS's authority to implement the failure-to-file-and-reconcile policy.

48

nexus to one of the enumerated categories such as operating an Exchange, and (3) the regulation must set a standard for meeting the requirement. HHS has relied on this express conferral of rulemaking authority to implement numerous provisions of the ACA, like establishing federal Exchanges. *See* 77 Fed. Reg. at 18,312. It is a load-bearing pillar for the entire edifice of the ACA.

HHS appropriately relied on that broad authority to issue the failure-to-file-and-reconcile policy. First, the Reconciliation Requirement is a requirement under Title I of the ACA, which requires recipients of advance premium tax credits to reconcile the credits they receive. 26 U.S.C. § 36B(f)(1); *see* 26 C.F.R. § 1.36B-4(a)(1)(i). Second, the Reconciliation Requirement is a requirement "with respect to" "the establishment and operation of Exchanges," because the requirements pertain to the advance payment of a premium tax credit for taxpayers who enroll in insurance plans through Exchanges. 42 U.S.C. § 18041(a)(1); *see Mullin v. Doe*, 146 S. Ct. 2121, 2133 (2026)(explaining that "the phrase 'with respect to' … 'generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject'"). Third, HHS "set[ ] standards for meeting [that] requirement[ ]." 42 U.S.C. § 18041(a)(1).

It did so here by facilitating compliance with the Reconciliation Requirement, resting on the basic insight that a taxpayer who has failed to comply with those requirements in the past has not satisfied the "standard[ ] for meeting" those requirements in the future. *Id.* HHS thus had statutory authority to condition eligibility for advance premium tax credits on meeting the Reconciliation Requirement.

HHS's longstanding understanding of its authority under § 18041(a)(1) to tie the Reconciliation Requirement to eligibility to advance premium tax credits bolsters its statutory argument. When an expert agency has interpreted a statute consistently over many years, its interpretation "constitute[s] a body of experience and informed judgment to which courts and litigants [may] properly resort for guidance." *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 140); *see also id.* at 402 (reaffirming *Skidmore*).

2. The district court erred in concluding that HHS violated "separate, express provisions" of the ACA in issuing the failure-to-file-and-reconcile policy. *See* JA43. The district court stated that advance premium tax credits "are prescribed by statutory formula," and then concluded that conditioning eligibility for advance premium tax credits on meeting the Reconciliation

50

Requirement "reads an exception into the statutory formula that is simply not there." JA44 (citing 26 U.S.C. § 36B(b)(2)-(3)). Neither the premise nor the conclusion is valid.

Congress "prescribed" the terms of premium tax credits in the ACA. It determined the amount of the credit, restricted the credit to taxpayers with certain annual household incomes, and it prohibited "individuals not lawfully present" from obtaining any tax credits at all. 26 U.S.C. § 36B(b)(2)-(3), (d), (e). But Congress did not prescribe the terms of when premium tax credits must be offered to consumers in advance. Instead, it directed HHS to "establish a program" to determine eligibility for advance premium tax credits and to enable the Treasury to make appropriate payments to issuers. 42 U.S.C. § 18082(a). Meanwhile, nothing in 26 U.S.C. § 36B establishes exhaustively eligibility criteria for tax credits at all, much less when payments should be made in advance. To the contrary, § 36B(h) provides additional authority for Secretary of the Treasury to prescribe regulations to effectuate tax credits. Rather than cabining the agency's authority, this type of broad delegation of "discretionary authority" to "prescribe rules to 'fill up the details' of a statutory scheme" affords the agency enormous latitude to act within the bounds of the statute. *Loper Bright*, 603 U.S. at 394-95.

51

Nor did Congress expressly prohibit HHS from tying advance premium tax credit eligibility to meeting the Reconciliation Requirement. The district court refers to "express provisions of the statute" forbidding the failure-to-file-and-reconcile policy, JA43, but no such provision exists. That omission is notable, because courts expect that "if Congress had intended to curtail in a particular area … broad rulemaking authority [it] granted," then it would "do so in language expressly describing an exception." *American Hosp. Ass'n v. NLRB*, 499 U.S. 606, 613 (1991).

The district court's analysis would fare no better if it rested on an implicit prohibition. The district court appeared to believe that some sort of negative implication applies because Congress established by statute the most basic criteria for eligibility. *See* JA43-44. But that cannon of interpretation "applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (cleaned up). Such circumstances do not exist here because the criteria specified "can[not] reasonably be thought to occupy the field." *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 361 (4th Cir. 2020) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012)). Congress did

52

not supply a detailed list of criteria in which failure-to-reconcile would naturally be expected to appear. Instead, it set out the basic terms of premium tax credits and the Reconciliation Requirement and left all the details of advance credits to the agency to implement.

### C. HHS lawfully rescinded an automatic 60-day extension of an income-verification period

HHS rescinded the automatic income-verification period extension for two reasons: that it lacked statutory authority to extend the period across the board and that rescission was appropriate for a variety of reasons. Each independently supports HHS's decision.

1. HHS properly concluded that automatically extending the income-verification period in all cases exceeds its statutory authority. Congress provided that "[HHS] may modify the methods used under the program established by this section for the [e]xchange and verification of information" if certain conditions are met. 42 U.S.C. § 18081(c)(4)(B). The relevant question is whether that provision authorized HHS to transform a 90-day income-verification period into a 150-day period in all circumstances.

To interpret the scope of this provision, the Court must read "the words of a statute … in their context and with a view to their place in the overall statutory scheme." *United States v. Miller*, 604 U.S. 518, 533 (2025)

53

(quotation marks omitted). Here, the relevant context is paragraph (c)(4) of § 18081. *See* App. A10 (reproducing statutory text). The overall subsection is entitled "Verification of information contained in records of specific Federal officials," and the paragraph is entitled "Methods." 42 U.S.C. § 18081(c)(4).[7] Clause (A), entitled "In general," describes how information is exchanged between HHS and other sources to facilitate "verifications and determinations": either through a system for online submission or by checking records already held by other government agencies. *Id.* § 18081(c)(4)(A). Clause (B) then provides modification authority, provided that the modification does not compromise the confidentiality and security of information. *Id.* § 18081(c)(4)(B). Each of these provisions focus on the same thing: "how information is exchanged and verified between HHS and trusted data sources." 90 Fed. Reg. at 27,119; *see* 42 U.S.C. § 18081(c) (subsection title) Thus, context does not suggest that HHS may modify any provision related in some way to data verification writ large. That these modifications must account for data confidentiality and security underscore the limited scope of HHS's power to modify the deadline.

---

[7] Congress enacted these provision headers. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1411(c)(4), 124 Stat. 119, 226-27 (2010).

54

Congress's grant of express authority to "extend the 90-day period under [42 U.S.C. § 18081(e)(4)(A)(ii)(II)] for enrollments occurring during 2014," 42 U.S.C. § 18081(e)(4)(A)(ii), confirms that HHS lacks broader modification power. Congress empowered HHS to vary the 90-day income-verification period in the initial year of the Exchanges operation. But that express provision implies that in every year other than 2014, HHS has no power to uniformly extend the income-verification period. If, as the district court concluded, HHS generally had the power to extend the income-verification period, the special authority conferred upon HHS for 2014 would be unnecessary. Courts and agencies alike, however, must avoid interpretations of a statute that "render[s] superfluous another part of the same statutory scheme." *City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) (quotation marks omitted). Thus, in all years other than 2014, HHS may not uniformly modify the income-verification period.

2. Even if HHS had statutory authority to authorize a blanket 60-day extension of the income-verification period, it properly exercised its discretion to rescind that policy.

a. "[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions" which is why

"[a]gencies have long treated cost as a centrally relevant factor when deciding whether to regulate." *Michigan*, 576 U.S. at 752-53. Here, HHS estimated that the mandatory 60-day extension resulted in an increase in advance premium tax credit expenditures by $170 million in 2024. 90 Fed. Reg. at 27,119 (documenting costs of tax credits paid to enrollees who received 60-day extension but still failed to resolve income-verification issue). Thus, in order to maintain that policy, HHS would have had to conclude that it provided substantial benefits.

HHS instead found that the mandatory 60-day extension offered few benefits. While HHS had previously believed that extending the period would help consumers resolve income-verification issues, HHS in fact found that the automatic extension provided no meaningful benefit to consumers. 90 Fed. Reg. at 27,119. The key to that conclusion is that HHS's understanding that "before the automatic 60-day extension, anyone who needed a 60-day extension was granted one under [the *ad hoc* extension regulation]." *Id.* The automatic extension, therefore, provided no marginal benefit over the existing policy to anyone who tried in good faith to solve an income-verification issue. *See id.*

56

In sum, HHS weighed $170 million in wasted funds against negligible benefits and concluded that the costs outweighed the benefits. That policy judgment was, at a minimum, reasonable under the APA.

b. The district court had no basis to set aside HHS's decision to terminate the automatic 60-day extension.

The district court pointed to 42 U.S.C. § 18081(c)(4)(B), which permits HHS to modify methods for information verification "if the Secretary determines such modifications would reduce the administrative costs and burdens on the applicant." JA52-53 (cleaned up). The district court interpreted that provision to mean that HHS could only rescind the income-verification period policy if it concluded that it would reduce applicants' administrative costs and burdens. JA53. According to the district court, HHS's focus on "'program integrity' and 'costs to taxpayers'" was improper. JA53.

The district court's reasoning is puzzling in two respects. *First*, the district court treated a necessary finding for unlocking modification authority as the sole relevant policy consideration in using that authority. Section 18081(c)(4)(B) permits HHS to modify methods for information verification only if the agency concludes that the changes reduce

administrative costs and burdens on the applicants. It does not follow, however, that HHS must approve any modification that would have that effect. Indeed, had HHS wholly failed to consider the fiscal impacts of the policy, that oversight would likely have rendered its decision unlawful. *Second,* the relevance of § 18081(c)(4)(B) is unclear here. The district court accepted plaintiffs' theory that the provision gave HHS authority to implement the policy. But if HHS reverts from a policy implemented under § 18081(c)(4)(B) to the statutory default, it need not meet the criteria for using that statutory power in the first place. Rather, HHS is free to conclude that the policy is ineffectual and to restore the 90-day period for which Congress provided.

**D.　HHS lawfully standardized and shortened the open-enrollment period for Exchanges.**

1. The ACA gives HHS broad discretion to set the length of open-enrollment periods. *See* 42 U.S.C. § 18031(c)(6)(B). HHS appropriately exercised that discretion here.

A basic problem posed by the structure of the ACA is "adverse selection[, ]a situation where individuals with higher risk are more likely to select coverage than healthy individuals." 90 Fed. Reg. at 27,136. By "prohibit[ing] insurance companies from denying coverage to those with

58

[preexisting] conditions or charging unhealthy individuals higher premiums than healthy individuals," the ACA ensures that people with health issues can obtain insurance at affordable rates. *National Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 548 (2012). These provisions, however, "provid[e] an incentive for individuals to delay purchasing health insurance until they become sick, relying on the promise of guaranteed and affordable coverage." *Id.* "[O]ne of the few tools established by the ACA to mitigate adverse selection" is the limited open-enrollment period. 90 Fed. Reg. at 27,139. By limiting a consumer's ability to enroll in an insurance plan to specified periods, the open-enrollment window creates an incentive to obtain health insurance before it is needed to pay for costly care. *See id.*

For as long as the ACA has operated, HHS has sought to balance the risk of adverse selection "with the need to ensure that consumers have adequate opportunity to enroll in [plans] through an Exchange." 77 Fed. Reg. at 18,387. The length of the open-enrollment period has varied over time as HHS has learned from experience how best to achieve its policy goals. *See* 90 Fed. Reg. at 27,136. In the Final Rule, HHS concluded that shortening the open-enrollment period by approximately two weeks would

59

strike a better balance between deterring adverse selection and enabling enrollment in plans. *See id.* at 27,137-38.

HHS reached that conclusion largely because it determined that the benefits it had sought to achieve with an 11-week open-enrollment period had not materialized. 90 Fed. Reg. at 27,137. HHS had previously predicted that a longer open-enrollment period would allow people surprised by increased premiums on their January bills to switch to cheaper plans, but subsequent experience proved that fewer than 3% of enrollees disenrolled from or switched to other plans between December 15 and January 15. *Id.* Similarly, HHS had previously predicted that a longer open-enrollment period would boost enrollment, but it learned that 97% of enrollees signed up within the first nine weeks of the period. *See id.* at 27,138. HHS also reexamined data from an earlier iteration of its policy, under which the period for federally facilitated Exchanges ended on December 15 but the period for some state-based Exchanges ended past January 15. *See id.* at 27,137. HHS found that the longer window in those States failed to grow enrollment at the same rate as Exchanges on the Federal platform. *See id.*

60

Comparing illusory benefits to the substantial risk of adverse selection, HHS reasonably decided to shorten the open-enrollment period. *See* 90 Fed. Reg. at 27,137-38.

2. The district court erred in vacating HHS' policy judgment on this issue. The district court faulted HHS for failing to sufficiently "explain why the adverse selection problem would be remedied by the open enrollment period it chose" and for "offer[ing] no current data, reports, or evidence establishing its conclusion." JA39-40. Neither criticism has merit.

Start with HHS's explanation of the adverse-selection problem. An agency's decision will survive arbitrary and capricious review if its "path may reasonably be discerned." *Alaska Dep't of Env't Conservation*, 540 U.S. at 497 (quotation marks omitted). Here, the path is clear. Adverse selection is a fundamental and well-known issue with ACA enrollment. *See NFIB*, 567 U.S. at 548. As HHS has previouisly explained "shifting to an earlier open enrollment [period]" means "that all consumers who enroll during this time will receive a full year of coverage," which "will reduce selection risk for issuers" 81 Fed. Reg. 12,204, 12,274 (Mar. 7, 2016). Further, as HHS explained when it set a six-week open-enrollment period in 2017, a "shorter open enrollment period … will reduce opportunities for adverse selection by

61

those who learn that they will need healthcare services in late December or January." 82 Fed. Reg. at 18,353-54. That is one of the mechanisms by which a shorter open-enrollment period, under which an insurance plan must be effective by January 1 of the following year, *see* 90 Fed. Reg. at 27,139 reduces the risk of adverse selection. As explained, in 2022 HHS lengthened open enrollment believing that the "risk of adverse selection was outweighed by the benefits" of a longer period. *Id.* at 27,137. When those predicted benefits did not materialize, HHS reasonably concluded that the risks of adverse selection outweighed the illusory benefits of a longer enrollment period. *Id.* That policy judgment reflects HHS's understanding over more than a decade of how adverse-selection risk correlates to open-enrollment dates. The district court was not free to second guess that decision or to demand that the agency reiterate its longstanding understanding of this problem in granular detail.

HHS also identified appropriate data to support its conclusions. HHS relied on statistics from 2024-2025 showing that the expanded open-enrollment period was not widely used and that few people took advantage of the opportunity to switch or drop coverage after December 15. 90 Fed. Reg. at 27,137-38. HHS also reexamined the data from 2017-2021, when the open-

enrollment period for federal Exchanges ended in mid-December, to conclude that a longer open-enrollment period did not meaningfully grow enrollment. *Id.* at 27,137. While the district court faulted HHS for not finding new data, JA40, HHS relied on the most relevant dataset available to it. Moreover, to change position, an agency need not rely on new facts; reevaluating which policy to embrace "in light of [already established] facts" lies "well within an agency's discretion." *National Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009)). That is exactly what HHS did here.

***

In sum, the district court fundamentally erred in flyspecking a wide array of HHS's policy judgments on complex issues concerning the operation of Exchanges that Congress expressly authorized the agency to regulate and modify as necessary.

63

## CONCLUSION

For the foregoing reasons, the judgment should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

*Of Counsel:*

ROBERT FOSTER
*Acting General Counsel*

ELIZABETH C. KELLEY
*Deputy General Counsel*
*Chief Legal Officer for CMS*

JOCELYN S. BEER
*Acting Deputy Associate*
*General Counsel for Litigation*

JILL BRADLEY
BENJAMIN FISCHER
*Attorneys*

*U.S. Department of Health and*
*Human Services*

KELLY O. HAYES
*United States Attorney*

CHARLES W. SCARBOROUGH

 /s/ Maxwell A. Baldi
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*
*maxwell.baldi@usdoj.gov*

JULY 2026

64

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,973 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

/s/ *Maxwell A. Baldi*
MAXWELL A. BALDI

**ADDENDUM**

# TABLE OF CONTENTS

26 U.S.C. § 36B.................................................................................A1

42 U.S.C. § 18022 ..............................................................................A4

42 U.S.C. § 18041 ..............................................................................A6

42 U.S.C. § 18081 ..............................................................................A7

42 U.S.C. § 18082 .............................................................................A13

**26 U.S.C. § 36B**

**§ 26B. Refundable credit for coverage under a qualified health plan.**

**(a) In general.** In the case of an applicable taxpayer, there shall be allowed as a credit against the tax imposed by this subtitle for any taxable year an amount equal to the premium assistance credit amount of the taxpayer for the taxable year.

**(b) Premium assistance credit amount** For purposes of this section—

> **(1) In general.** The term "premium assistance credit amount" means, with respect to any taxable year, the sum of the premium assistance amounts determined under paragraph (2) with respect to all coverage months of the taxpayer occurring during the taxable year.

> **(2) Premium assistance amount.** The premium assistance amount determined under this subsection with respect to any coverage month is the amount equal to the lesser of—

>> **(A)** the monthly premiums for such month for 1 or more qualified health plans offered in the individual market within a State which cover the taxpayer, the taxpayer's spouse, or any dependent (as defined in section 152) of the taxpayer and which were enrolled in through an Exchange established by the State under 1311 1 of the Patient Protection and Affordable Care Act, or

>> **(B)** the excess (if any) of—

>>> **(i)** the adjusted monthly premium for such month for the applicable second lowest cost silver plan with respect to the taxpayer, over

>>> **(ii)** an amount equal to 1/12 of the product of the applicable percentage and the taxpayer's household income for the taxable year.

\*\*\*

**(f) Reconciliation of credit and advance credit.**

> **(1) In general.** The amount of the credit allowed under this section for any taxable year shall be reduced (but not below zero) by the amount of any advance payment of such credit under section 1412 of the Patient Protection and Affordable Care Act.

> **(2) Excess advance payments.**

A1

**(A) In general.** If the advance payments to a taxpayer under section 1412 of the Patient Protection and Affordable Care Act for a taxable year exceed the credit allowed by this section (determined without regard to paragraph (1)), the tax imposed by this chapter for the taxable year shall be increased by the amount of such excess.

\*\*\*

**(3) Information requirement.** Each Exchange (or any person carrying out 1 or more responsibilities of an Exchange under section 1311(f)(3) or 1321(c) of the Patient Protection and Affordable Care Act) shall provide the following information to the Secretary and to the taxpayer with respect to any health plan provided through the Exchange:

**(A)** The level of coverage described in section 1302(d) of the Patient Protection and Affordable Care Act and the period such coverage was in effect.

**(B)** The total premium for the coverage without regard to the credit under this section or cost-sharing reductions under section 1402 of such Act.

**(C)** The aggregate amount of any advance payment of such credit or reductions under section 1412 of such Act.

**(D)** The name, address, and TIN of the primary insured and the name and TIN of each other individual obtaining coverage under the policy.

**(E)** Any information provided to the Exchange, including any change of circumstances, necessary to determine eligibility for, and the amount of, such credit.

**(F)** Information necessary to determine whether a taxpayer has received excess advance payments.

\*\*\*

**(h) Regulations.** The Secretary shall prescribe such regulations as may be necessary to carry out the provisions of this section, including regulations which provide for—

**(1)** the coordination of the credit allowed under this section with the program for advance payment of the credit under section 1412 of the Patient Protection and Affordable Care Act, and

**(2)** the application of subsection (f) where the filing status of the taxpayer for a taxable year is different from such status used for determining the advance payment of the credit.

A3

**42 U.S.C. § 18022**

**§ 18022. Essential health benefits requirements.**

\*\*\*

**(d) Levels of coverage**

(1) **Levels of coverage defined.** The levels of coverage described in this subsection are as follows:

(A) **Bronze level.** A plan in the bronze level shall provide a level of coverage that is designed to provide benefits that are actuarially equivalent to 60 percent of the full actuarial value of the benefits provided under the plan.

(B) **Silver level.** A plan in the silver level shall provide a level of coverage that is designed to provide benefits that are actuarially equivalent to 70 percent of the full actuarial value of the benefits provided under the plan.

(C) **Gold level.** A plan in the gold level shall provide a level of coverage that is designed to provide benefits that are actuarially equivalent to 80 percent of the full actuarial value of the benefits provided under the plan.

(D) **Platinum level.** A plan in the platinum level shall provide a level of coverage that is designed to provide benefits that are actuarially equivalent to 90 percent of the full actuarial value of the benefits provided under the plan.

(2) **Actuarial value.**

(A) **In general.** Under regulations issued by the Secretary, the level of coverage of a plan shall be determined on the basis that the essential health benefits described in subsection (b) shall be provided to a standard population (and without regard to the population the plan may actually provide benefits to).

(B) **Employer contributions.** The Secretary shall issue regulations under which employer contributions to a health savings account (within the meaning of section 223 of title 26) may be taken into account in determining the level of coverage for a plan of the employer.

A4

**(C) Application**. In determining under this title,1 the Public Health Service Act [42 U.S.C. 201 et seq.], or title 26 the percentage of the total allowed costs of benefits provided under a group health plan or health insurance coverage that are provided by such plan or coverage, the rules contained in the regulations under this paragraph shall apply.

**(3) Allowable variance**. The Secretary shall develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates.

\*\*\*

**42 U.S.C. § 18041**

**§ 18041. State flexibility in operation and enforcement of Exchanges and related requirements**

**(a) Establishment of standards.**

**(1) In general.** The Secretary shall, as soon as practicable after March 23, 2010, issue regulations setting standards for meeting the requirements under this title,[*] and the amendments made by this title, with respect to—

**(A)** the establishment and operation of Exchanges (including SHOP Exchanges);

**(B)** the offering of qualified health plans through such Exchanges;

**(C)** the establishment of the reinsurance and risk adjustment programs under part E; and

**(D)** such other requirements as the Secretary determines appropriate.

The preceding sentence shall not apply to standards for requirements under subtitles A and C (and the amendments made by such subtitles) for which the Secretary issues regulations under the Public Health Service Act [42 U.S.C. 201 et seq.].

\*\*\*

---

[*] This title, referred to in subsecs. (a)(1) and (d), is title I of Pub. L. 111-148, Mar. 23, 2010, 124 Stat. 130, which enacted this chapter and enacted, amended, and transferred numerous other sections and notes in the Code.

42 U.S.C. § 18081

### § 18081. Procedures for determining eligibility for Exchange participation, premium tax credits and reduced cost-sharing, and individual responsibility exemptions

**(a) Establishment of program**.—The Secretary shall establish a program meeting the requirements of this section for determining—

**(1)** whether an individual who is to be covered in the individual market by a qualified health plan offered through an Exchange, or who is claiming a premium tax credit or reduced cost-sharing, meets the requirements of sections 18032(f)(3), 18071(e), and 18082(d) of this title and section 36B(e) of title 26 that the individual be a citizen or national of the United States or an alien lawfully present in the United States;

**(2)** in the case of an individual claiming a premium tax credit or reduced cost-sharing under section 36B of title 26 or section 18071 of this title—

**(A)** whether the individual meets the income and coverage requirements of such sections; and

**(B)** the amount of the tax credit or reduced cost-sharing;

\*\*\*

**(b) Information required to be provided by applicants**

**(1) In general**.—An applicant for enrollment in a qualified health plan offered through an Exchange in the individual market shall provide—

(A) the name, address, and date of birth of each individual who is to be covered by the plan (in this subsection referred to as an "enrollee"); and

(B) the information required by any of the following paragraphs that is applicable to an enrollee.

\*\*\*

**(3) Eligibility and amount of tax credit or reduced cost-sharing**.—In the case of an enrollee with respect to whom a premium tax credit or reduced cost-sharing under section 36B of title 26 or section 18071 of this title is being claimed, the following information:

A7

### (A) Information regarding income and family size

The information described in section 6103($l$)(21) of title 26[1] for the taxable year ending with or within the second calendar year preceding the calendar year in which the plan year begins.

### (B) Certain individual health insurance policies obtained through small employers

The amount of the enrollee's permitted benefit (as defined in section 9831(d)(3)(C) of title 26) under a qualified small employer health reimbursement arrangement (as defined in section 9831(d)(2) of such title).

### (C) Changes in circumstances

The information described in section 18082(b)(2) of this title, including information with respect to individuals who were not required to file an income tax return for the taxable year described in subparagraph (A) or individuals who experienced changes in marital status or family size or significant reductions in income.

**\*\*\***

## (c) Verification of information contained in records of specific Federal officials

### (1) Information transferred to Secretary

An Exchange shall submit the information provided by an applicant under subsection (b) to the Secretary for verification in accordance with the requirements of this subsection and subsection (d).

### (2) Citizenship or immigration status

**(A) Commissioner of Social Security**.—The Secretary shall submit to the Commissioner of Social Security the following information for a determination as to whether the information provided is consistent with the information in the records of the Commissioner:

**(i)** The name, date of birth, and social security number of each individual for whom such information was provided under subsection (b)(2).

**(ii)** The attestation of an individual that the individual is a citizen.

A8

**(B) Secretary of Homeland Security.—** the Secretary shall submit to the Secretary of Homeland Security the information described in clause (ii) for a determination as to whether the information provided is consistent with the information in the records of the Secretary of Homeland Security.

> **(i) In general.**—In the case of an individual—
>
> > **(I)** who attests that the individual is an alien lawfully present in the United States; or
> >
> > **(II)** who attests that the individual is a citizen but with respect to whom the Commissioner of Social Security has notified the Secretary under subsection (e)(3) that the attestation is inconsistent with information in the records maintained by the Commissioner;
>
> **(ii) Information.**—The information described in clause (ii) is the following:
>
> > **(I)** The name, date of birth, and any identifying information with respect to the individual's immigration status provided under subsection (b)(2).
> >
> > **(II)** The attestation that the individual is an alien lawfully present in the United States or in the case of an individual described in clause (i)(II), the attestation that the individual is a citizen.

## (3) Eligibility for tax credit and cost-sharing reduction

The Secretary shall submit the information described in subsection (b)(3)(A) provided under paragraph (3), (4), or (5) of subsection (b) to the Secretary of the Treasury for verification of household income and family size for purposes of eligibility.

## (4) Methods

> **(A) In general.**—The Secretary, in consultation with the Secretary of the Treasury, the Secretary of Homeland Security, and the Commissioner of Social Security, shall provide that verifications and determinations under this subsection shall be done—

**(i)** through use of an on-line system or otherwise for the electronic submission of, and response to, the information submitted under this subsection with respect to an applicant; or

**(ii)** by determining the consistency of the information submitted with the information maintained in the records of the Secretary of the Treasury, the Secretary of Homeland Security, or the Commissioner of Social Security through such other method as is approved by the Secretary.

### (B) Flexibility

The Secretary may modify the methods used under the program established by this section for the Exchange [2] and verification of information if the Secretary determines such modifications would reduce the administrative costs and burdens on the applicant, including allowing an applicant to request the Secretary of the Treasury to provide the information described in paragraph (3) directly to the Exchange or to the Secretary. The Secretary shall not make any such modification unless the Secretary determines that any applicable requirements under this section and section 6103 of title 26 with respect to the confidentiality, disclosure, maintenance, or use of information will be met.

## (d) Verification by Secretary

In the case of information provided under subsection (b) that is not required under subsection (c) to be submitted to another person for verification, the Secretary shall verify the accuracy of such information in such manner as the Secretary determines appropriate, including delegating responsibility for verification to the Exchange.

## (e) Actions relating to verification

### (1) In general

Each person to whom the Secretary provided information under subsection (c) shall report to the Secretary under the method established under subsection (c)(4) the results of its verification and the Secretary shall notify the Exchange of such results. Each person to whom the Secretary provided information under subsection (d) shall report to the Secretary in such manner as the Secretary determines appropriate.

A10

**(2) Verification**

**(A) Eligibility for enrollment and premium tax credits and cost-sharing reductions**.—If information provided by an applicant under paragraphs (1), (2), (3), and (4) of subsection (b) is verified under subsections (c) and (d)—

(i) the individual's eligibility to enroll through the Exchange and to apply for premium tax credits and cost-sharing reductions shall be satisfied; and

(ii) the Secretary shall, if applicable, notify the Secretary of the Treasury under section 18082(c) of this title of the amount of any advance payment to be made.

\*\*\*

**(4) Inconsistencies involving other information**

**(A) In general**.—If the information provided by an applicant under subsection (b) (other than subsection (b)(2)) is inconsistent with information in the records maintained by persons under subsection (c) or is not verified under subsection (d), the Secretary shall notify the Exchange and the Exchange shall take the following actions:

**(i) Reasonable effort**

The Exchange shall make a reasonable effort to identify and address the causes of such inconsistency, including through typographical or other clerical errors, by contacting the applicant to confirm the accuracy of the information, and by taking such additional actions as the Secretary, through regulation or other guidance, may identify.

**(ii) Notice and opportunity to correct**.—In the case the inconsistency or inability to verify is not resolved under subparagraph (A), the Exchange shall—

**(I)** notify the applicant of such fact;

**(II)** provide the applicant an opportunity to either present satisfactory documentary evidence or resolve the inconsistency with the person verifying the information under subsection (c)

A11

or (d) during the 90-day period beginning the date on which the notice required under subclause (I) is sent to the applicant.

The Secretary may extend the 90-day period under subclause (II) for enrollments occurring during 2014.

\*\*\*

**42 U.S.C. § 18082**

**§ 18082. Advance determination and payment of premium tax credits and cost-sharing reductions**

**(a) In general.**—The Secretary, in consultation with the Secretary of the Treasury, shall establish a program under which—

**(1)** upon request of an Exchange, advance determinations are made under section 18081 of this title with respect to the income eligibility of individuals enrolling in a qualified health plan in the individual market through the Exchange for the premium tax credit allowable under section 36B of title 26 and the cost-sharing reductions under section 18071 of this title;

**(2)** the Secretary notifies—

**(A)** the Exchange and the Secretary of the Treasury of the advance determinations; and

**(B)** the Secretary of the Treasury of the name and employer identification number of each employer with respect to whom 1 or more employee 1 of the employer were determined to be eligible for the premium tax credit under section 36B of title 26 and the cost-sharing reductions under section 18071 of this title because—

**(i)** the employer did not provide minimum essential coverage; or

**(ii)** the employer provided such minimum essential coverage but it was determined under section 36B(c)(2)(C) of title 26 to either be unaffordable to the employee or not provide the required minimum actuarial value; and

**(3)** the Secretary of the Treasury makes advance payments of such credit or reductions to the issuers of the qualified health plans in order to reduce the premiums payable by individuals eligible for such credit.

**(b) Advance determinations**

**(1) In general.**—The Secretary shall provide under the program established under subsection (a) that advance determination of eligibility with respect to any individual shall be made—

A13

**(A)** during the annual open enrollment period applicable to the individual (or such other enrollment period as may be specified by the Secretary); and

**(B)** on the basis of the individual's household income for the most recent taxable year for which the Secretary, after consultation with the Secretary of the Treasury, determines information is available.

**(2)** Changes in circumstances.—The Secretary shall provide procedures for making advance determinations on the basis of information other than that described in paragraph (1)(B) in cases where information included with an application form demonstrates substantial changes in income, changes in family size or other household circumstances, change in filing status, the filing of an application for unemployment benefits, or other significant changes affecting eligibility, including—

**(A)** allowing an individual claiming a decrease of 20 percent or more in income, or filing an application for unemployment benefits, to have eligibility for the credit determined on the basis of household income for a later period or on the basis of the individual's estimate of such income for the taxable year; and

**(B)** the determination of household income in cases where the taxpayer was not required to file a return of tax imposed by this chapter for the second preceding taxable year.

**(c) Payment of premium tax credits and cost-sharing reductions**

**(1) In general**

The Secretary shall notify the Secretary of the Treasury and the Exchange through which the individual is enrolling of the advance determination under section 18081 of this title.

**(2) Premium tax credit**

**(A) In general**

The Secretary of the Treasury shall make the advance payment under this section of any premium tax credit allowed under section 36B of title 26 to the issuer of a qualified health plan on a monthly basis (or such other periodic basis as the Secretary may provide).

A14

**(B) Issuer responsibilities.**—An issuer of a qualified health plan receiving an advance payment with respect to an individual enrolled in the plan shall—

    **(i)** reduce the premium charged the insured for any period by the amount of the advance payment for the period;

    **(ii)** notify the Exchange and the Secretary of such reduction;

    **(iii)** include with each billing statement the amount by which the premium for the plan has been reduced by reason of the advance payment; and

    **(iv)** in the case of any nonpayment of premiums by the insured—

        **(I)** notify the Secretary of such nonpayment; and

        **(II)** allow a 3-month grace period for nonpayment of premiums before discontinuing coverage.

### (3) Cost-sharing reductions

The Secretary shall also notify the Secretary of the Treasury and the Exchange under paragraph (1) if an advance payment of the cost-sharing reductions under section 18071 of this title is to be made to the issuer of any qualified health plan with respect to any individual enrolled in the plan. The Secretary of the Treasury shall make such advance payment at such time and in such amount as the Secretary specifies in the notice.

### (d) No Federal payments for individuals not lawfully present

Nothing in this subtitle or the amendments made by this subtitle allows Federal payments, credits, or cost-sharing reductions for individuals who are not lawfully present in the United States.

### (e) State flexibility

Nothing in this subtitle or the amendments made by this subtitle shall be construed to prohibit a State from making payments to or on behalf of an individual for coverage under a qualified health plan offered through an Exchange that are in addition to any credits or cost-sharing reductions allowable to the individual under this subtitle and such amendments.

A15