No. 26-1938

IN THE

# United States Court of Appeals for the Fourth Circuit

CITY OF COLUMBUS, *et al.*,

*Plaintiffs-Appellees*,

v.

ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY OF HEALTH AND HUMAN SERVICES, *et al.*,

*Defendants-Appellants*.

On Appeal from the U.S. District Court
for the District of Maryland
Case No. 1:25-cv-02114-BAH

## BRIEF OF PLAINTIFFS-APPELLEES

JOEL MCELVAIN
CORTNEY ROBINSON HENDERSON
CHRISTINE L. COOGLE
*Democracy Forward Foundation*
*P.O. Box 34553*
*Washington, D.C. 20043*
*(202) 448-9090*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, the City of Columbus, who is Plaintiff-Appellee, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?

   YES ☐ NO ☑

2. Does party/amicus have any parent corporations?

   YES ☐ NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

   YES ☐ NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

   YES ☐ NO ☑

5. Is party a trade association?

   YES ☐ NO ☑

6. Does this case arise out of a bankruptcy proceeding?

   YES ☐ NO ☑

7. Is this a criminal case in which there was an organization victim?

   YES ☐ NO ☑

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, the Mayor and City Council of Baltimore, who is Plaintiff-Appellee, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?

   YES ☐ NO ☑

2. Does party/amicus have any parent corporations?

   YES ☐ NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

   YES ☐ NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

   YES ☐ NO ☑

5. Is party a trade association?

   YES ☐ NO ☑

6. Does this case arise out of a bankruptcy proceeding?

   YES ☐ NO ☑

7. Is this a criminal case in which there was an organization victim?

   YES ☐ NO ☑

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, the City of Chicago, who is Plaintiff-Appellee, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?

   YES ☐ NO ☑

2. Does party/amicus have any parent corporations?

YES ☐ NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

YES ☐ NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

YES ☐ NO ☑

5. Is party a trade association?

YES ☐ NO ☑

6. Does this case arise out of a bankruptcy proceeding?

YES ☐ NO ☑

7. Is this a criminal case in which there was an organization victim?

YES ☐ NO ☑

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Doctors for America, who is Plaintiff-Appellee, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?

YES ☐ NO ☑

2. Does party/amicus have any parent corporations?

YES ☐ NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

YES ☐ NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

YES ☐ NO ☑

5. Is party a trade association?

YES ☐ NO ☑

6. Does this case arise out of a bankruptcy proceeding?

YES ☐ NO ☑

7. Is this a criminal case in which there was an organization victim?

YES ☐ NO ☑

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Main Street Alliance, who is Plaintiff-Appellee, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?

YES ☐ NO ☑

2. Does party/amicus have any parent corporations?

YES ☐ NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

YES ☐ NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

YES ☐ NO ☑

5. Is party a trade association?

YES ☐ NO ☑

6. Does this case arise out of a bankruptcy proceeding?

YES ☐ NO ☑

7. Is this a criminal case in which there was an organization victim?

YES ☐ NO ☑

## TABLE OF CONTENTS

**Page**


Introduction ..... 1

Statement of Jurisdiction ..... 3

Statement of the Issues ..... 4

Pertinent Statutes and Regulations ..... 6

Statement of the Case ..... 6

I. The Affordable Care Act ..... 6

II. The 2025 Marketplace Rule ..... 11

III. The Effects of the Final Rule on Plaintiffs ..... 15

IV. Prior Proceedings ..... 18

Summary of Argument ..... 19

Standard of Review ..... 24

Argument ..... 24

I. Plaintiffs Have Standing ..... 24

A. Plaintiffs Are Harmed by the Rule ..... 25

B. The Cities Have Standing to Challenge the Rule ..... 28

C. MSA Has Standing to Challenge the Rule ..... 32

D. DFA Has Standing to Challenge the Rule ..... 34

II. The Failure-to-Reconcile Policy Is Contrary to Law ..... 35

III. CMS Arbitrarily Permitted Insurers to Market Plans with Lowered Actuarial Values ..... 42

IV. CMS Arbitrarily Shortened the Open Enrollment Period ............ 48

V. CMS Arbitrarily Shortened the Time Period for Enrollees to Verify Eligibility for Coverage ................................................ 54

Conclusion.......................................................................................... 62

# TABLE OF AUTHORITIES

**Cases** **Page**

*Appalachian Voices v. U.S. Dep't of Interior*,
25 F.4th 259 (4th Cir. 2022) ........ 24

*Barton v. Barr*, 590 U.S. 222 (2020) ........ 56

*California v. Kennedy*, No. 1:25-cv-12019,
2026 WL 2364297 (D. Mass. Aug. 14, 2026) ........ 45, 51

*Carolina Youth Action Project v. Wilson*,
60 F.4th 770 (4th Cir. 2023) ........ 25

*Casino Airlines, Inc. v. NTSB*, 439 F.3d 715 (D.C. Cir. 2006) ........ 60

*Chamber of Com. of U.S. v. NLRB*,
721 F.3d 152 (4th Cir. 2013) ........ 39

*Chamber of Com. of U.S. v. SEC*,
443 F.3d 890 (D.C. Cir. 2006) ........ 50

*Children's Hosp. Ass'n of Tex. v. Azar*,
933 F.3d 764 (D.C. Cir. 2019) ........ 57

*Cigar Ass'n of Am. v. FDA*, 964 F.3d 56 (D.C. Cir. 2020) ........ 48

*City of Columbus v. Kennedy*, No. 25-2012,
2025 WL 4948067 (4th Cir. Sept. 18, 2025) ........ 18

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) ........ 46

*Commissioner v. Zuch*, 605 U.S. 422 (2025) ........ 40

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ........ 32

*Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025) ........ 31

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ........ 49

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) .................... 31, 35

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020),
*vacated as moot*, 142 S. Ct. 1665 (2022) ...................................... 48, 53

*King v. Burwell*, 576 U.S. 473 (2015) ............................................*passim*

*Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50 (2004)................ 55

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................ 24

*Massachusetts v. HHS*, 923 F.3d 209 (1st Cir. 2019) ............................ 29

*Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020),
*cert. dismissed*, 141 S. Ct. 2618 (2021) ........................................ 29, 41

*Me. Cmty. Health Options v. United States*,
590 U.S. 296 (2020)............................................................................. 6, 38

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
70 F.4th 582 (D.C. Cir. 2023) ............................................................ 59

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
583 U.S. 366 (2018)............................................................................. 55

*Motion Picture Ass'n of Am. v. FCC*,
309 F.3d 796 (D.C. Cir. 2002)............................................................. 39

*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) .......................... 45, 59

*Nat'l Ass'n of Broadcasters v. FCC*,
39 F.4th 817 (D.C. Cir. 2022) ...................................................... 39, 41

*Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*,
654 F.3d 496 (4th Cir. 2011) ............................................................. 40

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ..................... 6

*N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541 (D.C. Cir. 2020)................ 42

*Perez v. Cuccinelli*, 949 F.3d 865 (4th Cir. 2020) .................................. 59

*Perez v. Mountaire Farms, Inc.*, 650 F.3d 350 (4th Cir. 2011) ............... 44

*Pharm. Coal. for Patient Access v. United States*,
126 F.4th 947 (4th Cir. 2025) ............................................................ 24

*Phila. Yearly Mtg. of Religious Soc'y of Friends*,
--- F.4th ---, 2026 WL 2409055 (4th Cir. Aug. 18, 2026) ..................... 31

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024) ............................................................ 35

*Sierra Club v. U.S. Dep't of Interior*,
899 F.3d 260 (4th Cir. 2018) ..................................................... 53, 62

*Sorenson Commc'ns, Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014) .......... 53

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ........................................... 24

*Tyler v. Hennepin Cnty.*, 598 U.S. 631 (2023) ....................................... 34

*United States v. Texas*, 599 U.S. 670 (2023) .......................................... 29

*Union of Concerned Scientists v. U.S. Dep't of Energy*,
998 F.3d 926 (D.C. Cir. 2021) ............................................................ 33

*Wisc. Dep't of Revenue v. William Wrigley, Jr., Co.*,
505 U.S. 214 (1992) ............................................................................ 44

**Statutes**

5 U.S.C. 705 ............................................................................................ 18

26 U.S.C. § 24(g) ....................................................................................... 40

26 U.S.C. § 32(k) ....................................................................................... 40

26 U.S.C. § 36B ......................................................................... 9, 38, 39, 41

26 U.S.C. § 36B(a) .................................................... 37, 38, 39

26 U.S.C. § 36B(b) .................................................... 9, 13, 39, 43

26 U.S.C. § 36B(c) .................................................... 37

26 U.S.C. § 36B(e) .................................................... 37, 39

26 U.S.C. § 36B(f) .................................................... 12, 35

26 U.S.C. § 36B(h) .................................................... 9, 41

28 U.S.C. § 1291 .................................................... 3

28 U.S.C. § 1331 .................................................... 3

42 U.S.C. § 300gg-1(a) .................................................... 6

42 U.S.C. § 300gg-1(b) .................................................... 6

42 U.S.C. § 300gg-6(a) .................................................... 7

42 U.S.C. § 18022(a) .................................................... 7

42 U.S.C. § 18022(b) .................................................... 7

42 U.S.C. § 18022(d) .................................................... *passim*

42 U.S.C. § 18031(b) .................................................... 7

42 U.S.C. § 18031(c) .................................................... 8, 48

42 U.S.C. § 18031(i) .................................................... 8

42 U.S.C. § 18041 .................................................... 39

42 U.S.C. § 18081 .................................................... 9, 40, 55

42 U.S.C. § 18081(a) .................................................... 41

42 U.S.C. § 18081(c) .................................................... 14, 54-59

42 U.S.C. § 18081(e) .......... 14, 54-57

42 U.S.C. § 18081(f) .......... 10

42 U.S.C. § 18082 .......... 9, 12, 40

42 U.S.C. § 18082(a) .......... 38, 41

42 U.S.C. § 18082(c) .......... 38, 39

42 U.S.C. § 18091 .......... 10, 61

42 U.S.C. § 18114 .......... 61

Patient Protection and Affordable Care Act,
Pub. L. No. 111-148, 124 Stat. 119 (2010) .......... 6

Health Care and Education Reconciliation Act of 2010,
Pub. L. No. 111-152, 124 Stat. 1029 (2010) .......... 6

One Big Beautiful Bill Act, Pub. L. No. 119-21,
139 Stat. 72 (2025) .......... 40

Md. Code Ann., Pub. Safety §§ 1-101(b) (West 2025) .......... 29

Md. Code Ann., Pub. Safety §§ 1-304(a) (West 2025) .......... 29

Md. Code Ann., Pub. Safety §§ 1-304(c) (West 2025) .......... 29

**Regulations**

26 C.F.R. § 1.36B-4 .......... 41

45 C.F.R. § 155.305(f) .......... 36, 37, 42

45 C.F.R. § 155.305(f) (2025) .......... 12, 36

45 C.F.R. § 155.315(f) .......... 58

45 C.F.R. § 155.315(f) (2024) .......... 14, 59

45 C.F.R. § 155.320(c) .................................................................. 35

45 C.F.R. § 155.410 ...................................................................... 49

45 C.F.R. § 155.410(e) .................................................................. 14

45 C.F.R. § 155.410(e) (2024) ........................................................ 49

45 C.F.R. § 156.140(c) ............................................................ 13, 42

88 Fed. Reg. 25,740 (Apr. 27, 2023) ...................................... 27, 37, 58

90 Fed. Reg. 4424 (Jan. 15, 2025) .................................................. 11

90 Fed. Reg. 27,074 (June 25, 2025) ........................................ *passim*

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ........................................... 40

*State-Based Exchanges*, CMS, https://perma.cc/JFT3-6EAK (captured June 28, 2025) ........................................................................ 8

United Healthcare, *Optimum Choice, Inc.: Part III: Actuarial Memorandum: PUBLIC; Maryland 2026 Individual Exchange Rates* (2025), https://perma.cc/35L2-M49D ...................... 26

## INTRODUCTION

The Affordable Care Act (ACA) extends a promise: all Americans are guaranteed access to insurance coverage that will pay for their health needs. One of the ways that the ACA seeks to fulfill that promise is by establishing health insurance Exchanges, through which individuals can shop for and buy an affordable policy that covers a set of essential health benefits. The Act aims to keep the costs of these policies down by subsidizing the cost of coverage, which attracts younger and healthier people into the market, improving the risk pool and lowering premiums for everyone. When the Act is implemented as Congress intended, it succeeds at this goal.

Policymakers at the Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS), however, have a different vision for health insurance markets. They prefer policies that would reduce federal subsidy spending by driving people off coverage on the Exchanges. CMS sought to accomplish this result through a final rule governing policies for enrollment in subsidized coverage on the Exchanges. 90 Fed. Reg. 27,074 (June 25, 2025). Through a combination of measures, the rule would drive up consumers' cost of

coverage on the Exchanges, make it harder for people to enroll in policies through the Exchanges, and impose barriers on obtaining subsidies even for those people who do successfully enroll.

In adopting this rule, CMS committed a hodgepodge of errors. In some cases, the agency asserted statutory powers that it does not have, such as its claim that it may alter Congress's eligibility standards for the advance premium tax credits that make it possible for many people to buy insurance on the Exchanges. In other cases, CMS failed to recognize the statutory authorities that it does have, such as its claim that it was required to shorten the period for applicants to resolve questions going to their eligibility for subsidized coverage. And in yet other cases, the agency failed to engage in reasoned decisionmaking, such as its effort to permit insurers to market plans that offer inadequate coverage and its attempt to shorten the open enrollment period.

These provisions would impose harm on Plaintiffs if they were to go into effect. Municipalities like Columbus, Baltimore, and Chicago are providers of last resort. Because they operate clinics and other facilities that treat all comers, without regard to their insurance status, driving people off insurance coverage leaves the Plaintiff Cities to foot the bill.

The rule would inevitably increase the cost of coverage for the members of Main Street Alliance (MSA), who are small business owners and entrepreneurs who depend on insurance coverage through the Exchanges. And many patients of the clinicians who are members of Doctors for America would have their health coverage limited or lost. The rule would lead to greater administrative hurdles and less compensation for those doctors, who would be hindered from providing their patients with adequate care.

The district court protected Plaintiffs from these harms by vacating several provisions of the rule, including the four provisions at issue in this appeal, as contrary to law or arbitrary and capricious. The judgment of the district court should be affirmed.

## STATEMENT OF JURISDICTION

The district court exercised jurisdiction over this case under 28 U.S.C. § 1331. *See* JA81. After that court entered final orders resolving all claims of all parties, JA62-64, JA65-67, Defendants filed a timely notice of appeal, JA854. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. CMS adopted a rule that would cause hundreds of thousands of people to drop out of ACA coverage, leading the Cities and physician members of DFA to incur greater costs from the provision of uncompensated care to uninsured and underinsured individuals, and MSA members who enrolled in ACA plans to pay more in premiums and out-of-pocket costs. Do Plaintiffs have standing to challenge the provisions of the rule that would cause them these harms?

2. By statute, any "applicable taxpayer" is eligible to receive premium tax credits to subsidize the purchase of health insurance and to receive advance payment of those credits. CMS adopted a "failure-to-reconcile" policy that imposes extra-statutory conditions on eligibility for those credits. May the agency modify the statutory criteria for tax credit eligibility?

3. The ACA requires plans offered on the Exchanges to have specified actuarial values, subject to "de minimis" variations. CMS adopted a rule that would almost completely erase the distinction between silver and bronze plans. Is the rule a valid exercise of the agency's authority to permit de minimis variations?

4. The ACA requires CMS to specify an annual open enrollment period for the Exchanges. Under current policy, that period extends into January, because the agency found that permitting enrollments after the end of the calendar year would draw healthier people into the market and reduce premiums overall. CMS sought to revoke that policy but did not engage with the evidence showing the benefits of January enrollments. May CMS shorten the enrollment period without addressing this evidence?

5. Under current policy, if CMS identifies a discrepancy in an enrollee's application for coverage, the enrollee has 150 days to present documentation showing his income. The agency previously had set this deadline because it found that a shorter period did not afford applicants sufficient time to gather and present the required documents, meaning many otherwise eligible people—primarily younger and healthier people—would lose coverage. CMS now seeks to shorten that deadline, concluding that it does not have legal authority to modify the statutory default period to resolve paperwork issues, even though it continues to modify that period in other circumstances. Did the agency correctly describe its own statutory authority?

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addenda to this brief and to the opening brief of the appellants.

## STATEMENT OF THE CASE

### I. The Affordable Care Act

In 2010, Congress enacted the Patient Protection and Affordable Care Act. Pub. L. No. 111-148, 124 Stat. 119 (2010) (as amended by Pub. L. No. 111-152, 124 Stat. 1029 (2010)). "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012); *see also King v. Burwell*, 576 U.S. 473, 478-79 (2015).

The Act's "guaranteed issu[e]" requirement specifies that every "health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every employer and individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), subject to specific statutory exceptions, *id.* § 300gg-1(b). "In other words, the Act 'ensure[s] that anyone can buy insurance.'" *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 301 (2020) (quoting *King*, 576 U.S. at 493).

Health insurance plans must cover a set of "essential health benefits," such as prescription drugs. *Id.* § 300gg-6(a); *id.* § 18022(b)(1). And to protect patients from devastating costs when a medical condition exhausts their coverage, the Act "limits cost-sharing"—*e.g.*, deductibles and copayments—for these essential health benefits. *Id.* § 18022(a)(2).

To help individuals learn about and enroll in health insurance, the Act "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King*, 576 U.S. at 482 (quoting 42 U.S.C. § 18031(b)(1)). These Exchanges, also known as health insurance marketplaces, enable people ineligible for Medicare or Medicaid to obtain adequate, affordable insurance independent of their jobs. The Exchanges therefore serve as "marketplace[s] that allow[] people to compare and purchase" ACA-compliant plans. *Id.* at 479.

There are several different types of Exchanges. Some states, like Maryland, have elected to create Exchanges themselves (state-based Exchanges or SBEs), while others, like Illinois in 2025, have created Exchanges that operate on the federal Healthcare.gov platform (state-based Exchanges on the federal platform, or SBE-FPs). The Exchange in other states, including Ohio, is operated by CMS and known as the

federally facilitated Exchange (FFE). *See State-Based Exchanges*, CMS, https://perma.cc/JFT3-6EAK (captured June 28, 2025).

Plans offered on the Exchanges that meet the requirements described above are known as "qualified health plans." Individuals enroll in qualified health plans for a given benefit year during an annual open enrollment period, or under specified special enrollment periods. 42 U.S.C. § 18031(c)(6). To assist with enrollment, the Act requires Exchanges to award grants to healthcare "Navigators" that conduct public education and awareness campaigns, help consumers understand their choices, and facilitate their enrollment. *Id*. § 18031(i)(1), (3).

Plans on the Exchanges offer various levels of generosity: a "bronze" plan is designed to provide benefits that are actuarially equivalent to 60% of the full value of benefits under the plan (meaning that premiums are calculated in the expectation that 40% of the cost of covered benefits would be paid for through enrollee out-of-pocket spending), and "silver," "gold," and "platinum" plans are designed to provide benefits that are actuarially equivalent to 70%, 80%, and 90%, respectively, of the full value of benefits under the plan. *Id*. § 18022(d)(1). Because actuarial predictions may be imprecise, the Act specifies that CMS may "provide

for a de minimis variation … to account for differences in actuarial estimates." *Id.* § 18022(d)(3).

The Act also "seeks to make insurance more affordable by giving refundable tax credits to individuals." *King*, 576 U.S. at 482 (citing 26 U.S.C. § 36B). These "premium tax credits" (PTCs) vary depending on an individual's income and are generally pegged to the cost of the "benchmark" silver plan, which is the second-lowest-cost silver plan offered within a market. *See, e.g.*, 26 U.S.C. § 36B(b)(3)(B)-(C). The Act initially made these tax credits available to individuals with incomes between 100% and 400% of the federal poverty level. *Id.* § 36B(b)(3)(A). There was no income cap on these tax credits from 2021 through 2025, *see id.* § 36B(b)(3)(A)(iii), but the income cap has been reinstated for 2026.

PTCs are claimed on an individual's tax return after the end of the year and are paid by the IRS. *Id.* § 36B(h). Rather than waiting to recover their costs the next year, enrollees may claim "advance premium tax credits" (APTCs) up front so that the value of the tax credits may be applied directly to the purchase of insurance. 42 U.S.C. §§ 18081, 18082. CMS is responsible for determining whether individuals meet the statutory requirements for APTCs, as well as for "redetermin[ing]

eligibility on a periodic basis in appropriate circumstances." *Id.* § 18081(f)(1)(B).

In sum, the Act requires that insurers generally offer only quality health insurance and aims to lower the cost of coverage to encourage individuals to enroll. This coverage improves access to care and overall health and reduces financial burdens on consumers as well as institutions that pay for uncompensated care. *See* JA108-110.

Increasing enrollment in quality health insurance coverage is not only the ACA's immediate goal; it is also key to the Act's long-term success. Insurance market stability requires robust enrollment, particularly by relatively healthy individuals. JA110; *see* 42 U.S.C. § 18091(2)(I) ("broaden[ing] the health insurance risk pool to include healthy individuals … will lower health insurance premiums"); *King*, 576 U.S. at 480. Limiting the cost of health insurance is, in turn, essential to promoting enrollment. JA110; *see King*, 576 U.S. at 480-81. By driving costs down and insured rates up, the Act ensures that insurance markets function smoothly.

When faithfully implemented, the Act's reforms meet Congress's goal of enabling more individuals to enroll in health insurance coverage.

JA109. More than 24 million individuals were enrolled in Marketplace coverage in 2025. JA713.

## II. The 2025 Marketplace Rule

In keeping with its practice of annual rulemakings, CMS published a final rule in early 2025 that addressed the operation of the Exchanges for the 2026 plan year. 90 Fed. Reg. 4424 (Jan. 15, 2025). Although insurers had already begun their preparations for 2026 in reliance on that rule, months later, CMS issued a second rulemaking mid-year that dramatically changed the agency's approach on numerous issues. 90 Fed. Reg. 27,074.

CMS's second final rule contains numerous provisions that, individually and collectively, would raise consumers' premiums for plans on the Exchanges, limit coverage under those plans, and deter millions of individuals from enrolling in coverage, leading to higher uncompensated care costs for providers of last resort. Independent experts project that the rule would lead to at least 1.8 million fewer people enrolling on the Exchanges. JA108. The rule achieves this through measures that would erode the value of coverage obtained through the Exchanges, impose barriers to enrollment in the Exchanges, and limit

the availability of subsidized insurance. Four of those measures are at issue in this appeal.

First, the rule would limit the availability of subsidized coverage, including through the failure-to-reconcile policy. The amount of APTCs that an enrollee receives over the course of a year and the amount of PTCs that the enrollee receives on his or her tax return depend on the same statutory formula; APTCs are intended to be a substitute for the tax credit. *See* 26 U.S.C. § 36B(f); 42 U.S.C. § 18082. But APTCs are calculated based on the enrollee's projected income, so if the enrollee provides an incorrect estimate (because, for example, he or she works more or fewer hours than expected), the enrollee might unknowingly owe (or be owed) a tax payment at the end of the year. Under the policy in effect before the final rule, any such enrollee must be given notice in the first year that they are at risk of losing eligibility for APTCs, although (given tax confidentiality requirements) the Exchange often won't inform them why this is the case. *See* 45 C.F.R. § 155.305(f)(4)(i), (ii) (2025). If tax credits remain unreconciled, APTCs eligibility may be revoked in the second year. *See id.* The final rule would revoke that grace period, for

2026 only, and require the Exchanges to determine the enrollee to be ineligible for APTCs in the first year. 90 Fed. Reg. at 27,221.

Second, the rule would erode the actuarial value of coverage. As noted above, the Act sets targets for the actuarial value of bronze, silver, gold, and platinum plans on the Exchanges, subject to a permissible range of "de minimis" variation to "account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3). The final rule would permit bronze plans to range from four points below to five points above the statutory target (that is, bronze plans may offer coverage ranging from 56% to 65% of anticipated expenditures) and silver, gold, and premium plans to fall four points below the target (that is, silver plans may cover as little as 66% of anticipated expenditures). 45 C.F.R. § 156.140(c)(1). By eroding the value of silver plan coverage, the final rule would also reduce PTCs, which are calculated based on silver plan premiums. *See* 26 U.S.C. § 36B(b)(2)(B). Overall, net premiums on the Exchange would increase by up to $714 per year for a typical family as a result of this provision. 90 Fed. Reg. at 27,208.

Third, the rule would shorten the open enrollment period. Under current policy, the open enrollment period for the Exchanges runs from

November 1 to at least January 15. This two-and-a-half-month period has been beneficial for the health of the Exchanges, as younger and healthier people tend to enroll later in the process and are particularly more likely to enroll after the end-of-the-year holiday period, when they face unusual financial stress. The final rule would prohibit open enrollment in January by requiring all Exchanges to hold open enrollment periods that begin no later than November 1, end no later than December 31, and are no more than nine weeks in duration. 45 C.F.R. § 155.410(e).

Finally, the rule would give enrollees less time to verify their eligibility for coverage. When an Exchange checks an applicant's income to determine eligibility for and the amount of APTCs, and it finds an inconsistency in that applicant's data, it gives the applicant notice and an opportunity to respond. 42 U.S.C. § 18081(e)(4). The statute provides a default 90-day response period, subject to CMS's authority to modify the procedures for this verification process. *Id.* §§ 18081(c)(4), (e)(1), (e)(4). Current regulations provide for an additional 60 days where necessary, because 90 days is often not enough time to track down the proof of income needed. 45 C.F.R. § 155.315(f)(7) (2024). The final rule revokes that 60-day extension. 90 Fed. Reg. at 27,221.

## III. The Effects of the Final Rule on Plaintiffs

These and other provisions of the rule would worsen the barriers to coverage on the Exchanges by making coverage more expensive or by heightening the administrative obstacles consumers face. JA117. If they were to go into effect, the rule would increase the number of uninsured overall by 1.8 million. JA108. Younger and healthier people are more likely to drop from coverage, worsening the risk pool and leading to higher health insurance premiums, further exacerbating the problem of high costs, which in turn would cause additional people to become uninsured. JA108. This would increase uncompensated care, especially for safety net providers. JA109. On average, every newly uninsured individual results in an increase of $1,000 in costs on the rest of the health care system. 90 Fed. Reg. at 27,096.

Plaintiffs would suffer significant harm from the rule. Those policies would harm the owners and employees of small businesses like the members of Main Street Alliance, who rely on affordable health coverage through the Exchanges—not only to access the health care they need but to provide them the freedom to operate their own businesses without seeking employer-sponsored insurance elsewhere. JA134;

JA137. The rule's provisions would strip that freedom from many small business owners operating on narrow margins, as well as their employees. JA138.

For example, Brooke Legler is a small business owner and MSA member in Wisconsin. JA136.[1] She has a chronic condition that requires her to take costly medication, including a biologic that costs approximately $10,000 per month. JA136-137. The increase in premiums that will result from the final rule would make it harder for her to afford the medications she needs to survive. JA117; JA138.

The final rule would also harm medical providers in myriad ways. Because patients with no or inadequate insurance are less likely to seek the care they need until conditions become serious, DFA's member physicians would see patients with more serious or emergency needs; would receive less compensation for many patients, even while spending more time navigating their patients' administrative barriers to coverage; and would lose contact with newly uninsured patients, particularly in

---

[1] In 2026, Ms. Legler sold her small business, but intends to begin operations again if economic factors, including the cost of health insurance, permit her to do so. Decl. of Brooke Legler ¶ 4, *Columbus v. Kennedy*, No. 1:26-cv-2215 (D. Md. June 4, 2026), Dkt. No. 17-7.

low-income and rural communities. JA141-142; JA144-145; JA162-163. This greater expenditure of time and effort, even while seeing decreased compensation, would hinder clinicians' ability to provide their patients with adequate health care.

For example, DFA member Dr. Beth Oller is a family medicine physician in Rooks County, Kansas. JA143. She treats more than 800 patients of all ages for a broad range of health needs. JA143-144. She practices with a rural county health center, the continued operation of which would be put at risk if the rule were to go into effect and cause her patients to see their insurance coverage erode or to lose coverage altogether. JA144-145. As a result, Dr. Oller would receive less compensation, while spending more (uncompensated) time helping patients navigate red tape to determine coverage. JA145. These results would hinder her ability to provide optimal care and jeopardize her patients' long-term health. JA145.

The rule's harms would extend to local governments in cities like Columbus, Baltimore, and Chicago. The Cities fund and operate a range of community health centers, clinics, and other health care services, as well as emergency medical transport. JA148-149; JA152-153; JA156;

JA159. To ensure that residents get the care that they need, they provide these services regardless of a patient's insurance coverage or ability to pay. An increase in the number of uninsured and underinsured residents would strain those services and, ultimately, the Cities' budgets, which must make up the shortfall from decreased compensation and increased demand for emergency services. JA148-150; JA153; JA156-159.

## IV. Prior Proceedings

Plaintiffs sued to challenge the rule under the Administrative Procedure Act (APA). JA102-105. Plaintiffs moved for a stay of the effective date of eight provisions of the rule under 5 U.S.C. § 705. The district court granted that stay in part, finding that the Cities and MSA had standing to bring suit based on "the increased premiums and uncompensated care costs that are 'predictable results' of the challenged provisions of the Rule," but deferred judgment as to DFA's standing. JA284. As relevant here, the court found that Plaintiffs were likely to succeed on their claims that the failure-to-reconcile provision was contrary to law, JA322-323, and the actuarial value policy was arbitrary and capricious, JA310-111; *see also City of Columbus v. Kennedy*, No. 25-2012, 2025 WL 4948067 (4th Cir. Sept. 18, 2025) (denying stay pending

appeal). The district court did not grant a stay with respect to the provision shortening the time to provide income documentation. JA327.

After further briefing, the district court granted Plaintiffs' motion for summary judgment in part. JA62-67. CMS did not dispute standing after it produced the administrative record, other than to renew its contention that DFA lacked standing. The court adhered to its determination that the Cities and MSA had standing and again found it unnecessary to address DFA's standing. *See* JA10-11. As relevant here, the district court held that the failure-to-reconcile provision, the actuarial value provision, the shortening of the open enrollment period, and the shortening of the period to resolve documentation inconsistencies were contrary to law, arbitrary and capricious, or both. JA30-31, JA40, JA43-44, JA53.

## SUMMARY OF ARGUMENT

**I.** CMS adopted a rule that, through various measures, would drive people off of coverage on the ACA Exchanges and would raise costs for those who continue to purchase insurance on those Exchanges.

The Cities would be harmed in their capacities as safety net providers. They each operate clinics and other health care services, as

well as emergency medical transport, and they provide these services without regard to the recipient's ability to pay. By increasing the number of uninsured and underinsured individuals, the rule would burden the Cities' budgets as they find themselves unable to recoup the costs of the services that they are required by law to provide. These financial harms are classic injuries in fact, and they will follow from the rule under predictable, commonsense inferences from economic theory that CMS itself acknowledged in its rulemaking.

MSA also has standing because the rule would directly impose higher costs on its members. By permitting cheaper, but less comprehensive, plans to qualify at the "silver" level of coverage, the rule would lower tax credits across the board for any subsidized enrollee in the ACA Exchanges. MSA's member Brooke Legler is case in point. Due to her medical condition, she needs to maintain comprehensive coverage, which she could not afford without PTCs. If the rule's actuarial value provisions were to go into effect, she would receive a lower tax credit and pay a higher net premium for the same level of coverage. These additional costs qualify as an injury in fact traceable to CMS's rule. MSA's members would also be harmed by the other provisions of the rule, which would

worsen the risk pool, increasing both premiums and out-of-pocket costs for Exchange enrollees.

DFA also has standing for the same reason that the Cities do; its member physicians will inevitably treat more uninsured and underinsured patients and receive less pay for doing so, directly leading to lower compensation for those members. These injuries would be incurred while the member physicians perform their core mission of providing medical services to their communities.

**II.** The failure-to-reconcile provision is contrary to law. Federal law guarantees that any "applicable taxpayer" is eligible for PTCs and further specifies a detailed formula for the calculation of those credits. Nothing in the statute conditions either the eligibility or the amount of PTCs on the reconciliation of prior tax debts. The determination of eligibility for, and the calculation of, APTCs turns on the same criteria. CMS was not free to invoke its general rulemaking authority to override Congress's detailed specification of the formula for PTCs.

**III.** The actuarial value provision is arbitrary and capricious. The statute specifies the levels of generosity for plans offered on the Exchanges; a "silver" plan, for example, covers 70% of a typical enrollee's

expected health care costs. The rule would permit insurers to market plans as "silver" that range as low as 66% in actuarial value. CMS invoked its authority to "provide for a de minimis variation in the actuarial valuations" of these plans "to account for differences in actuarial estimates," 42 U.S.C. § 18022(d)(3), but it made no effort to justify this rule as an accounting for these differences. Although CMS asserts that it has a "holistic" understanding of its statutory authority that is not tethered to the statutory language, it was obligated to consider the factors that Congress identified and to take care not to permit a variation that strayed beyond a "de minimis" departure from the statutory value.

**IV.** The shortening of the open enrollment period was also arbitrary and capricious. Currently, the open enrollment period extends into January, to encourage younger and healthier people into the market and to improve the risk pool. These people feel greater financial pressure at the end of the calendar year and would be less likely to buy coverage if open enrollment were to end in December. CMS seeks to justify its new rule as an effort to balance the need to provide sufficient time for consumers to enroll in the Exchanges against the possibility that a longer

open enrollment period would cause adverse selection. But this trade-off is entirely illusory. All the available evidence, from the empirical experience of the state-based Exchanges, shows that January enrollees are younger and healthier and that their enrollments accordingly lower premiums overall. CMS did not engage with this evidence.

**V.** The shortening of the period to resolve documentation inconsistencies was also arbitrary and capricious. Federal law specifies a 90-day default period for this purpose, subject to a grant of authority to CMS to modify this period. The agency previously recognized that applicants are often unable to gather and present needed documentation within 90 days and exercised its authority to provide an additional 60 days to complete this process. CMS now reasons that it lacks such statutory authority. It misreads the statute, which plainly permits such modifications, and the agency itself must understand this point, because it continues to exercise the same authority to modify the statutory default period in other contexts. Because CMS based its rule on a misreading of the law, this provision must be vacated. In any event, the rule is arbitrary and capricious for the additional reason that CMS sought to justify the

provision as an effort to address program integrity concerns, a rationale that is nonsensical and that is not defended by the agency in this appeal.

## STANDARD OF REVIEW

This Court reviews the district court's award of summary judgment in this APA case de novo. *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 953 (4th Cir. 2025). This Court reviews CMS's legal conclusions de novo, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024), and otherwise "conduct[s] a searching and careful review" of CMS's rulemaking "to determine whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) (quotation marks omitted).

## ARGUMENT

### I. Plaintiffs Have Standing

To show standing, a plaintiff must have "suffered an injury in fact" that is "fairly traceable to the challenged conduct of the defendant," and "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A court has jurisdiction to proceed to the merits so long as at least one plaintiff has standing. *See*

*Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023). The district court correctly found that the Cities and MSA have standing to challenge CMS's rule, including the provisions at issue here. JA283-296. Although the district court did not reach this question, DFA also has standing to challenge the rule.

**A. Plaintiffs Are Harmed by the Rule**

The rule contains numerous provisions that, if permitted to go into effect, would worsen the barriers to coverage on the Exchanges by making coverage more expensive or by heightening the administrative obstacles consumers face. JA117. As explained, *supra* p. 15, the provisions would lead to at least 1.8 million more uninsured; younger and healthier people would be more likely to drop coverage, worsening the risk pool and further exacerbating the problem of high costs and uncompensated care. JA108-109.

These predictions are not merely hypothetical. After CMS published its proposed rule, insurers incorporated substantial premium increases in their 2026 plan year models. One Maryland insurer projected that it would need to raise its premiums substantially because the rule, if finalized, would "lead to healthier enrollees leaving the

market and an overall worsening of the risk pool." JA290 (quoting United Healthcare, *Optimum Choice, Inc.: Part III: Actuarial Memorandum: PUBLIC; Maryland 2026 Individual Exchange Rates* 7 (2025), https://perma.cc/35L2-M49D).

Each of the provisions at issue in this appeal would contribute to these effects.[2] The failure-to-reconcile provision would force an estimated 210,000 individuals to drop coverage, forcing them to resort to safety net providers for their health care needs. 90 Fed. Reg. at 27,198. Younger and healthier people would be more likely to drop coverage, resulting in a worse risk pool and higher premiums for those who remain in the market. JA574.

---

[2] It is not apparent whether CMS challenges Plaintiffs' standing with respect to the remaining provisions of the rule that were the subject of the district court's order. *Compare* Opening Br. 64 (seeking reversal of the judgment in full) *with* Joint Letter Notifying Court of Narrowed Issues 2, *California v. Kennedy*, No. 1:25-cv-12019 (D. Mass. July 27, 2026), Dkt. No. 137 (representing in parallel litigation that government would not seek reversal of four provisions vacated in this action). In any event, the standing analysis is the same with respect to each of these provisions. *See* JA434 (surcharge on premiums for certain enrollees will lead to dropped coverage and higher premiums); JA523-524 (same with respect to provision denying coverage for those with prior insurance premium debts); JA572-573 (same with respect to special enrollment period verification provisions); JA532 (same with respect to data-matching provisions).

The actuarial value provision, similarly, would increase cost-sharing for an average enrolled family by $714 annually, JA514, leaving enrollees more likely to be underinsured. In addition, the provision would cause consumers to drop coverage, as fewer consumers would consider their higher net premiums to be a worthwhile bargain. Younger and healthier people would be more likely to drop coverage, further exacerbating the problem. JA551-552; JA563; JA372.

By the agency's own telling, the provision shortening the period for resolving documentation issues with the agency would cause approximately 226,000 enrollees to lose eligibility for tax credits on the Exchanges, 90 Fed. Reg. at 27,199, and these individuals would almost certainly be thrown off coverage altogether. These enrollees tend to be healthier, so if they do not participate in the Exchanges, the risk pool will worsen, and premiums will increase for remaining enrollees. *Id.* at 27,119; *see* JA530; *see also* 88 Fed. Reg. 25,740, 25,820 (Apr. 27, 2023).

The provision shortening the open enrollment period would have similar effects. January enrollees in the Exchanges are younger and healthier, so their enrollments lower premiums overall. JA565-566; JA541; JA439-440; JA458. If the open enrollment period were to end in

December, fewer people would enroll in coverage. JA423; JA567; JA542; JA375; *see also* 90 Fed. Reg. at 27,137. The result would be higher premiums for those who remain insured, as demonstrated by the results when CMS previously experimented with a shorter enrollment period. JA657-658.

**B. The Cities Have Standing to Challenge the Rule**

Each of these provisions, and the rule in its collective effect, would harm the Cities. As explained, *supra* pp. 17-18, the Cities fund and operate a range of health services and emergency medical transport to residents regardless of their insurance or ability to pay. JA148-149; JA152-153; JA156-157. If the rule's provisions were to go into effect, the Cities would serve more individuals with no or inadequate coverage, and they would not be able to recoup the costs of those services. JA148-49; JA153; JA157-159.

In addition, individuals who lack insurance coverage are more likely to wait until their conditions are more severe before seeking care and thus are more likely to rely on ambulance calls and other emergency medical services. JA158. The greater demand for these services would increase the strain on the Cities' already-overstretched emergency

medical services and, again, create budgetary shortfalls that the Cities will have to make up. JA149-150; JA153-154; JA159-160. These financial injuries resulting from uncompensated care costs are classic Article III injuries in fact. *See, e.g.*, *Massachusetts v. HHS*, 923 F.3d 209, 223 (1st Cir. 2019); *see also Mayor of Baltimore v. Azar*, 973 F.3d 258, 293-94 (4th Cir. 2020) (en banc), *cert. dismissed*, 141 S. Ct. 2618 (2021).

These injuries are not self-inflicted. *Contra* Opening Br. 34. The agency's suggestion—that the Cities could avoid costs simply by "choos[ing] [not] to provide services to their residents," *id.*—blinks reality. Among other things, the Cities have legal obligations to provide emergency ambulance and other services for their populations. *See, e.g.*, Md. Code Ann., Pub. Safety §§ 1-101(b), 1-304(a), (c)(1) (West 2025). And even if there are other "path[s]" for consumers to take that would not lead to "an uncompensated ride in a City of Columbus ambulance," Opening Br. 4, there inevitably will be more such rides as a result of CMS's rule, and the Cities will be injured when they are not paid for those rides. JA149-150; JA153-154, JA159-160.[3]

[3] Contrary to CMS's characterization, Opening Br. 34, the Supreme Court did not hold that a local government's decision to "supply social services such as healthcare," *United States v. Texas*, 599 U.S. 670, 674

CMS derides the Cities' injuries as dependent on "an attenuated chain of speculation." Opening Br. 31. This argument is difficult to credit, given that the agency itself acknowledged in its rulemaking the well-established economic principle that increased costs and increased administrative burdens will cause people to drop coverage, and that younger and healthier people would be more likely to do so. *See* 90 Fed. Reg. at 27,213 (projecting that up to 1.8 million people would drop coverage as a result of the rule); *id.* at 27,086, 27,171, 27,196, 27,207, 27,214, 27,219 (acknowledging that coverage losses impose uncompensated care costs on providers); *id.* at 27,145, 27,190, 27,192 (acknowledging that municipalities also would bear the burden of uncompensated care costs); *id.* at 27,116 (recognizing that failure-to-reconcile policy leads to coverage losses and higher net costs for enrollees); *id.* at 27,176-77 (same as to actuarial value policy); *id.* at 27,119 (same as to revocation of extension to resolve documentation issues).

---

(2023), could not support a cognizable injury. That case accepted that a rule interfering with those efforts could cause an injury in fact, but held that a plaintiff could not rely on such an injury to demand the prosecution of a third party, a proposition that has no relevance here.

As the district court correctly noted, standing can be shown through a "predictable chain of events leading from the challenged government action to the asserted injury." JA289 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 385 (2024); *see also Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025) ("When third party behavior is predictable, commonsense inferences may be drawn."); *Phila. Yearly Mtg. of Religious Soc'y of Friends v. DHS*, — F.4th —, 2026 WL 2409055, *6-7 (4th Cir. Aug. 18, 2026). The district court correctly reasoned that it is readily predictable—indeed, it was predicted by the agency itself, *see* 90 Fed. Reg. at 27,145, 27,190, 27,192—that a rule that leads to lower rates of insurance coverage will cause greater costs for cities that are responsible for providing uncompensated care. JA290. This suffices to show the Cities' standing.

CMS also incorrectly asserts that Plaintiffs' claims depend on speculation that "a third party may act unlawfully." Opening Br. 33. The agency refers to the failure-to-reconcile provision, but it ignores that, due to errors and delays in IRS reporting, many people lose coverage under this provision despite having fully paid their tax obligations. *See infra* pp. 35-36. In any event, standing may be based on third parties'

predictable responses to the defendant's actions, even if those third parties act unlawfully. *See Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

### C. MSA Has Standing to Challenge the Rule

CMS contends that MSA lacks standing insofar as it has not shown that its members would face higher costs under the rule. Opening Br. 36. But the rule directly imposes these higher costs on MSA's members. By permitting cheaper, but less comprehensive, plans to qualify at the "silver" level of coverage, the rule will lower tax credits across the board for all subsidized enrollees in the ACA Exchanges, including MSA member Brooke Legler. *See* JA118-119; JA363; JA551-552. Ms. Legler's chronic medical condition makes her "dependent on substantial medication" for treatment, including her $10,000-per-month biologic currently covered by her insurance. JA137. She needs to maintain comprehensive coverage that covers these medications, and she can only afford that coverage with PTCs. JA137. She has remained eligible for these tax credits in 2026, and she enrolled in a plan that matches her current level of coverage. JA354. Thus, if the actuarial value rule were to go into effect, she would receive a lower tax credit and pay a higher net

premium for the same level of coverage. JA354. These additional costs qualify as an injury in fact that is traceable to CMS's rule. JA287.

CMS notes that "some issuers did not plan to take advantage of the actuarial-value policy adopted in the Final Rule." Opening Br. 32. But, before the district court stayed this provision, 80% of issuers in states on the FFE (including Ms. Legler's state of Wisconsin) planned to offer a plan with the wider actuarial value range, affecting the range of plans (and, therefore, the subsidy amounts) that would have been available for 99.6% of enrollees in these states. Decl. of Jeff Wu ¶ 24, Dist. Ct. Dkt. No. 42-2. CMS faults Plaintiffs for being unable to demonstrate with certainty the counterfactual of what the benchmark plan premium would have been in Ms. Legler's county in the absence of the district court's stay. But this puts Plaintiffs to an impossible level of proof; those premiums were never published, but the information provided by the agency's own declarant, Mr. Wu, shows that subsidies were almost certainly lower, and net premiums almost certainly higher, for every subsidized enrollee in the FFE states. *Id.*; *see Union of Concerned Scientists v. U.S. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021) ("absolute certainty is not required" to show standing).

The agency also contends that Ms. Legler has not shown that she intends to avail herself of the failure-to-reconcile policy, the longer open enrollment period, or the extension of time to resolve data matching issues. Opening Br. 37-38. But this misunderstands the way that the agency's revisions to these policies would harm her. Hundreds of thousands of enrollees would drop coverage as a result of these policies, with the result being a worsening of the risk pool and higher gross and net premiums for equivalent coverage for those, like Ms. Legler, who remain in coverage. This "classic pocketbook injury" suffices to show her, and MSA's, standing. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023).

### D. DFA Has Standing to Challenge the Rule

DFA and its members have standing for the same reasons that the Cities do: as patients drop ACA coverage, its members will continue to provide medical care but will receive less compensation for performing the same services. JA141-142; JA144-145; JA162-164. DFA's members did "directly assert[] a personal loss of income as a result of the Final Rule," the agency's contrary claims notwithstanding. Opening Br. 39. CMS analogizes DFA's theory of standing to the sort of "diversion of resources" theory that the Supreme Court has rejected, *see id.* (citing

*Alliance for Hippocratic Med.*, 602 U.S. at 395), but the provision of medical care is part of each physician's "core mission," and the rule's interference with that mission shows DFA's standing, *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 397 (4th Cir. 2024).

## II. The Failure-to-Reconcile Policy Is Contrary to Law

Enrollees are required to reconcile the APTCs that they claim on the basis of their projected income with the PTCs that are allowed on their tax return on the basis of the income they actually received. 26 U.S.C. § 36B(f). CMS has a process that requires insurance applicants to report whether they have reconciled their tax credits on prior tax returns and then checks that reporting against IRS data; if the Exchange finds a discrepancy, the applicant is required to submit additional paperwork. *See* 45 C.F.R. § 155.320(c). About 1.8 million people were subjected to this requirement in 2025. 90 Fed. Reg. at 27,198. Many of these people were flagged in error, often because the data that the IRS reports to the Exchange is incomplete and lags in time. JA529. This issue is particularly acute for the 3.3 million people who are self-employed, many of whom do not file their tax returns until October, leaving insufficient

time for the IRS to update records before the next enrollment season. JA654.

Many of these people also never learn why their eligibility for APTCs is in question. An applicant's federal tax information must be handled consistently with federal tax privacy law, and so in many cases an applicant with a failure-to-reconcile issue will learn only that they have been barred from subsidized insurance, but not the reason why. JA573-574. This Kafkaesque scenario causes numerous people to lose coverage, worsening the risk pool. JA124, JA574; *see* JA553-555 (discussing risk pool effects of administrative burdens).

Under CMS's previous policy, an applicant could lose eligibility for APTCs if, after receiving notice in the first year of the issue, they do not reconcile their tax return in the second year. 45 C.F.R. § 155.305(f)(4)(i), (ii) (2025). CMS sought to revise that policy, for 2026 only, to require the Exchanges to determine the enrollee to be ineligible for APTCs in the first year that the issue arises. 90 Fed. Reg. at 27,221 (adding 45 C.F.R. § 155.305(f)(4)(iii)). Under either version of this policy, enrollees who lose eligibility for APTCs would become responsible for the full cost of their coverage, which in many cases is prohibitively expensive. Many people

fail to complete the additional paperwork that CMS requires, thereby losing eligibility for APTCs, even in cases where they hadn't owed a tax debt in the first place. *See* 88 Fed. Reg. at 25,815-16. CMS estimates that its revised failure-to-reconcile policy would have caused about 210,000 people to drop coverage in 2026. 90 Fed. Reg. at 27,198.

The district court correctly held that the failure-to-reconcile policy is unlawful and vacated 45 C.F.R. § 155.305(f)(4). The ACA does not condition eligibility for PTCs or APTCs on the reconciliation of prior tax debts. As for PTCs, for every "applicable taxpayer" enrolled in qualifying coverage, "there *shall be allowed* as a credit against the tax imposed by this subtitle for any taxable year an amount equal to the premium assistance credit amount of the taxpayer for the taxable year." 26 U.S.C. § 36B(a) (emphasis added). The statute defines an "applicable taxpayer" as a taxpayer with income in a specified range, *id.* § 36B(c)(1)(A), provided that the taxpayer (if married) files a joint return, *id.* § 36B(c)(1)(C), subject to statutory limitations prohibiting the taxpayer from claiming a credit on behalf of family members who are dependents of other taxpayers or who are "not lawfully present," *id.* § 36B(c)(1)(D), (e). Thus, every person who meets the definition of an "applicable

taxpayer" is eligible for PTCs, whether or not they filed paperwork for a prior year or owe a prior tax debt.

The same is true with respect to APTCs. Upon a determination that an applicant meets the eligibility standards specified in Section 36B, "the Secretary of the Treasury *shall make* the advance payment under this section of any premium tax credit allowed under section 36B of title 26 to the issuer of a qualified health plan" on the enrollee's behalf. 42 U.S.C. § 18082(c)(2)(A) (emphasis added); *see also id.* § 18082(a)(3). This duty, as well, is mandatory; the statute's use of the word "shall" "creates an obligation impervious to discretion," *Me. Cmty. Health Options*, 590 U.S. at 310 (cleaned up), and Treasury's obligation is to pay in advance the amount that would be owed under Section 36B, on behalf of any individual eligible for the tax credit under that section—regardless of Treasury's or CMS's policy preferences. *See* JA18 (vacating separate provision of final rule on the same ground).

In asserting that "Congress did not prescribe the terms of when premium tax credits must be offered to consumers in advance," Opening Br. 51, CMS ignores the mandatory language of Section 36B(a) and 42 U.S.C. § 18022(c), both of which go uncited in the government's brief.

Although CMS invokes its general rulemaking authority over the Exchanges under 42 U.S.C. § 18041 to justify its rule, Opening Br. 48, an agency may not invoke a "generic grant of rulemaking authority" to promulgate rules that "alter the specific choices Congress made." *Nat'l Ass'n of Broadcasters v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022); *see also Chamber of Com. of U.S. v. NLRB*, 721 F.3d 152, 161 (4th Cir. 2013).

CMS faults the district court for assuming that "some sort of negative implication applies" prohibiting the agency from altering the statutory formula for PTCs and APTCs. Opening Br. 52. But, again, given the specific and mandatory language of Sections 36B(a) and 18082(c), there is no need to search further in either statute for such a prohibition. In any event, this Court may not presume that a rule "is permissible because Congress did not expressly foreclose the possibility," *Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002), and here the structure of Section 36B confirms that Congress did not grant CMS the authority to alter the statutory formula.

That statute sets forth in exhaustive detail the terms under which taxpayers are eligible for PTCs and the calculation of those credits, 26 U.S.C. § 36B(b)-(e), but does not condition eligibility on the reconciliation

of old tax debts. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 108 (2012) ("The more specific the enumeration, the greater the force of the [negative implication] canon[.]"). The absence of any such provision is particularly striking, given that Congress knows how to impose such a condition and frequently does so with respect to other tax credits. *See* 26 U.S.C. §§ 24(g), 32(k) (conditioning eligibility for future child and earned income tax credits); *see also Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 507 (4th Cir. 2011).[4] So, if a taxpayer fails to reconcile APTCs, the statute contemplates that the IRS, not CMS, would use its wide-ranging enforcement tools to ensure that any potential debt is collected. *See generally Commissioner v. Zuch*, 605 U.S. 422, 430 (2025) (discussing IRS's offset and levy powers); *see also* JA574 (discussing measures that IRS recently adopted to ensure that tax returns reconcile PTCs).

CMS also refers to its statutory authority under 42 U.S.C. §§ 18081 and 18082 to determine eligibility for APTCs, *see* Opening Br. 51,

[4] Last year, Congress adopted a version of this failure-to-reconcile policy but pointedly chose to delay its effective date until 2028, underscoring that the agency lacks authority to impose such a condition on eligibility for tax credits before that date. Pub. L. No. 119-21, § 71303(a), 139 Stat. 72, 324 (2025).

although neither statute was invoked in the rulemaking itself. *See Mayor of Baltimore*, 973 F.3d at 279 (agency rule may be upheld "only on the basis upon which the record discloses that its action was based" (quotation marks omitted)).[5] Neither statute gives CMS the authority to alter the terms of eligibility for PTCs or APTCs. CMS is responsible for "establish[ing] a program" to determine whether an individual "claiming a premium tax credit" under Section 36B "meets the income and coverage requirements of such section[]," 42 U.S.C. § 18081(a), as well as a program under which "advance determinations are made" of an individual's "income eligibility" for "the premium tax credit allowable under section 36B," *id.* § 18082(a)(1). CMS is charged with establishing procedures for determining whether the statutory standards for PTC and APTC eligibility are met, but it may not use that procedural authority to

---

[5] CMS also references Treasury's rulemaking authority under 26 U.S.C. § 36B(h), Opening Br. 51, which is neither here nor there. Treasury's entirely separate regulation on this topic, 26 C.F.R. § 1.36B-4, which is not at issue in this case, does not attempt to impose any similar condition on future eligibility for PTCs or APTCs. The statute, in any event, gives Treasury the power to issue regulations to "carry out" Section 36B, not to alter the terms of that statute. *See Nat'l Ass'n of Broadcasters*, 39 F.4th at 820.

change the substantive standards for eligibility. *See N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020).[6]

## III. CMS Arbitrarily Permitted Insurers to Market Plans with Lowered Actuarial Values

The ACA requires insurers to offer plans that meet certain targets for generosity in the benefits each plan provides. For example, a silver plan "is designed to provide benefits that are actuarially equivalent to 70 percent of the full actuarial value of the benefits provided under the plan," 42 U.S.C. § 18022(d)(1)(B), meaning that the plan would be expected to pay for 70% of the cost of covered services, leaving 30% to be paid for through cost-sharing tools such as deductibles or co-pays. So an individual shopping on the Exchange would expect to buy a plan that meets this target. The rule, however, would permit insurers to engage in a bait-and-switch by allowing plans to be marketed as silver plans that cover as low as 66% of anticipated expenditures. 90 Fed. Reg. at 27,223 (amending 45 C.F.R. § 156.140(c)).

---

[6] Because the district court vacated 45 C.F.R. § 155.305(f)(4) as contrary to law, it had no occasion to consider whether CMS's addition of paragraph (f)(4)(iii) revoking the two-year version of the failure-to-reconcile policy for 2026 was arbitrary. That issue would be open to the district court to consider in the first instance, if necessary.

The formula for PTCs turns on the cost of the second-lowest-cost silver plan available on the Exchange. 26 U.S.C. § 36B(b)(2)(B). By permitting insurers to sell cheaper, but less comprehensive, silver plans, CMS estimated that the decrease in the value of the tax credits for all enrollees would have led to a reduction in PTCs by $1.22 billion overall for 2026 alone. 90 Fed. Reg. at 27,208. A typical family of four would see their subsidies decrease, and their cost of coverage rise, by an estimated $714 for the year. JA551-552.[7] And, because healthier people are more likely to drop out of coverage when premiums rise, the result would be a sicker risk pool, leading to even higher premiums for those who remain in the market. JA552; *see also* JA372; JA563. For this reason, the National Association of Insurance Commissioners—the standard-setting organization created and governed by insurance regulators from all fifty states—warned that the proposal "would compromise the integrity and

[7] CMS suggests that no subsidized enrollee would be harmed by its rule, because that enrollee would pay the same net amount for a "benchmark plan" even if subsidies are to decrease. Opening Br. 45-46. But this ignores that the benchmark plan itself would be less generous, meaning that the enrollee would be forced to choose between paying the same amount for worse coverage, or paying more to retain coverage of the same value.

health of the risk pool, discourage carrier participation, lead to higher premiums, and destabilize state insurance markets." JA380.

CMS permitted this erosion in the value of coverage by invoking its authority to develop guidelines to "provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3). But the rule permits far more than a "de minimis" variation. "Whether a particular activity is a *de minimis* deviation from a prescribed standard must, of course, be determined with reference to the purpose of the standard." *Wisc. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 232 (1992); *see also Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 378 (4th Cir. 2011) (Wilkinson, J., concurring) ("to give the de minimis rule too broad a reach would contradict congressional intent by denying proper effect to a statute").

The district court correctly reasoned that "the purpose of the standard is set forth in section 18022(d)(3) itself and the only permissible 'de minimis' variations are those that account for uncertainties in 'differences in actuarial estimates,' not variations to reflect a new Administration's policy preference for less generous subsidies." JA29.

The rule does not even attempt to justify the new policy as an effort to account for differences in actuarial estimates. *See* 90 Fed. Reg. at 27,174-78. CMS acted arbitrarily by failing to consider the purpose of the de minimis standard. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 60 (D.C. Cir. 2019) ("A statutorily mandated factor, by definition, is an important aspect of any issue before an administrative agency, as it is for Congress in the first instance to define the appropriate scope of an agency's mission." (quotation marks omitted)).

CMS does not even try to square its rule with the language of Section 18022(d)(3). It instead suggests that it need not be bound by that language because it understands "its statutory obligation in [a] more holistic light." Opening Br. 43; *see id.* 40 (suggesting that the statute allows for "some play in the joints").[8] The scope of the agency's discretion,

---

[8] Another district court recently upheld the actuarial value provision on grounds that the agency did not assert in its rulemaking or in this appeal. *California v. Kennedy*, No. 25-12019, 2026 WL 2364297 (D. Mass. Aug. 14, 2026). (CMS did not dispute the state governments' standing to challenge the rule.) Rather than falling back on a "holistic" understanding of the statute, that court reasoned that the agency did in fact consider "differences in actuarial estimates" because a narrower range of permissible actuarial values "could cause plans to shift out of their established 'metal tier' based on annual adjustments." *Id.* at *7. This is nonsensical; no party has asserted that there is any danger, for example, that silver plans would become bronze plans absent the rule.

however, is defined by the statutory text itself. Actuarial estimates are imprecise, and so Congress allowed for the possibility that there may be some variance in comparing plans with different cost-sharing structures. There may be room to argue over how much "de minimis variation" is permissible to account for these differences, or even over what additional factors the agency could take into account so long as it is also considering the statutorily required factors, but certainly a rule that all but completely erases the distinction between bronze and silver coverage exceeds the agency's authority. *See* 90 Fed. Reg. at 27,223 (purporting to allow silver plans with 66% actuarial values and bronze plans with 65% actuarial values).[9]

CMS seeks to justify this rule as one that would "promote competition." Opening Br. 41. An insurer may indeed have a competitive edge if it could call a plan "silver" while undercutting the statutory

---

Nor does it accurately describe the agency's reasoning, which, as noted, did not consider at all whether its rule was a de minimis measure to account for differences in actuarial estimates.

[9] CMS's appeal to its historical treatment of Section 18022(d)(3) cannot save its rule, because an agency "cannot take by adverse possession the authority to impose [a rule] in a way that shields the devaluation of statutory language from judicial review." *City of Providence v. Barr*, 954 F.3d 23, 45 (1st Cir. 2020).

standard for benefits offered under those plans. But this is not the form of competition among insurers that Congress sought to promote; Congress instead instructed CMS to provide for plans at specified actuarial values, with an allowance for minimal variation to account for differences in actuarial estimates. The agency acted arbitrarily, then, by failing to take into account Congress's purpose in setting standards for coverage for plans offered on the Exchanges and in permitting only limited variations from those standards.

CMS further attempts to defend the rule as one designed to bring unsubsidized enrollees into the market by offering plans with lower premiums and less generous coverage. Opening Br. 46-47. But the final rule stated simply that CMS "expect[ed]" the rule would lower premiums in the long run by drawing in healthier, unsubsidized enrollees, without citing any evidence to support this subjective belief or engaging with the record. 90 Fed. Reg. at 27,177.[10] Apart from that conclusory statement,

[10] Nor does the agency's theory make sense even on its own terms. An unsubsidized enrollee who desires cheaper, less generous coverage already has an option available to her: enrollment in a bronze plan with a 60% actuarial value. CMS does not explain why this enrollee would be any more likely to enter the market if a 66%-actuarial-value silver plan were also available to her. *See* JA664. But the harms that subsidized

CMS failed entirely to engage with commenters who raised the substantial body of empirical research showing that, on balance, a reduction in subsidies will cause healthier people to drop out of coverage, resulting in a weaker risk pool and higher premiums, even after accounting for "any plausible enrollment gains among non-subsidized enrollees." JA372; *see also supra* pp. 43-44; JA380; JA552; JA563. Such "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), *vacated as moot*, 142 S. Ct. 1665 (2022); *see also Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020) ("stating that a factor was considered ... is not a substitute for considering" it).

## IV. CMS Arbitrarily Shortened the Open Enrollment Period

The ACA directs the Secretary to require Exchanges to provide for "annual open enrollment periods, as determined by the Secretary for calendar years after the initial enrollment period." 42 U.S.C. § 18031(c)(6). Under the policy currently in effect, the open enrollment

enrollees would suffer from the erosion of value of Exchange plans are well established.

period for the Exchanges begins by November 1 and ends (at the earliest) on January 15. *See* 45 C.F.R. § 155.410(e)(4) (2024). For the 2027 plan year, however, the final rule would significantly shorten the open enrollment period by requiring all Exchanges to hold an open enrollment period that begins no later than November 1, 2026; ends no later than December 31; and is no more than nine weeks in duration. Open enrollment for future plan years would be subject to the same constraints. 90 Fed. Reg. at 27,222 (amending 45 C.F.R. § 155.410). About 1.5 million consumers enrolled in coverage for 2024 plans between December 15 and January 15 in FFE states; CMS acknowledges that many of these individuals would not enroll in coverage at all if the open enrollment period were shortened. 90 Fed. Reg. at 27,137. CMS failed to justify this change in policy and ignored a wealth of evidence showing that January enrollments have been beneficial both for enrollees and for the financial health of the Exchanges.

As the district court explained, "[a]gencies are free to change their existing policies," but they must "provide a reasoned explanation for the change," which CMS failed to do. JA39 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)). CMS asserts that it sought to

balance the need to provide sufficient time for consumers to enroll in the Exchanges against the possibility that a longer open enrollment period would create a risk of adverse selection. Opening Br. 59-60; *see* 90 Fed. Reg. at 27,136. But this trade-off is entirely illusory. All of the available evidence from the state-based Exchanges shows that January enrollees are younger and healthier and that their enrollments accordingly lower premiums overall. *See* JA565-566; JA375; JA458; JA541; JA439-440; JA510.

Data from the FFE is solely in the possession of CMS, but there is no reason to believe (and the agency offered none) that the result would be different in states on that Exchange. *See* JA566. Indeed, if CMS did have contrary data, it would have been obligated to reveal it to the public to allow commenters to respond. *See Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 905-07 (D.C. Cir. 2006). But CMS "offer[ed] no current data, reports, or evidence establishing its conclusion." JA40; *contra* Opening Br. 62-63. So the only evidence in the record—which was derived from the experience of the state-based Exchanges, and which CMS did not address—shows that a January deadline brings younger and healthier people into the market, lowering premiums.

The opportunity to enroll in January is critical to draw younger and healthier enrollees into the market, because many people experience pronounced financial stress at the end of the calendar year. As commenters observed—and CMS failed to address—if open enrollment ends in December, many people will forgo selecting health insurance out of a belief that they cannot afford the options available to them; conversely, many people (particularly younger people) experience less financial pressure at the beginning of the year, so if enrollment remains an option in January they are more willing to select insurance coverage. *See* JA567; JA542; JA397. CMS didn't address this point at all, other than to speculate that young people are "deadline-driven" and so would sign up at the end of the enrollment period no matter what that date may be. 90 Fed. Reg. at 27,139; *see also California*, 2026 WL 2364297, at *3. Both CMS and the district court in *California*, however, failed to engage with the point that commenters were making: younger and healthier people will be more likely to enroll if they are given the opportunity to do so after their end-of-year financial pressures subside. The rule was arbitrary for this reason as well.

The extension of the open enrollment period into January has had an additional benefit: it gives enrollees the opportunity to review their coverage and to switch plans if they find their current plan does not fit their needs. JA541-542; JA644. CMS attempts to downplay this benefit by noting that only about 3% of enrollees disenrolled from or switch to other plans between December 15 and January 15. Opening Br. 60; *see* 90 Fed. Reg. at 27,137. As the district court explained, this means that the arbitrary shortening of the open enrollment period would "take the described timeframe for enrollment away from the 470,000 individuals who relied on the opportunity [to switch plans] in the past." JA40 (quotation marks omitted). And CMS's "observation fails to map, without more, onto the risk of adverse selection supposedly motivating the adoption of a shorter period, nor does it explain *why* the risk of adverse selection drives the *particular length* of open enrollment ultimately selected." JA40 (emphases in original).

In addition, commenters noted that Navigators would face difficulty in providing assistance to consumers during a shortened open enrollment period, especially given the drastic cuts that CMS made to the Navigator program during 2025. JA567; JA542. The agency acknowledged that this

was a genuine concern, but responded only that it would encourage state-based Exchanges to "work with" interested parties in setting the dates of their open enrollment periods so long as those periods did not exceed nine weeks in length. 90 Fed. Reg. at 27,139. Once again, the agency merely "[n]odd[ed] to concerns raised by commenters" and then "dismiss[ed] them in a conclusory manner," a response that cannot be squared with the APA's requirements for reasoned decisionmaking. *Gresham*, 950 F.3d at 103.

There is therefore no basis for CMS's contention that the extended open enrollment period created a "risk of adverse selection" that requires "balanc[ing]," 90 Fed. Reg. at 27,136, and all of the evidence available in the record demonstrates the opposite. Not only did CMS fail to provide a reasoned justification for shortening the open enrollment period, but by doing so, the agency actually exacerbated the problem of adverse selection that it claimed it was trying to solve. The agency's "complete failure to … grapple with contrary evidence" was arbitrary. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018); *see also Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014).

## V. CMS Arbitrarily Shortened the Time Period for Enrollees to Verify Eligibility for Coverage

When an Exchange attempts to verify an applicant's income for purposes of determining his or her eligibility for, and the amount of, APTCs, and it finds an inconsistency in that applicant's data, it notifies the applicant and provides him or her with an opportunity to respond. 42 U.S.C. § 18081(e)(4). The statute provides a default period of 90 days for that response, subject to CMS's authority to modify the procedures for this verification process. *Id.* § 18081(c)(4), (e)(1), (e)(4). In many cases, 90 days is not enough time for an applicant to track down the proof of income needed to verify APTC eligibility. 90 Fed. Reg. at 27,119. Younger and healthier applicants are more likely to give up and drop out of coverage, harming the risk pool and increasing premiums for those who remain in coverage. *Id.*; *see* JA533. In light of these concerns, CMS exercised its modification authority in 2024 to provide for an additional 60 days for applicants to gather and present proof of household income. 45 C.F.R. § 155.315(f)(7) (2024). CMS now reasons, however, that it lacks statutory authority to provide this extension, and its final rule would rescind it. 90 Fed. Reg. at 27,119-20.

*First*, the district court correctly held that CMS has such authority under 42 U.S.C. § 18081(c)(4)(B). JA49-51. This provision permits CMS to "modify the methods used under the program established by [Section 18081] for the Exchange and verification of information if [CMS] determines such modifications would reduce the administrative costs and burdens on the applicant." 42 U.S.C. § 18081(c)(4)(B). The default deadline for applicants to exchange and verify information with CMS falls under Section 18081, *see id.* § 18081(e)(4)(A)(ii), and so is subject to the agency's modification authority.

CMS contends that Section 18081(c)(4)(B)'s modification authority is limited to methods dealing with "how information is exchanged and verified between HHS and trusted data sources," Opening Br. 54 (quoting 90 Fed. Reg. at 27,119), but nothing in the statutory text even hints at such a limitation. The agency cites instead to the subsection's headings, but "section headings cannot limit the plain meaning of a statutory text." *Merit Mgmt. Grp. v. FTI Consulting, Inc.*, 583 U.S. 366, 380 (2018). The subsection heading is further beside the point here, given that the relevant statute authorizes the modification of procedures anywhere in the "section" (not just the subsection). *See generally Koons Buick Pontiac*

*GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004). And CMS's reading of the statute is nonsensical. Section 18081(c)(4) authorizes modification of methods to reduce administrative burdens on the applicant. This language would make little sense if the statute permitted the agency to modify only the procedures it used with other federal agencies without the applicant's involvement.

CMS also contends that this reading of the statute would render Section 18081(e)(4)(A)(ii)(II) superfluous. Opening Br. 55. That provision expressly granted the agency the authority to extend the deadline for 2014, the first year of the Exchange's operations; from this, CMS relies on the *expressio unius* canon to infer that Congress denied the agency similar authority in later years. Contrary to the agency's reading, Congress did not revoke the modification power that it granted in paragraph (c)(4)(B) by reiterating in the next paragraph that extensions could be granted in 2014. After all, "redundancies are common in statutory drafting," sometimes due to "a congressional effort to be doubly sure," *Barton v. Barr*, 590 U.S. 222, 239 (2020), an observation that applies with particular force to the ACA, *see King*, 576 U.S. at 491.

In any event, the *expressio unius* canon is a "feeble helper in an administrative setting," where a statute, such as this one, contains multiple overlapping grants of authority to an agency. *Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 770-71 (D.C. Cir. 2019) (quotation marks omitted). Even outside of this setting, "[i]f there are other reasonable explanations for an omission in a statute, *expressio unius* may not be a useful tool." *Id*. at 771 (quotation marks omitted).

The most logical explanation for paragraph (e)(4)(A)'s phrasing is that Congress wished to remove any doubt as to the scope of CMS's authority in the first year of implementation for the ACA, when time was short and the agency faced numerous interpretive issues to resolve. There was no reason for Congress to further reiterate the "methods" authority it had already granted the agency under paragraph (c)(4)(B) for later years. That paragraph should accordingly be given its most natural reading, under which CMS retains the authority to modify the statutory methods for the verification of information, including the authority to modify the statutory default deadline for applicants to submit information to the Exchange. Section 18081(e)(4)(a)(ii)(II) thus serves an independent function by "permit[ting] the agency to extend [the 90-day

income verification] period automatically for the first year of the program, *without* engaging in the process otherwise necessary to exercise its authority to modify under § 18081(c)(4)(B)." JA50.

Indeed, CMS must itself understand the statute to operate in this way, given that it allows extensions of the 90-day period after 2014 in other circumstances. *See* 45 C.F.R. § 155.315(f)(3). In the district court, the agency tried to explain this inconsistency away by suggesting that the statute might only authorize it "to 'modify' a statutorily prescribed timeline in order to 'reduce the administrative costs and burdens' faced by a particular 'applicant.'" JA47 (quoting 42 U.S.C. § 18081(c)(4)(B); emphases omitted). But the word "particular" doesn't appear in the statutory text; under the actual statutory language, it would be perfectly permissible for CMS to find (as it did at one point) that it would "reduce the administrative costs and burdens on the applicant" if it were to permit a blanket extension rather than requiring each applicant to jump through a paperwork hoop to request one. 88 Fed. Reg. at 25,819.

Because CMS wrongly believed that it was required by the statute to adopt this rule, there is no need to proceed any further; the provision must be vacated given the agency's misconception of the scope of its legal

authority. *See Perez v. Cuccinelli*, 949 F.3d 865, 873 (4th Cir. 2020) (en banc); *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 597 (D.C. Cir. 2023) ("agency action may not stand if the agency has misconceived the law" (quotation marks omitted)).

*Second*, the district court correctly concluded that, in any event, the rescission of 45 C.F.R. § 155.315(f)(7) was arbitrary and capricious. Section 18081(c)(4)(B) requires the agency to consider whether modifications of information verification methods "would reduce the administrative costs and burdens on the applicant." 42 U.S.C. § 18081(c)(4)(B). As the district court observed, CMS failed to address applicant costs or administrative burdens in its rulemaking. JA53; *see Mozilla Corp.*, 940 F.3d at 60 (agency must, at a minimum, consider the factors identified by Congress). The agency instead pointed to alleged "program integrity" concerns. 90 Fed. Reg. at 27,119. But CMS did not explain how "program integrity" needs would be advanced in any way by the rule (and it does not defend this aspect of its reasoning on appeal). By definition, an enrollee who demonstrates eligibility to enroll has resolved the agency's "program integrity" concerns, whether that enrollee does so within 90 days or 150 days. Given that the agency's stated concern is that

fraudulent brokers are enrolling consumers without their consent, it defies logic for CMS to conclude that the appropriate response would be to make it harder for those consumers to prove their intent, and their eligibility, to enroll in a plan on the Exchange. And because the agency's primary rationale for the rule is indefensible (and undefended), the rule must be vacated. *See Casino Airlines, Inc. v. NTSB*, 439 F.3d 715, 717 (D.C. Cir. 2006) (if one rationale for a rule is invalid, the rule may be sustained only if the record is clear that the agency would have taken the same action on other valid grounds).

CMS instead points to the fiscal costs of coverage as justification for the rescission. Opening Br. 55-57. This doesn't accurately describe the agency's rulemaking; the rule's preamble briefly mentioned this cost but, as noted, asserted that the rule was needed to promote "program integrity." 90 Fed. Reg. at 27,119. In any event, it would always cost money to extend subsidies to applicants who Congress deemed to be eligible for assistance in paying for health care premiums. CMS was obligated to balance that cost against Congress's purposes in extending that eligibility, including its goals of providing for coverage for those who need it, protecting providers against the costs of providing

uncompensated care, and protecting insured individuals from the higher premiums that result when healthier individuals are driven out of coverage by excessive paperwork burdens. *Cf.* 42 U.S.C. §§ 18091(2)(I), 18114. The rulemaking was devoid of any such analysis.

CMS observed that "before the automatic 60-day extension, anyone who needed a 60-day extension was granted one under" the previous policy. 90 Fed. Reg. at 27,119. CMS concludes that the extension "therefore[] provided no marginal benefit over the existing policy to anyone who tried in good faith to solve an income-verification issue." Opening Br. 56. But the agency asked and answered the wrong question. The benefit of the automatic 60-day extension is not measured by the number of applicants who were granted extensions or who successfully relied on those extensions to resolve data issues (a percentage that has nearly doubled over the last five years, in any event, *see* 90 Fed. Reg. at 27,119). Rather, the agency should have investigated how many applicants lost eligibility because they were prevented (or deterred) from resolving data issues due to the revocation of the extension. CMS offered no evidence or reasoning on that question, and so acted arbitrarily. *See* JA52-53.

Moreover, CMS failed to address the point raised by commenters that, given the agency's ongoing elimination of critical staff who would provide crucial assistance in resolving data-matching issues, the need for the automatic 60-day extension would be even more acute going forward. JA580-581. CMS thus acted arbitrarily by failing to address the relevant factors that should have driven its decision. *See Sierra Club*, 899 F.3d at 270.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's summary judgment order.

Respectfully submitted,

*/s/ Joel McElvain*
JOEL MCELVAIN
CORTNEY ROBINSON HENDERSON
CHRISTINE L. COOGLE
*Democracy Forward Foundation*
*P.O. Box. 34553*
*Washington, DC 20043*
*(202) 448-9090*

September 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,662 words. It complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Joel McElvain*
Joel McElvain

# ADDENDUM

## TABLE OF CONTENTS

26 U.S.C. § 36B .......... A1

42 U.S.C. § 18031 .......... A15

42 U.S.C. § 18081 .......... A16

42 U.S.C. § 18114 .......... A17

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025) .......... A17

**26 U.S.C.A. § 36B**

**§ 36B. Refundable credit for coverage under a qualified health plan**

**(a) In general**.—In the case of an applicable taxpayer, there shall be allowed as a credit against the tax imposed by this subtitle for any taxable year an amount equal to the premium assistance credit amount of the taxpayer for the taxable year.

**(b) Premium assistance credit amount.**—For purposes of this section—

**(1) In general**.—The term "premium assistance credit amount" means, with respect to any taxable year, the sum of the premium assistance amounts determined under paragraph (2) with respect to all coverage months of the taxpayer occurring during the taxable year.

**(2) Premium assistance amount**.—The premium assistance amount determined under this subsection with respect to any coverage month is the amount equal to the lesser of—

**(A)** the monthly premiums for such month for 1 or more qualified health plans offered in the individual market within a State which cover the taxpayer, the taxpayer's spouse, or any dependent (as defined in section 152) of the taxpayer and which were enrolled in through an Exchange established by the State under 13111 of the Patient Protection and Affordable Care Act, or

**(B)** the excess (if any) of—

**(i)** the adjusted monthly premium for such month for the applicable second lowest cost silver plan with respect to the taxpayer, over

**(ii)** an amount equal to 1/12 of the product of the applicable percentage and the taxpayer's household income for the taxable year.

**(3) Other terms and rules relating to premium assistance amounts**—For purposes of paragraph (2)—

**(A) Applicable percentage**.—

**(i) In general.**—Except as provided in clause (ii), the applicable percentage for any taxable year shall be the percentage such that the applicable percentage for any taxpayer whose household income is within an income tier specified in the following table shall increase, on a sliding scale in a linear manner, from the initial premium percentage to the final premium percentage specified in such table for such income tier:

| In the case of household income (expressed as a percent of poverty line) within the following income tier: | The initial premium percentage is— | The final premium percentage is— |
|---|---|---|
| Up to 133% | 2.0% | 2.0% |
| 133% up to 150% | 3.0% | 4.0% |
| 150% up to 200% | 4.0% | 6.3% |
| 200% up to 250% | 6.3% | 8.05% |
| 250% up to 300% | 8.05% | 9.5% |
| 300% up to 400% | 9.5% | 9.5% |

**(ii) Indexing**.—

**(I) In general**.—Subject to subclause (II), in the case of taxable years beginning in any calendar year after 2014, the initial and final applicable percentages under clause (i) (as in effect for the preceding calendar year after application of this clause) shall be adjusted to reflect the excess of the rate of premium growth for the preceding calendar year over the rate of income growth for the preceding calendar year.

**(II) Additional adjustment**.—Except as provided in subclause (III), in the case of any calendar year after 2018, the percentages described in subclause (I) shall, in addition to the adjustment under subclause (I), be adjusted to reflect the excess (if any) of the rate of premium growth estimated under subclause (I) for the preceding calendar year over the rate of growth in the consumer price index for the preceding calendar year.

**(III) Failsafe.**—Subclause (II) shall apply for any calendar year only if the aggregate amount of premium tax credits under this section and cost-sharing reductions under section 1402 of the Patient Protection and Affordable Care Act for the preceding calendar year exceeds an amount equal to 0.504 percent of the gross domestic product for the preceding calendar year.

**(iii) Temporary percentages for 2021 through 2025.**—In the case of a taxable year beginning after December 31, 2020, and before January 1, 2026—

(I) clause (ii) shall not apply for purposes of adjusting premium percentages under this subparagraph, and

(II) the following table shall be applied in lieu of the table contained in clause (i):

| In the case of household income (expressed as a percent of poverty line) within the following income tier: | The initial premium percentage is— | The final premium percentage is— |
|---|---|---|
| Up to 150.0 percent | 0.0 | 0.0 |
| 150.0 percent up to 200.0 percent | 0.0 | 2.0 |
| 200.0 percent up to 250.0 percent | 2.0 | 4.0 |
| 250.0 percent up to 300.0 percent | 4.0 | 6.0 |

| | | |
|---|---|---|
| 300.0 percent up to 400.0 percent | 6.0 | 8.5 |
| 400.0 percent and higher | 8.5 | 8.5 |

**(B) Applicable second lowest cost silver plan.**—The applicable second lowest cost silver plan with respect to any applicable taxpayer is the second lowest cost silver plan of the individual market in the rating area in which the taxpayer resides which--

(i) is offered through the same Exchange through which the qualified health plans taken into account under paragraph (2)(A) were offered, and

(ii) provides—

(I) self-only coverage in the case of an applicable taxpayer—

(aa) whose tax for the taxable year is determined under section 1(c)2 (relating to unmarried individuals other than surviving spouses and heads of households) and who is not allowed a deduction under section 151 for the taxable year with respect to a dependent, or

(bb) who is not described in item (aa) but who purchases only self-only coverage, and

(II) family coverage in the case of any other applicable taxpayer.

If a taxpayer files a joint return and no credit is allowed under this section with respect to 1 of the spouses by reason of subsection (e), the taxpayer shall be treated as described in clause (ii)(I) unless a deduction is allowed under section 151 for the taxable year with respect to a dependent other than either spouse and subsection (e) does not apply to the dependent.

**(C) Adjusted monthly premium**.—The adjusted monthly premium for an applicable second lowest cost silver plan is the monthly premium which would have been charged (for the rating

area with respect to which the premiums under paragraph (2)(A) were determined) for the plan if each individual covered under a qualified health plan taken into account under paragraph (2)(A) were covered by such silver plan and the premium was adjusted only for the age of each such individual in the manner allowed under section 2701 of the Public Health Service Act. In the case of a State participating in the wellness discount demonstration project under section 2705(d) of the Public Health Service Act, the adjusted monthly premium shall be determined without regard to any premium discount or rebate under such project.

**(D) Additional benefits.**—If—

(i) a qualified health plan under section 1302(b)(5) of the Patient Protection and Affordable Care Act offers benefits in addition to the essential health benefits required to be provided by the plan, or

(ii) a State requires a qualified health plan under section 1311(d)(3)(B) of such Act to cover benefits in addition to the essential health benefits required to be provided by the plan,

the portion of the premium for the plan properly allocable (under rules prescribed by the Secretary of Health and Human Services) to such additional benefits shall not be taken into account in determining either the monthly premium or the adjusted monthly premium under paragraph (2).

**(E) Special rule for pediatric dental coverage**.—For purposes of determining the amount of any monthly premium, if an individual enrolls in both a qualified health plan and a plan described in section 1311(d)(2)(B)(ii)(I)3 of the Patient Protection and Affordable Care Act for any plan year, the portion of the premium for the plan described in such section that (under regulations prescribed by the Secretary) is properly allocable to pediatric dental benefits which are included in the essential health

benefits required to be provided by a qualified health plan under section 1302(b)(1)(J) of such Act shall be treated as a premium payable for a qualified health plan.

**(c) Definition and rules relating to applicable taxpayers, coverage months, and qualified health plan.**—For purposes of this section—

**(1) Applicable taxpayer**.—

**(A) In general.**—The term "applicable taxpayer" means, with respect to any taxable year, a taxpayer whose household income for the taxable year equals or exceeds 100 percent but does not exceed 400 percent of an amount equal to the poverty line for a family of the size involved.

[(**B) Repealed**. Pub. L. 119-21, Title VII, §§ 71302(a), July 4, 2025, 139 Stat. 322]

**(C) Married couples must file joint return**.—If the taxpayer is married (within the meaning of section 7703) at the close of the taxable year, the taxpayer shall be treated as an applicable taxpayer only if the taxpayer and the taxpayer's spouse file a joint return for the taxable year.

**(D) Denial of credit to dependents**.—No credit shall be allowed under this section to any individual with respect to whom a deduction under section 151 is allowable to another taxpayer for a taxable year beginning in the calendar year in which such individual's taxable year begins.

(**E) Temporary rule for 2021 through 2025**.—In the case of a taxable year beginning after December 31, 2020, and before January 1, 2026, subparagraph (A) shall be applied without regard to "but does not exceed 400 percent".

(**2) Coverage month**.—For purposes of this subsection—

**(A) In general**.—The term "coverage month" means, with respect to an applicable taxpayer, any month if—

(i) as of the first day of such month the taxpayer, the taxpayer's spouse, or any dependent of the taxpayer is covered by a qualified health plan described in subsection (b)(2)(A) that was enrolled in through an Exchange established by the State under section 1311 of the Patient Protection and Affordable Care Act, and

(ii) the premium for coverage under such plan for such month is paid by the taxpayer (or through advance payment of the credit under subsection (a) under section 1412 of the Patient Protection and Affordable Care Act).

**(B) Exception for minimum essential coverage**.—

**(i) In general**.—The term "coverage month" shall not include any month with respect to an individual if for such month the individual is eligible for minimum essential coverage other than eligibility for coverage described in section 5000A(f)(1)(C) (relating to coverage in the individual market).

**(ii) Minimum essential coverage**.—The term "minimum essential coverage" has the meaning given such term by section 5000A(f).

(**C) Special rule for employer-sponsored minimum essential coverage**.—For purposes of subparagraph (B)—

**(i) Coverage must be affordable**.—Except as provided in clause (iii), an employee shall not be treated as eligible for minimum essential coverage if such coverage—

(I) consists of an eligible employer-sponsored plan (as defined in section 5000A(f)(2)), and

(II) the employee's required contribution (within the meaning of section 5000A(e)(1)(B)) with respect to the plan exceeds 9.5 percent of the applicable taxpayer's household income.

This clause shall also apply to an individual who is eligible to enroll in the plan by reason of a relationship the individual bears to the employee.

**(ii) Coverage must provide minimum value**.—Except as provided in clause (iii), an employee shall not be treated as eligible for minimum essential coverage if such coverage consists of an eligible employer-sponsored plan (as defined in section 5000A(f)(2)) and the plan's share of the total allowed costs of benefits provided under the plan is less than 60 percent of such costs.

**(iii) Employee or family must not be covered under employer plan**.—Clauses (i) and (ii) shall not apply if the employee (or any individual described in the last sentence of clause (i)) is covered under the eligible employer-sponsored plan or the grandfathered health plan.

**(iv) Indexing**.—In the case of plan years beginning in any calendar year after 2014, the Secretary shall adjust the 9.5 percent under clause (i)(II) in the same manner as the percentages are adjusted under subsection (b)(3)(A)(ii).

**(3) Definitions and other rules**.—

**(A) Qualified health plan**.—The term "qualified health plan" has the meaning given such term by section 1301(a) of the Patient Protection and Affordable Care Act, except that such term shall not include a qualified health plan which is a catastrophic plan described in section 1302(e) of such Act.

**(iii) Exception in case of certain special enrollment periods**.—Such term shall not include any plan enrolled in

during a special enrollment period provided for by an Exchange—

(I) on the basis of the relationship of the individual's expected household income to such a percentage of the poverty line (or such other amount) as is prescribed by the Secretary of Health and Human Services for purposes of such period, and

(II) not in connection with the occurrence of an event or change in circumstances specified by the Secretary of Health and Human Services for such purposes.

**(B) Grandfathered health plan**.—The term "grandfathered health plan" has the meaning given such term by section 1251 of the Patient Protection and Affordable Care Act.

**(4) Special rules for qualified small employer health reimbursement arrangements.**—

**(A) In general.**—The term "coverage month" shall not include any month with respect to an employee (or any spouse or dependent of such employee) if for such month the employee is provided a qualified small employer health reimbursement arrangement which constitutes affordable coverage.

**(B) Denial of double benefit**.—In the case of any employee who is provided a qualified small employer health reimbursement arrangement for any coverage month (determined without regard to subparagraph (A)), the credit otherwise allowable under subsection (a) to the taxpayer for such month shall be reduced (but not below zero) by the amount described in subparagraph (C)(i)(II) for such month.

**(C) Affordable coverage**.—For purposes of subparagraph (A), a qualified small employer health reimbursement arrangement shall be treated as constituting affordable coverage for a month if—

(i) the excess of—

(I) the amount that would be paid by the employee as the premium for such month for self-only coverage under the second lowest cost silver plan offered in the relevant individual health insurance market, over

(II) 1/12 of the employee's permitted benefit (as defined in section 9831(d)(3)(C)) under such arrangement, does not exceed—

(ii) 1/12 of 9.5 percent of the employee's household income.

**(D) Qualified small employer health reimbursement arrangement**.—For purposes of this paragraph, the term "qualified small employer health reimbursement arrangement" has the meaning given such term by section 9831(d)(2).

**(E) Coverage for less than entire year.**—In the case of an employee who is provided a qualified small employer health reimbursement arrangement for less than an entire year, subparagraph (C)(i)(II) shall be applied by substituting "the number of months during the year for which such arrangement was provided" for "12".

**(F) Indexing**.—In the case of plan years beginning in any calendar year after 2014, the Secretary shall adjust the 9.5 percent amount under subparagraph (C)(ii) in the same manner as the percentages are adjusted under subsection (b)(3)(A)(ii).

**(d) Terms relating to income and families**.—For purposes of this section—

**(1) Family size**.—The family size involved with respect to any taxpayer shall be equal to the number of individuals for whom the taxpayer is allowed a deduction under section 151 (relating to allowance of deduction for personal exemptions) for the taxable year.

**(2) Household income**.—

**(A) Household income.**—The term "household income" means, with respect to any taxpayer, an amount equal to the sum of—

(i) the modified adjusted gross income of the taxpayer, plus

(ii) the aggregate modified adjusted gross incomes of all other individuals who—

(I) were taken into account in determining the taxpayer's family size under paragraph (1), and

(II) were required to file a return of tax imposed by section 1 for the taxable year.

**(B) Modified adjusted gross income.**—The term "modified adjusted gross income" means adjusted gross income increased by—

(i) any amount excluded from gross income under section 911,

(ii) any amount of interest received or accrued by the taxpayer during the taxable year which is exempt from tax, and

(iii) an amount equal to the portion of the taxpayer's social security benefits (as defined in section 86(d)) which is not included in gross income under section 86 for the taxable year.

**(3) Poverty line**.—

**(A) In general**.—The term "poverty line" has the meaning given that term in section 2110(c)(5) of the Social Security Act (42 U.S.C. 1397jj(c)(5)).

**(B) Poverty line used**.—In the case of any qualified health plan offered through an Exchange for coverage during a taxable year beginning in a calendar year, the poverty line used shall be the most recently published poverty line as of the 1st day of the regular enrollment period for coverage during such calendar year.

**(e) Rules for individuals not lawfully present**.—

**(1) In general.**—If 1 or more individuals for whom a taxpayer is allowed a deduction under section 151 (relating to allowance of deduction for personal exemptions) for the taxable year (including the taxpayer or his spouse) are individuals who are not lawfully present—

(A) the aggregate amount of premiums otherwise taken into account under clauses (i) and (ii) of subsection (b)(2)(A) shall be reduced by the portion (if any) of such premiums which is attributable to such individuals, and

(B) for purposes of applying this section, the determination as to what percentage a taxpayer's household income bears to the poverty level for a family of the size involved shall be made under one of the following methods:

(i) A method under which—

(I) the taxpayer's family size is determined by not taking such individuals into account, and

(II) the taxpayer's household income is equal to the product of the taxpayer's household income (determined without regard to this subsection) and a fraction—

(aa) the numerator of which is the poverty line for the taxpayer's family size determined after application of subclause (I), and

(bb) the denominator of which is the poverty line for the taxpayer's family size determined without regard to subclause (I).

(ii) A comparable method reaching the same result as the method under clause (i).

**(2) Lawfully present.**—For purposes of this section, an individual shall be treated as lawfully present only if the individual is, and is reasonably expected to be for the entire period of enrollment for which

the credit under this section is being claimed, a citizen or national of the United States or an alien lawfully present in the United States.

**(3) Secretarial authority.**—The Secretary of Health and Human Services, in consultation with the Secretary, shall prescribe rules setting forth the methods by which calculations of family size and household income are made for purposes of this subsection. Such rules shall be designed to ensure that the least burden is placed on individuals enrolling in qualified health plans through an Exchange and taxpayers eligible for the credit allowable under this section.

**(f) Reconciliation of credit and advance credit**.—

**(1) In general.**—The amount of the credit allowed under this section for any taxable year shall be reduced (but not below zero) by the amount of any advance payment of such credit under section 1412 of the Patient Protection and Affordable Care Act.

**(2) Excess advance payments**.—If the advance payments to a taxpayer under section 1412 of the Patient Protection and Affordable Care Act for a taxable year exceed the credit allowed by this section (determined without regard to paragraph (1)), the tax imposed by this chapter for the taxable year shall be increased by the amount of such excess.

**(3) Information requirement**.—Each Exchange (or any person carrying out 1 or more responsibilities of an Exchange under section 1311(f)(3) or 1321(c) of the Patient Protection and Affordable Care Act) shall provide the following information to the Secretary and to the taxpayer with respect to any health plan provided through the Exchange:

(A) The level of coverage described in section 1302(d) of the Patient Protection and Affordable Care Act and the period such coverage was in effect.

(B) The total premium for the coverage without regard to the credit under this section or cost-sharing reductions under section 1402 of such Act.

(C) The aggregate amount of any advance payment of such credit or reductions under section 1412 of such Act.

(D) The name, address, and TIN of the primary insured and the name and TIN of each other individual obtaining coverage under the policy.

(E) Any information provided to the Exchange, including any change of circumstances, necessary to determine eligibility for, and the amount of, such credit.

(F) Information necessary to determine whether a taxpayer has received excess advance payments.

**(g) Special rule for individuals who receive unemployment compensation during 2021.**—

**(1) In general**.—For purposes of this section, in the case of a taxpayer who has received, or has been approved to receive, unemployment compensation for any week beginning during 2021, for the taxable year in which such week begins—

(A) such taxpayer shall be treated as an applicable taxpayer, and

(B) there shall not be taken into account any household income of the taxpayer in excess of 133 percent of the poverty line for a family of the size involved.

**(2) Unemployment compensation.**—For purposes of this subsection, the term "unemployment compensation" has the meaning given such term in section 85(b).

**(3) Evidence of unemployment compensation**.—For purposes of this subsection, a taxpayer shall not be treated as having received (or been approved to receive) unemployment compensation for any week

unless such taxpayer provides self-attestation of, and such documentation as the Secretary shall prescribe which demonstrates, such receipt or approval.

**(4) Clarification of rules remaining applicable**.—

**(A) Joint return requirement.**—Paragraph (1)(A) shall not affect the application of subsection (c)(1)(C).

**(B) Household income and affordabillity.**—Paragraph (1)(B) shall not apply to any determination of household income for purposes of paragraph (2)(C)(i)(II) or (4)(C)(ii) of subsection (c)

**(h) Regulations**.—The Secretary shall prescribe such regulations as may be necessary to carry out the provisions of this section, including regulations which provide for—

(1) the coordination of the credit allowed under this section with the program for advance payment of the credit under section 1412 of the Patient Protection and Affordable Care Act, and

(2) the application of subsection (f) where the filing status of the taxpayer for a taxable year is different from such status used for determining the advance payment of the credit.

**42 U.S.C. § 18031**

**§ 18031. Affordable choices of health benefit plans**

***

**(c) Responsibilities of the Secretary**

***

**(6) Enrollment periods**

The Secretary shall require an Exchange to provide for—

(A) an initial open enrollment, as determined by the Secretary (such determination to be made not later than July 1, 2012);

(B) annual open enrollment periods, as determined by the Secretary for calendar years after the initial enrollment period;

(C) special enrollment periods specified in section 9801 of Title 26 and other special enrollment periods under circumstances similar to such periods under part D of title XVIII of the Social Security Act; and

(D) special monthly enrollment periods for Indians (as defined in section 1603 of Title 25).

***

**42 U.S.C. § 18081**

**§ 18081. Procedures for determining eligibility for Exchange participation, premium tax credits and reduced cost-sharing, and individual responsibility exemptions**

***

**(f) Appeals and redeterminations**

**(1) In general**

The Secretary, in consultation with the Secretary of the Treasury, the Secretary of Homeland Security, and the Commissioner of Social Security, shall establish procedures by which the Secretary or one of such other Federal officers--

(A) hears and makes decisions with respect to appeals of any determination under subsection (e); and

(B) redetermines eligibility on a periodic basis in appropriate circumstances.

***

**42 U.S.C. § 18114**

**§ 18114. Access to therapies**

Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that—

(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;

(2) impedes timely access to health care services;

(3) interferes with communications regarding a full range of treatment options between the patient and the provider;

(4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions;

(5) violates the principles of informed consent and the ethical standards of health care professionals; or

(6) limits the availability of health care treatment for the full duration of a patient's medical needs.

**One Big Beautiful Bill Act, Pub. L. No. 119–21, 139 Stat. 72 (2025)**

***

**§ 71303. Requiring Verification of Eligibility for Premium Tax Credits.**

**(a) IN GENERAL.**—Section 36B(c) is amended by adding at the end the following new paragraphs:

***

"(6) EXCHANGE COMPLIANCE WITH FILING REQUIREMENTS.—The term 'coverage month' shall not include, with respect to any individual covered by a qualified health plan enrolled in through an Exchange, any month for which the Exchange does not meet the requirements of section 155.305(f)(4)(iii) of title 45, Code of Federal Regulations (as published in the Federal Register on June 25, 2025 (90 Fed. Reg. 27074), applied as though it applied to all plan years after 2025), with respect to the individual.".

***

**(c) EFFECTIVE DATE.**—The amendments made by this section shall apply to taxable years beginning after December 31, 2027.