No. 26-01938

# In the United States Court of Appeals For the Fourth Circuit

CITY OF COLUMBUS, et al.,

*Plaintiffs-Appellees*,

- against -

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Maryland

**BRIEF FOR AMICI CURIAE THE CITY OF NEW YORK AND NYC HEALTH + HOSPITALS, THE COUNTY OF SANTA CLARA, AND SIX OTHER LOCAL JURISDICTIONS IN SUPPORT OF APPELLEES**

STEVEN BANKS
*Corporation Counsel*
*of the City of New York*
MACKENZIE FILLOW*
100 Church Street
New York, New York 10007
212-356-4378
RICHARD DEARING
DEVIN SLACK
ELINA DRUKER
mfillow@law.nyc.gov

**Counsel of Record*

TONY LOPRESTI
*County Counsel,*
*County of Santa Clara*
RACHEL A. NEIL
70 West Hedding Street
East Wing, 9th Floor
San José, CA 95110
Ninth Floor, East Wing
rachel.neil@cco.sccgov.org

## TABLE OF CONTENTS

INTERESTS OF AMICI ........................................................... 1

SUMMARY OF ARGUMENT ..................................................... 5

ARGUMENT ........................................................................ 7

A. Public healthcare systems and safety-net hospitals are under strain. ........................................................ 7

B. The Final Rule will harm public health by dramatically increasing the number of underinsured and uninsured patients. ........................................................ 13

C. The enormous costs of the Final Rule will be carried by public healthcare systems and safety-net hospitals. ....... 16

CONCLUSION ..................................................................... 20

CERTIFICATE OF COMPLIANCE ........................................... 23

CORPORATE DISCLOSURE STATEMENT ................................ 23

CERTIFICATE OF SERVICE .................................................... 23

## INTERESTS OF AMICI[1]

Amici are local public hospital and healthcare systems, and local governments that maintain public health departments, own or operate hospitals or clinics, or otherwise fund safety-net healthcare services for vulnerable members of our communities. Together, we stand on the front lines of protecting public health. Amici's views on public health are shaped by our deep and unique experience in the area.

NYC Health + Hospitals ("H+H") is the largest municipal health care system in the country. Its mission is to provide the highest quality health care services to all New Yorkers with compassion, dignity, and respect to all, regardless of insurance status or ability to pay. Over 70,000 NYC H+H team members provide essential inpatient, outpatient, and home-based services to more than one million individuals every year across New York City's five boroughs. H+H's integrated system includes 11 acute care locations; five post-acute/long-term care facilities; over 20 community health care centers; home care services; an accountable care organization; and a health plan,

[1] Amici file this brief under Federal Rule of Appellate Procedure 29(a)(2). All parties consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae or their counsel made a monetary contribution to this brief's preparation or submission.

MetroPlusHealth. H+H provides nearly 60% of all behavioral health services in New York City, and is the largest provider of health care to New Yorkers experiencing homelessness. Medicaid plays a critical role in H+H's ability to care for the communities it serves; nearly 70% of adult patients are insured by Medicaid or have no insurance, and 97% of babies born at H+H and 70% of patients under 18 are covered by Medicaid. The populations that H+H serve continue to be the most marginalized populations in New York City.

The County of Santa Clara, which is the most populous of the San Francisco Bay Area's nine counties with roughly 1.9 million residents, operates the largest public health and hospital system in Northern California. Alongside its Public Health Department, Behavioral Health Services Department, Emergency Medical Services (EMS) Agency, Custody Health Department, and a County-run health plan (Valley Health Plan), the County also operates four public hospitals and a network of clinics that offer emergency, urgent, acute, preventative, and specialized care, as well as pharmacy services. The County's clinics and four public hospitals serve approximately 320,000 unique patients per year and serve as a critical health care safety-net provider, providing care to anyone in the county who needs it, regardless of financial circumstances, including indigent patients, patients who come from the

55% of Santa Clara County households that do not speak English as a first language, and rural community members who would otherwise need to travel great distances to receive care.

King County, Washington, serves its 2.2 million residents with 13 public health centers. In addition, King County owns Harborview Medical Center, a world-renowned teaching hospital that is the only Level 1 trauma center serving Alaska, Idaho, Montana, and Washington. And the City and County of San Francisco, California, with roughly 800,000 residents, provides direct health services through its Department of Public Health to thousands of insured and uninsured people, including those most socially and medically vulnerable. It serves 125,000 people each year across its clinics and hospitals, including Zuckerberg San Francisco General, the only trauma center serving all of San Francisco and northern San Mateo County. The remaining Amici similarly maintain public health departments, own or operate hospitals or clinics, or otherwise fund healthcare services for vulnerable members of our communities.

As local governments and/or safety-net healthcare providers, Amici are responsible for safeguarding and promoting the health and wellbeing of our communities. In keeping with this mandate, many local governments, including the City of New York, New York; County of

Santa Clara, California; Harris County, Texas; County of Los Angeles, California; City of Cincinnati, Ohio; County of Monterey, California; City and County of San Francisco, California; and King County, Washington deliver essential medical and mental health services to people regardless of their ability to pay. Public healthcare facilities operated by local governments thus play a critical role in the nation's healthcare system by caring for uninsured and underinsured patients who have nowhere else to turn.

The at-issue provisions of the U.S. Department of Health and Human Services (HHS) and Centers for Medicare & Medicaid Services (CMS) rule will, by HHS's own admission, cause hundreds of thousands of individuals to lose health insurance. This surge in uninsured patients will strain already overburdened safety-net healthcare systems, including those operated by Amici, and will undermine public health as newly uninsured patients struggle to obtain care. Amici have a strong interest in ensuring that members of our communities are not unlawfully deprived of health insurance coverage and that local safety-net healthcare systems are not overwhelmed by a surge in the number of uninsured patients.

## SUMMARY OF ARGUMENT

Local governments serve as the first line of defense in protecting the public health, and Amici—which include local governments that operate some of the nation's largest public hospital and healthcare systems—can report that these are particularly challenging times to do this work.

Providing high-quality medical care in our communities has never been easy. But recent years have been particularly hard on public healthcare systems, which serve as safety-net providers that do not turn away patients, regardless of their ability to pay. Across the country, safety-net hospitals are currently experiencing severe and unprecedented challenges because of the rising costs and demand for healthcare, severe staffing shortages, and insufficient revenue. These challenges have led to many hospital closures. And there is a snowball effect—as nearby hospitals and clinics close, remaining facilities must cover the spillover and find their own uncompensated costs ballooning.

All of this can lead to overcrowding, longer wait times, and strained resources. That, in turn, erodes public trust in our public healthcare systems, further damaging public health, interfering with preventative care, delaying diagnosis and treatment, contributing to the

incidence and spread of diseases, and causing healthcare costs to go up across the board.

In granting summary judgment, the district court correctly found that the Patient Protection and Affordable Care Act; Marketplace Integrity & Affordability, 90 Fed. Reg. 27,074 (June 25, 2025) (the "Final Rule") improperly amended the failure-to-reconcile policy, changed actuarial value calculations, shortened the open enrollment period, and rescinded an earlier policy requiring an automatic 60-day extension of the income-verification period. Cumulatively, as the Final Rule acknowledged (*id.* at 27,213), these changes to eligibility and enrollment systems adopted by HHS and CMS would have caused hundreds of thousands of individuals (up to 1.8 million) across the country to become uninsured or underinsured.

On appeal, HHS and CMS argue (at 30–35) that the municipal plaintiffs have not demonstrated an injury-in-fact sufficient to support standing to challenge the Final Rule. But the evidence is clear: a massive increase in the number of uninsured and underinsured individuals will inexorably place enormous strain on local governments and safety-net providers, which must absorb the cost of care for individuals who have nowhere else to turn. Indeed, before the Affordable Care Act (ACA) was adopted, safety-net providers relied on an array of funding streams to

defray the enormous costs of providing uncompensated and undercompensated care, but that framework has eroded as insurance coverage has expanded due to the ACA. Therefore, a sudden increase in the number of newly uninsured individuals may put our nation's safety-net hospitals and healthcare systems on *worse footing* than before the ACA was adopted, at a time when they can ill afford to suffer such a blow.

As local governments that operate large public hospitals and health systems and local public hospitals, Amici know all too well the strain that these changes will place on safety-net providers and the ripple effect they will have on public health. Given these immense public harms, Amici respectfully urge the Court to affirm the district court's grant of summary judgment in Plaintiffs-Appellees' favor.

## ARGUMENT

### A. Public healthcare systems and safety-net hospitals are under strain.

Public healthcare systems and hospitals provide crucial services across the nation. But they are facing unprecedented hurdles to delivering care. Acute staffing and resource shortages have loomed for over a decade.[2] The Association of American Medical Colleges has

[2] Daily Briefing: *America deliberately limited its physician supply—now it's facing a shortage*, ADVISORY BD. (Feb. 16, 2022), https://perma.cc/5XJK-U887; Carmichael, Mary, *Primary-Care Doctor Shortage Hurts Our Health*, NEWSWEEK (Feb. 25, 2010), https://perma.cc/2UUS-NSK3.

projected a nationwide shortage of up to 86,000 physicians by 2036.[3] Staffing shortages force hospitals to reduce healthcare services, compounding hospitals' financial problems.[4]

The pandemic intensified these problems. Hospital staff worked in grueling conditions around the clock, logging significant overtime, to respond to an unprecedented disaster. They dealt with staggering patient mortality rates, full beds, and shortages of ventilators for patients and personal protective equipment for themselves—and experienced illness, burnout, exhaustion, and trauma.[5] Pandemic-related challenges triggered a mass exodus from the medical

[3] *The Complexities of Physician Supply and Demand: Projections From 2021 to 2036,* ASS'N OF AM. MED. COLL. (Mar. 2024), https://perma.cc/5Q8E-5BKM; *Compendium of Graduate Medical Education Initiatives: Report* , AM. MED. ASS'N (2025), https://perma.cc/2KED-KEGM.

[4] Muoio, Dave, *'Unsustainable' losses are forcing hospitals to make 'heart-wrenching' cuts and closures, leaders warn*, FIERCE HEALTHCARE (Sept. 16, 2022), https://perma.cc/MSD2-E5UH (reporting that, due to shortage of 3,900 nurses and 14% of clinical support staff, Trinity Health, which operates 88 hospitals, has had to take 12% of its beds, 5% of operating rooms, and 13% of emergency departments offline); Glatter, Dr. Robert, et ano., *The Coming Collapse of the U.S. Health Care System*, TIME (Jan. 10, 2023), https://perma.cc/3CXV-DEBP (explaining that hospital beds are "browned out" due to lack of staff, leading to overcrowding).

[5] Pearson, Bradford, *Nurses Are Burned Out. Can Hospitals Change in Time to Keep Them?* N.Y. TIMES (Feb. 20, 2023), https://tinyurl.com/y2c37dxt; Belluz, Julia, *The doctors are not all right,* VOX (Jun. 23, 2021), https://perma.cc/9JB2-4N26.

profession.[6] And the outlook for hospitals has remained bleak even as the pandemic has receded.[7]

Add to all this an aging population, and demand for medical care is at an all-time high just as the supply is plummeting. Never before have so many people lived so long. All of the nation's 74 million baby boomers will soon be 65 or older; and by 2035 seniors will outnumber children.[8] "[O]lder people see a physician at three or four times the rate of younger people and account for a highly disproportionate number of surgeries, diagnostic tests, and other medical procedures."[9] And this aging population includes physicians and nurses themselves. "We're facing a

[6] *Issue Brief: Impact of the COVID-19 Pandemic on the Hospital and Outpatient Clinician Workforce*, Office of the Assistant Secretary for Planning and Evaluation, Office of Health Policy, U.S. DEP'T OF HEALTH AND HUMAN SERV., (May 3, 2022), https://perma.cc/U6VA-XJ2M.

[7] *Cost of Caring: Challenges Facing America's Hospitals as They Care for Patients in 2026*, AM. HOSP. ASS'N (Mar. 2026), https://perma.cc/L6FQ-9WXQ; *Early NFP Hospital Medians Show Expected Deterioration; Will Worsen*, FITCH (Mar. 2, 2023), https://perma.cc/PB8W-9N6K; *see e.g.*¸ Adcroft, Patrick, *Mount Sinai Beth Israel hospital to close amid financial losses,* NY1 (Sep. 14, 2023), https://perma.cc/F9G9-M35P; Dyrda, Laura, *293 Hospitals At Immediate Risk Of Closure*, BECKER HOSPITAL REVIEW (June 2, 2023), https://perma.cc/MHT2-85ZV; Zhang, Xiaoming, et al., *Physician workforce in the United States of America: forecasting nationwide shortages*. HUM RESOUR. HEALTH (Feb. 6, 2020), https://perma.cc/8BQV-4TMW.

[8] Howley, Elaine, *The U.S. Physician Shortage Is Only Going to Get Worse. Here Are Potential Solutions,* TIME (Jul. 25, 2022), https://perma.cc/6MNC-FDCB.

[9] *Id.*

physician retirement cliff"—with many actively licensed physicians age 60 or older, and not enough new doctors taking their places.[10]

The challenges facing public hospitals, as compared with private hospitals, are deepened by the demographics of public hospitals' patient populations. Even with the gains in insurance coverage occasioned by the ACA, over 200,000 of the patients New York City's public healthcare system serves every year are uninsured, and most other patients are insured by public payers that reimburse providers at below-cost rates, resulting in more than $1 billion in uncompensated care.[11] Likewise, of the 320,000 patients served by the County of Santa Clara's public hospitals and clinics every year, approximately 16,000 are uninsured, 180,000 are insured by Medi-Cal (California's implementation of the federal Medicaid health care program), and 37,000 are insured by Medicare.

Providing medical care for uninsured and underinsured populations is already challenging for a number of reasons. Low-income

---

[10] *Id.*; *see also* Kayser, Alexis, *We're Nearing a Doctor Retirement Cliff. Can Health Care Survive the Fall?*, NEWSWEEK (Sept. 6, 2025), https://www.newsweek.com/doctor-physician-retirement-cliff-health-care-2054258.

[11] *Metropolitan Anchor Hospital (MAH) Case Study, NYC Health + Hospitals | New York*, AM. HOSPITAL ASS'N (June 2022), https://perma.cc/6Q6P-QR8U; *Fact Sheet: Underpayment by Medicare and Medicaid*, AM. HOSPITAL ASS'N (Feb. 2022), https://perma.cc/6D5D-A3M5.

individuals have historically suffered from a range of acute ailments at higher rates than their higher-income counterparts.[12] The communities served by public hospitals are disproportionately susceptible to "chronic conditions, such as hypertension and diabetes, that are by far the largest drain on our health system."[13]

Moreover, uninsured individuals forgo preventative care and routine screenings at higher rates than their insured counterparts.[14] As a consequence, safety-net hospitals become default clinics, even for non-emergencies. And delays in diagnosis and treatment also lead to negative medical outcomes and higher costs in providing emergency medical care for avoidable ailments.[15]

---

[12] Madara, Dr. James, *America's health care crisis is much deeper than COVID-19,* AM. MED. ASS'N (Jul. 22, 2020), https://perma.cc/KD4L-P6MU.

[13] *Id.*

[14] *Nearly a Quarter of People Who Say They Were Disenrolled from Medicaid During the Unwinding Are Now Uninsured* (April 24, 2024), KFF, https://perma.cc/PPU6-Z5G8 (reporting that the majority of individuals who lost their health insurance skipped or delayed care or prescriptions); *Facilitating Equitable Access to Cancer Screening – President's Cancer Panel*, U.S. DEP'T OF HEALTH AND HUMAN SRVS. NAT'L CANCER INST. (Feb. 2, 2022), https://perma.cc/R6KD-BX5C (same, for cancer screenings); Lu, P.J., et al, *Impact of Health Insurance Status on Vaccination Coverage Among Adult Populations*, AM. J. PREV. MED., 2015;48(6):647-661 (June 2015), https://www.ajpmonline.org/article/S0749-3797(14)00719-3/pdf.

[15] Bermudez, D., & Baker, L. C. (2005). *The Relationship between SCHIP Enrollment and Hospitalizations for Ambulatory Care Sensitive Conditions in California*. J HEALTH CARE POOR UNDERSERVED, 16(1), 96-110; Garfield, R., et al., *The Uninsured and the ACA: A Primer-Key Facts about Health Insurance and the Uninsured amidst Changes to the Affordable Care Act*. KFF (Jan. 25, 2019), https://perma.cc/W4TN-WFAD; Starfield, B. and Shi Leiyu J., *Contribution of*

Safety-net hospitals and clinics have faced a perfect storm. The massive shortfall of staff and resources, coupled with increased demand for uncompensated care, already creates acute financial pressures.[16] Since 2010, an astounding number of hospitals—more than 150—across the country have closed,[17] and more than 600 are at risk of closure.[18] This includes both rural and inner-city hospitals, and has put significant strain on surviving hospitals.[19] For example, in 2025, the County of Santa Clara purchased Regional Medical Center (RMC), a then-private hospital that—prior to acquisition by the County—was at risk of closure and was progressively eliminating services, such as labor and delivery, and then trauma care. RMC serves a community of residents who are nearly twice as likely to lack health insurance compared with county

*Primary Care to Health Systems and Health*, MILBANK Q (Oct. 3, 2005), https://perma.cc/JFX8-5HV7.

[16] *The Current State of Hospital Finances: Hospital Finance Report, Fall 2022 Update*, KAUFMAN HALL, https://perma.cc/327Z-3CHP.

[17] Map: *Rural Hospital Closures 2005-Present*, UNC CECIL G. SHEPS CENTER FOR HEALTH SERVICES RESEARCH (launched 2014), https://perma.cc/HLH4-EWBN.

[18] *Rural Hosp. at Risk of Closing*, CTR. FOR HEALTHCARE QUALITY & PAYMENT REFORM (May 2026), https://perma.cc/5RRQ-96HF; Severance, H., *More Hospitals Are Closing. Why?* ACEP NOW (Jan.11, 2024), https://perma.cc/CAS4-Z6HH; Weissart, D., *The Toll of Rural Hospital Closures*, BOSTON U. SCHOOL OF PUBLIC HEALTH, PUBLIC HEALTH POST (June 18, 2024), https://perma.cc/YVA6-4XUV.

[19] Rau, Jordan, *Urban Hospitals of Last Resort Cling to Life in Time of COVID*, KHN (Sept. 17, 2020), https://perma.cc/5VRQ-MQTV; *see also* Healthcare Quality and Outcomes Lab, *Medicaid Cuts Likely to Affect Urban Safety-Net Hospitals*, HARVARD T.H. CHAN SCHOOL OF PUBLIC HEALTH (Nov. 17, 2025), https://perma.cc/J53T-CWQ8.

residents overall. Indeed, about 40% of the county's Medicaid enrollees live within five miles of RMC.

Many other hospitals and clinics have survived only by shutting down select vital services. "It is not uncommon to hear that health care systems have shut down Pediatrics, Psychiatry, Obstetrics, and ICU."[20] And inpatient beds and operating rooms taken offline due to staffing shortages lead to longer wait times for admission from emergency rooms. The problem is compounded by corresponding shortages in outpatient and rehabilitation facilities, which delay patient discharge.[21] In all, even before the Final Rule, the challenges of operating public hospitals and healthcare systems were profound.

### B. The Final Rule will harm public health by dramatically increasing the number of underinsured and uninsured patients.

The Final Rule will push these problems past the breaking point, putting a dramatic unnecessary strain on limited resources and causing delays in treatment or reductions in services for an array of conditions. When public confidence in the ability of public healthcare systems to provide quality services erodes, harms reverberate across our communities.

[20] Glatter, *supra* n.4.

[21] *Id.*

As explained above, there is already a scarcity of resources causing the closure of hospitals, shuttering of departments, and delays in services. Thousands of patients, regardless of their insurance status, in need of all kinds of medical care, could find themselves facing significant delays, and some may forgo care altogether, as health system resources are stretched to address the acute needs of newly uninsured populations who spill over from non-safety-net healthcare providers. These negative experiences have significant, community-wide impacts. However, the burden will fall most heavily on vulnerable members of our communities, who are already at higher risk for poor health and are less likely to have the time and means to absorb the burden of long waiting times, delays in care, or missed workdays.

Research shows that patients who have negative medical experiences, or who feel betrayed by their medical institutions—for example, an individual whose much-needed surgery is delayed due to lack of space in the operating room—are more likely to distrust and disengage from their healthcare providers.[22] Negative experiences make people less likely to follow medical advice in the future. And loss of faith

[22] Smith, Carly Parnitzke, *First, do no harm: institutional betrayal and trust in health care organizations*, 10 J. MULTIDISC. HEALTHCARE 133, 137, 140-42 (2017), https://perma.cc/4F93-3MK5.

in healthcare providers reaches beyond the individual: research also shows that people who feel that a relative has experienced poor medical care are likely to lose trust in healthcare providers in general.[23]

These ripple effects carry far beyond one individual's experience and result in increased public skepticism of medical providers, which correlates with devastating consequences for local governments' ability to ensure their communities' health and welfare. For instance, research shows that individuals who mistrust healthcare systems are also more likely to delay seeking health care, fail to adhere to medical advice, and miss medical appointments.[24] Unsurprisingly, these tendencies can lead to worse individual health outcomes.

What's more, when large numbers of individuals in our communities delay seeking care and miss out on early diagnosis and treatment of emerging diseases, it impairs the ability of our public health officials to quickly detect outbreaks of communicable diseases. Delays prevent officials from rapidly responding to contain outbreaks, leading to the spread of illnesses across our communities and placing

[23] Oguro, Nao, et al., *The impact that family members' health care experiences have on patients' trust in physicians*, BMC HEALTH SERV. RSCH., at 2, 9-10 (Oct. 19, 2021), https://perma.cc/AA8E-LPU4.

[24] LaVeist, Thomas A., et al., *Mistrust of Health Care Organizations is Associated with Underutilization of Health Services*, 44 HEALTH SERVS. RSCH., 2093, 2102-03 (2009), https://perma.cc/A3GV-PNZW.

yet more strain on our fragile public health systems.[25] Thus, reduced trust in healthcare professionals and systems will impair local governments' ability to carry out one of their core functions: ensuring the health and wellbeing of their residents.[26]

### C. The enormous costs of the Final Rule will be carried by public healthcare systems and safety-net hospitals.

Public hospitals and healthcare systems will feel the fiscal strain caused by the Final Rule acutely. As explained above, safety-net providers will, of course, have to shoulder the dramatically increased costs for uncompensated care for uninsured and underinsured patients. And patients from private hospitals and clinics whose care is no longer covered will spill over onto safety-net providers, further increasing uncompensated care costs. The financial strain will only be amplified by the fact that uninsured and underinsured patients who forgo preventative care and screenings may experience avoidable, high-cost hospital stays.

---

[25] *Technical Brief: Communicable diseases and primary health care—the way forward*, World Health Organization (July 2023), who-uhl-technical-brief-communicablediseases.pdf.

[26] *See, e.g.*, Blewett, L., et al., *Aligning US Health and Immigration Policy to Reduce the Incidence of Tuberculosis.*, 18(4) INT J TUBERC. LUNG DISEASE, 397-404 (April 18, 2024), https://perma.cc/NWF5-DB9V.

And there is reason to believe that increasing the number of uninsured individuals will put public hospitals and healthcare systems in a worse position than they were in before the ACA was adopted. In 2013, before the ACA was adopted, the uncompensated costs of care for uninsured individuals totaled roughly $85 billion, and safety-net hospitals relied on a number of sources to defray these costs.[27] Safety-net hospitals could not offset their uncompensated costs because of a low percentage of commercially insured patients. Instead, they relied on programs, such as the federal Disproportionate Share Hospital (DSH) program, which provides federal funds to safety-net hospitals that serve a high proportion of Medicaid beneficiaries and uninsured patients.[28]

Since 2014, when the ACA was fully implemented, there has been a significant reduction in the number of uninsured individuals nationwide—falling from 14.5% in 2013 to 9.4% in 2015 (a 35% decline)—and down to 8.3% in 2025.[29] This increase in the rate of

---

[27] Garfield, *supra* n.15.

28 GHYHA *Position Paper: Medicaid DSH* (Sept. 9, 2024), https://perma.cc/CKE2-DX7F.

29 Schubel, J. and Broaddus, M, *Uncompensated Care Costs Fell in Nearly Every State as ACA's Major Coverage Provisions Took Effect: Medicaid Waivers That Create Barriers to Coverage Jeopardize Gains*, CTR. ON BUDGET & POLICY PRIORITIES (May 23, 2018), https://perma.cc/25ZK-4W5Z; Cohen, Robin A., et al., *Health Insurance Coverage: Early Release of Estimates From the National Health Interview Survey, 2025*, NAT'L CTR. FOR HEALTH STAT. (May 28, 2026), https://www.cdc.gov/nchs/data/nhis/earlyrelease/Health-Insurance-Coverage-Early-Release-of-Estimates-2025.pdf.

individuals with health insurance, in turn, drove a steep decline in unpaid hospital bills. For example, the share of nonelderly individuals incurring uncompensated care costs fell from 7.3% in 2011–2013 to 4.8% in 2015–2017—a drop of more than one-third.[30] In that same time, the aggregate annual cost of uncompensated care fell from an average of roughly $63 billion per year to roughly $42 billion.[31] As a result, hospitals' uncompensated care costs as a share of operating expenses fell by about 30%, translating to $12 billion nationwide in 2015.[32]

Though the increase in the insured population was an unprecedented public health achievement, Congress responded to the uptick in rates of health insurance by making cuts to the DSH program.[33] Those cuts are now looming. As a result, safety-net hospitals

[30] Karpman, M., et al., *Declines in Uncompensated Care Costs for The Uninsured under the ACA and Implications of Recent Growth in the Uninsured Rate*, KFF (Apr. 6, 2021), https://perma.cc/8RQ9-5ZBP.

[31] *Id.*

[32] Schubel, *supra* n.29.

[33] *Medicaid Disproportionate Share Hospital (DSH) Payments*, MEDICAID.GOV, last accessed on Aug. 20, 2026 at https://www.medicaid.gov/medicaid/financial-management/medicaid-disproportionate-share-hospital-dsh-payments; *AHA, National Hospital Groups Urge Congress to Prevent Medicaid DSH Cuts* (Sept. 5, 2025), https://perma.cc/UZ4G-NPXS.

may be in a worse position to absorb increases in uncompensated costs than they were before the ACA.

In sum, public healthcare systems and hospitals will be rocked by the Final Rule at a time when steep staffing shortages, as well as soaring demand and costs, are already causing widespread hospital closures. The Final Rule will undermine the ability of local governments to protect public health with devastating consequences across the board. When low-income individuals lose affordable coverage, their medical costs will not simply disappear, as HHS and CMS seem to have assumed; they will be shifted onto the backs of our safety-net hospitals and public healthcare systems, many times amplified. And some safety-net providers will surely buckle under the weight.

## CONCLUSION

Amici urge the Court to uphold the district court's grant of Plaintiffs-Appellees' motion for summary judgment.

Dated: September 8, 2026

Respectfully submitted,

STEVEN BANKS
*Corporation Counsel*
*of the City of New York*

By: ______________________
MACKENZIE FILLOW
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
212-356-4378
mfillow@law.nyc.gov

## ADDITIONAL COUNSEL

STEVEN BANKS
*Corporation Counsel of the City of New York*
100 Church Street
New York, New York 10007
212-356-2609
RICHARD P. DEARING
DEVIN SLACK
ELINA DRUKER
rdearing@law.nyc.gov
dslack@law.nyc.gov
edruker@law.nyc.gov

*Attorneys for the City of New York and the New York City Health and Hospitals Corporation*

TONY LOPRESTI
*County Counsel, County of Santa Clara*
KAVITA NARAYAN
MEREDITH A. JOHNSON
RACHEL A. NEIL
70 West Hedding Street
East Wing, 9th Floor
San José, CA 95110
rachel.neil@cco.sccgov.org

*Attorneys for County of Santa Clara, California*

ABBIE KAMIN
*Harris County Attorney*
NEAL SARKAR
*First Assistant County Attorney*
Office of Harris County Attorney
1010 Lamar, 11th Floor
Houston, Texas 77002

*Attorneys for Harris County, Texas*

DAWYN HARRISON
*County Counsel, County of Los Angeles*
JON SCOTT KUHN
CANDICE ROOSJEN
500 W. Temple Street
Los Angeles, CA 90012

*Attorneys for the County of Los Angeles, California*

EMILY SMART WOERNER
*City Solicitor, City of Cincinnati*
801 Plum Street, Room 214
Cincinnati, OH 45202

*Attorney for the City of Cincinnati, Ohio*

SUSAN K. BLITCH
*County Counsel, County of Monterey*
168 West Alisal Street, 3rd Floor
Salinas, CA 93901

*Attorney for County of Monterey, California*

## ADDITIONAL COUNSEL

DAVID CHIU
*City Attorney*
City Hall Room 234
One Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102

*Attorney for the City and County of San Francisco, California*

LEESA MANION
*King County Prosecutor*
CHRISTOPHER M. SANDERS
*General Counsel to King County*
EXECUTIVE GIRMAY ZAHILAY
401 Fifth Ave, Suite 800
Seattle, WA 98104

*Attorneys for King County, Washington*

## CERTIFICATE OF COMPLIANCE

This brief was prepared on a computer using 14-point Georgia Pro with 2.3 spacing for the body; 12-point Georgia Pro with 1.15 spacing for footnotes; and 15-point Sitka Subheadings with single spacing for headings and subheadings. The portions of the brief that must be included in a word count contain 4,052 words.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, none of the amici is required to make a corporate disclosure.

## CERTIFICATE OF SERVICE

I hereby certify that this motion and its accompanying certification will be served on all registered parties through this Court's CM/ECF system.

MACKENZIE FILLOW