**No. 26-1938**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

CITY OF COLUMBUS, ET AL.,

Plaintiffs - Appellees,

v.

ROBERT F. KENNEDY, JR., ET AL.,

Defendants - Appellants.

---

On Appeal from the United States Court
for the District of Maryland, No. 1:25-cv-02114-BAH
The Honorable Brendan A. Hurson

**Brief of Amici Curiae California; New Jersey; Arizona; Colorado; Connecticut; Delaware; Illinois; Maine; Maryland; Massachusetts; Michigan; Minnesota; Nevada; New Mexico; New York; North Carolina; Oregon; Josh Shapiro,** *in his official capacity as Governor of Pennsylvania*; **Rhode Island; Vermont; Virginia; and Washington in Support of Plaintiffs - Appellees and Affirmance**

---

JENNIFER DAVENPORT
Attorney General of New Jersey
MAYUR P. SAXENA
Assistant Attorney General

AMANDA I. MOREJÓN
BRYCE K. HURST
ESTEFANIA PUGLIESE-SAVILLE
Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625

*Attorneys for Amicus Curiae*
*State of New Jersey*

ROB BONTA
Attorney General of California
NELI N. PALMA
Senior Assistant Attorney General
NIMROD PITSKER ELIAS
Supervising Deputy Attorney General

SEAN C. MCGUIRE
HILARY BURKE CHAN
Deputy Attorneys General
Office of the Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101

*Attorneys for Amicus Curiae*
*State of California*

September 8, 2026

*Additional counsel listed on signature pages*

# TABLE OF CONTENTS


**Page**

INTRODUCTION AND INTERESTS OF AMICI CURIAE ...................... 1

BACKGROUND ........................................................................................ 2

ARGUMENT ........................................................................................... 4

I. The 2025 Rule Imposes Significant Compliance Costs............ 6

II. The 2025 Rule Reduces Revenues That Enable Amici States To Operate Their Exchanges .......................................... 8

III. The 2025 Rule Increases Uncompensated Care Costs............ 13

CONCLUSION ...................................................................................... 16

## TABLE OF AUTHORITIES

**Page**

**CASES**

*City of Columbus v. Kennedy*,
2026 WL 1707125 (D. Md. June 12, 2026) .......... 4, 12, 13

*City of Columbus v. Kennedy*,
796 F. Supp. 3d 123 (D. Md. 2025) .......... *passim*

*King v. Burwell*,
576 U.S. 473 (2015) .......... 2

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .......... 2

**STATUTES**

26 U.S.C. § 36B(b)(2)(B) .......... 12

42 U.S.C. § 18091(2)(I) .......... 3

**OTHER AUTHORITIES**

Centers for Medicare and Medicaid Services, *State-based Exchanges* (Apr. 7, 2026), (https://www.cms.gov/cciio/resources/fact-sheets-and-faqs/state-marketplaces) .......... 3

Comment Letter of Covered California (Apr. 14, 2025), (https://www.regulations.gov/comment/CMS-2025-0020-25629) .......... 15

Comment Letter of Jason Levitis, Christen Linke Young, and Sabrina Corlette (Apr. 14, 2025), (https://www.regulations.gov/comment/CMS-2025-0020-25047) .......... 15

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Comment Letter of Massachusetts Health Connector (Apr. 14, 2025), (https://www.regulations.gov/comment/CMS-2025-0020-23081/) ........ 11, 15

Comment Letter of State Marketplace Network (Apr. 14, 2025), (https://www.regulations.gov/comment/CMS-2025-0020-25338/) ........ 10, 15

KFF, *Open Enrollment Marketplace Plan Selections, 2014-2026* (https://www.kff.org/affordable-care-act/state-indicator/open-enrollment-marketplace-plan-selections/) ........ 3

Matt McGough, Jared Ortaliza, and Justin Lo, *et al.*, "What We Know So Far About 2026 ACA Marketplace Enrollment, Premiums, and Deductibles," KFF (May 19, 2026) (https://www.kff.org/affordable-care-act/what-we-know-so-far-about-2026-aca-marketplace-enrollment-premiums-and-deductibles/) ........ 4, 12

Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074 (June 25, 2025) ........ *passim*

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

Amici Curiae California, New Jersey, Arizona, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, New York, North Carolina, Oregon, Josh Shapiro, in his official capacity as Governor of Pennsylvania, Rhode Island, Vermont, Virginia, and Washington (Amici States) have a compelling interest in ensuring the effective operation of the Patient Protection and Affordable Care Act's (ACA) health insurance exchanges, which provide healthcare coverage to millions of our residents. The ACA has been instrumental in lowering the uninsured rate, expanding access to healthcare, and reducing uncompensated care costs in our States. Yet the regulation at issue here, issued by the U.S. Department of Health and Human Services and one of its sub-agencies, the Centers for Medicare and Medicaid Services (CMS or the Agency), titled Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074 (June 25, 2025) (the 2025 Rule), imposes grave harm on the ACA exchanges and on our States. Many of the Amici States here previously filed their own lawsuit seeking to enjoin and vacate several provisions of the 2025 Rule, *see* Complaint for Declaratory and Injunctive Relief, *State of California, et al., v. Robert F. Kennedy, Jr., et al.*, No. 1:25-cv-12019-NMG, ECF 1 (D. Mass. July 17, 2025), and recently secured a decision granting summary judgment in their favor as to one provision,

*see* Memorandum and Order, *id.* at ECF 141 (Aug. 14, 2026). Amici States fully support Appellees' arguments. They offer this brief to help this Court understand the harmful real-world effects of the challenged provisions of the 2025 Rule on our States, our state exchanges, and our citizens, which in turn illustrate why the judgments below staying and vacating the Rule correctly concluded that granting Appellees relief was in the public interest.

## BACKGROUND

The ACA was passed in 2010 to "increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538-39 (2012). Congress's goal in passing the ACA was "to improve health insurance markets, not to destroy them." *King v. Burwell*, 576 U.S. 473, 498 (2015). Since plan year 2014, consumers and small businesses in every state have been able to obtain health coverage via: exchanges operated by the states (state-based exchanges, or SBEs); the exchange operated by the federal government (the federally facilitated exchange, or FFE); or a state's off-exchange market for small-group plans. There are currently 24 SBEs, with the remaining 26

states using the FFE.[1] Most the Amici States maintain a state-based exchange.[2] Across all Amici States, over seven and a half million consumers enrolled in health insurance through the ACA exchanges in 2025.[3]

Millions of Americans rely on the ACA for access to affordable and high-quality health insurance. Between 2020 and 2025, enrollment on ACA exchanges more than doubled, reaching a record 24.3 million enrollees in 2025.[4] These enrollees make up a risk pool that includes a diverse mix of healthy and sick enrollees, which is essential to the operation of the ACA marketplaces and helps keep premiums lower for consumers who purchase their own health insurance, as Congress intended when it enacted the ACA. *See* 42 U.S.C. § 18091(2)(I) ("includ[ing] healthy individuals . . . will lower health insurance premiums").

---

[1] Of the 24 SBEs, three rely on HHS to perform certain exchange functions (typically eligibility and enrollment), and consumers enroll in coverage through healthcare.gov. These three SBEs retain responsibility for all other marketplace functions. One of the three is seeking to transition away from the federal platform for plan year 2027 (Oregon) and another is seeking to do so for plan year 2028 (Oklahoma). *See* Centers for Medicare & Medicaid Services, *State-based Exchanges* (Apr. 7, 2026), https://www.cms.gov/cciio/resources/fact-sheets-and-faqs/state-marketplaces.

[2] Amici States utilizing the FFE are Arizona, Delaware, Michigan, and North Carolina.

[3] KFF, *Open Enrollment Marketplace Plan Selections, 2014-2026* (accessed Sept. 8, 2026) (https://www.kff.org/affordable-care-act/state-indicator/open-enrollment-marketplace-plan-selections/).

[4] *Id.*

The uncertainty created by the promulgation and adoption of the 2025 Rule, coupled with the expiration of enhanced financial help for many consumers, began to reverse that progress. During open enrollment for plan year 2026, ACA enrollment nationwide fell for the first time in seven years, down 1.2 million from the previous plan year, or nearly five percent of all enrollees, to 23.1 million enrollees. Along with this overall decline in enrollment, the steepest in the ACA's history, enrollment by the healthiest cohort of enrollees (ages 18 to 34) declined by approximately eight percent, enrollees' premium payments increased by 58 percent, and deductibles increased by 37 percent.[5]

## ARGUMENT

If the vacated provisions of the 2025 Rule were to become effective, it would cause significant harm to not only the Appellees in this case, but also States across the country, and so the lower court's stay and vacatur of the several provisions of the Rule are supported by a strong public interest. *See City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025) (granting in part and denying in part Plaintiffs' motion to stay); *City of Columbus v. Kennedy*, 2026 WL 1707125 (D.

[5] Matt McGough, Jared Ortaliza, and Justin Lo, *et al.*, "What We Know So Far About 2026 ACA Marketplace Enrollment, Premiums, and Deductibles," KFF (May 19, 2026) (https://www.kff.org/affordable-care-act/what-we-know-so-far-about-2026-aca-marketplace-enrollment-premiums-and-deductibles/).

Md. June 12, 2026) (granting in part and denying in part Plaintiffs' motion for summary judgment).

In concluding that the plaintiffs below had standing to sue, the district court found that the 2025 Rule would injure consumers by making the cost of healthcare coverage unaffordable, 796 F. Supp. 3d at 141-45, and the Rule would result in significant disenrollment of current ACA consumers as a result, which would cause further injury to municipalities by forcing them to shoulder increased uncompensated care costs, *id.* at 145-48. And in concluding that a stay was in the public interest, the court agreed with Appellees that "[t]he rule's harms will not be limited to Plaintiffs and their members, but will extend to the millions of Americans who will lose coverage on the Exchanges and who will suffer from higher health care costs as a result." *Id.* at 174. This amicus brief details those broader harms.

The vacated provisions of the 2025 Rule would harm Amici States by imposing significant compliance costs; by decreasing state revenues derived from enrollments; and by causing the States to shoulder increased uncompensated care costs as the uninsured population increases. These harms are not speculative. Rather, they are immediate, substantial, and would extend far beyond the parties here to impact States across the country.

## I. THE 2025 RULE IMPOSES SIGNIFICANT COMPLIANCE COSTS

If the Rule were to become effective, it would result in an array of immediate compliance costs for States across the country. Indeed, at this late point in the plan year, compliance with the Rule's provision shortening the failure-to-reconcile (FTR) window from two years to one year is likely impracticable for the States. Over a year ago, CMS acknowledged during rulemaking that the "majority of State Exchanges expressed in comments that they could not make the technological changes to revert back to a 1-year FTR policy in time for OEP 2026" with only a few months of lead time. 90 Fed. Reg. at 27,199. Despite this, CMS imposed the requirement anyway—but for only one year. *Id*. The FTR provision affects plan year 2026 only, not plan year 2027, open enrollment for which begins *next month* in two Amici States and in November for the rest. If this Court were to reverse and allow the FTR provision to spring back into effect, it would do so only for a matter of days or weeks before plan year 2027 begins. Amici States would therefore incur compliance costs twice in quick succession—once to make technical and operational changes in order to comply for what remains of the 2026 plan year, and again to undo those changes for the 2027 plan year.

CMS has directly acknowledged the substantial nature of those compliance costs to the States. The 2025 Rule includes a regulatory impact analysis that predicts the costs the Rule would impose on the States, including the costs imposed

specifically by those provisions that are the subject of this appeal. For example, CMS estimated that the FTR provision would, alone, be expected to cost the States approximately $19.4 million "to develop and code changes to the eligibility systems to evaluate and verify FTR status." 90 Fed. Reg. at 27,189-90, tbl. 10 (at quantified costs). Likewise, CMS estimated the revocation of the automatic 60-day extension to resolve income data-matching issues would cost the States $9.5 million. Similarly, shortening the open enrollment period (OEP) would cost the States about $7.4 million, again according to the Agency's own estimates. *Id.*

Amici States have also estimated the costs they expect to incur from updating their systems, retraining staff, updating websites and publications, and creating advertising and outreach materials to notify consumers in their States of the changes required by the 2025 Rule. In California, the overall estimated cost of complying with all provisions of the 2025 Rule was "more than $1.5 million and 12,500 hours of staff time" just to update information technology systems, while the cost beyond that was "unquantifiable." Altman Decl., ECF 10-4 at ¶ 11.[6] New

---

[6] Amici States cite herein to declarations from our exchanges, public health experts, insurance regulators, and other officials on the ground with responsibilities related to maintaining the ACA marketplaces. These declarations were initially submitted in support of the States' own motion for a preliminary injunction and stay in the parallel *California v. Kennedy* matter, 1:25-cv-12019-NMG, ECF 10-1 (D. Mass. July 18, 2025). All declarations cited hereafter are publicly available without redaction as attachments to that filing. All ECF citations in this brief are citations to the *California v. Kennedy* matter unless otherwise noted.

York estimated that their immediate cost would be "over $10 million on staff time, alone, to update our information technology [] systems." Holahan Decl., ECF 10-21 at ¶ 20. Pennsylvania estimated compliance costs of approximately $5.5 million. Humphreys Decl., ECF 10-22 at ¶ 28. In Connecticut, the estimate was "$300,000 and over 1,000 hours of staff time." Michel Decl., ECF 10-6 at ¶ 17. Maine predicted "more than $2 million and more than 500 hours of staff time." Schneider Decl., ECF 10-11 at ¶ 18. Massachusetts's estimate was $150,000 and 1,500 hours of staff and vendor time. Woltmann Decl., ECF 10-12 at ¶ 8. And New Jersey estimated that it would need to spend $2 million to update information technology systems. Zimmerman Decl., ECF 10-19 at ¶ 27. These are only some of the States' costs to comply with the 2025 Rule. *See generally* ECF 10-1 to 10-26 (State declarations addressing compliance costs). Furthermore, these cost estimates from July 2025 do not include the additional costs and staff time that would likely be required for more expedited implementation of the changes.

In sum, quite apart from the direct harms to Appellees in this case, Amici States would incur distinct compliance costs if the provisions of the 2025 Rule were to go into effect.

## II. THE 2025 RULE REDUCES REVENUES THAT ENABLE AMICI STATES TO OPERATE THEIR EXCHANGES

Not only will the States have to incur substantial compliance costs, but they will have to do so with fewer resources. To finance their operation of ACA

exchanges, Amici States collect a fee for each plan sold on the exchange.[7] *See* 90 Fed. Reg. at 27,219 (noting that the exchanges "must be financially self-sustaining" and that States currently "charge user fees to issuers" to comply with that requirement.) If allowed to take effect, the challenged provisions of the 2025 Rule will significantly lower enrollment—as the Agency acknowledges—and thus the number of plans sold on the exchanges. *See* 90 Fed. Reg. at 27,190 (2025 Rule expected to cause "[t]otal reduced annual enrollment between 725,000 and 1,800,000 in PY 2026"). As relevant here, the Rule will cause enrollment to drop through three mechanisms: by making enrollment and re-enrollment more difficult through both the FTR and OEP provisions, and by reducing the value of coverage and raising consumers' costs through the actuarial value (AV) provision.

First, shortening the FTR window from two years to one year will make enrollment and re-enrollment more difficult. Barriers to enrollment have a disproportionate effect on healthier people in the risk pool, who are less motivated to navigate administrative burdens in order to maintain coverage. Appellants acknowledge that, due to this phenomenon, the one-year FTR window will reduce

---

[7] Some States collect fees based on the "percent of the total monthly premiums collected by an issuer for each plan purchased through our individual exchange" and small business exchange. Altman Decl., ECF 10-4, at ¶ 8. Other States charge health insurance companies a premium tax, a portion of which funds the operations of the exchange. *E.g.*, Eberle Decl., ECF 10-13, at ¶ 13 (describing how the Maryland Health Benefit Exchange is funded). Under either funding system, a decrease in enrollment would lessen the exchange's revenue.

enrollment, and that premiums will thus increase because fewer healthy individuals will remain in the risk pool. *See* 90 Fed. Reg. at 27,116-17 (FTR one-year window will increase premiums).

Second, shortening the OEP to nine weeks will also lead to lower enrollment. California has utilized the flexibility to adopt a longer OEP that existed prior to the 2025 Rule to offer the same 91-day open enrollment period for over ten years. The Rule cuts this period by more than thirty percent. During rulemaking, commenters warned that condensing the OEP in this manner could reduce enrollment among younger and healthier individuals, who tend to wait longer to enroll (or re-enroll), and that nearly half a million people annually utilize the latter portion of the OEP window that the 2025 Rule eliminates. For instance, the State Marketplace Network, a consortium of state-based exchanges, warned CMS in a comment that "condensing enrollment periods in states with long-established enrollment deadlines will create confusion and lower enrollment."[8] Similarly, Massachusetts' state-based exchange, the Massachusetts Health Connector, told CMS that a shorter open enrollment period would "weaken the merged market risk pool and increase premiums for all segments of the merged market."[9] Additionally, in

---

[8] Comment Letter of State Marketplace Network at 2 (Apr. 14, 2025) (https://www.regulations.gov/comment/CMS-2025-0020-25338/).

[9] Comment Letter of Massachusetts Health Connector at 5-6 (Apr. 14, 2025) (https://www.regulations.gov/comment/CMS-2025-0020-23081).

Minnesota, as in many Amici States, a greater number of individuals aged 18-44 "sign up for coverage after December 15" than before December 15, meaning that this provision of the Rule "could increase costs to Minnesota by removing a pool of relatively young and healthy individuals from the pool of insureds." Caulum Decl., ECF 10-17 at ¶ 22. And, as CMS recognized, the longer OEP affords consumers "the opportunity to change plans" in January if they "learn of cost increases" in the new year. 90 Fed. Reg. at 27,136, 27,140.

Third, broadening the acceptable actuarial value ranges for plans sold through the exchanges will make plans less valuable, make care more expensive, and reduce the amount of premium tax credit available for subsidized enrollees—ultimately leading to further decreased enrollment. Each of the metal tier plans sold on the exchanges, bronze, silver, gold, and platinum, must cover a given percentage of an enrollee's expected annual health care costs: 60, 70, 80, and 90 percent, respectively. The challenged provisions of the 2025 Rule would allow insurers to design plans that undershoot those targets by up to four percentage points. Widening the range of acceptable actuarial value targets allows insurers to design plans with lower actuarial value—meaning they will cover less of an enrollee's expected costs. Such plans are, by definition, cheaper for the insurer to provide, with lower gross premiums. But lowering gross premiums in this manner will reduce the cost of the benchmark plan by which the amount of premium tax

credit (PTC) available in the marketplace is set, 26 U.S.C. § 36B(b)(2)(B), meaning that subsidized enrollees—92 percent of all ACA enrollees in 2025[10]—will see their costs *rise* as PTC is removed from the marketplace. CMS estimated that, as a result, subsidies for all enrollees would have fallen by $1.2 *billion* for 2026 had this provision taken effect, and by $1.4 billion by 2029. 90 Fed. Reg. at 27,208. The Agency acknowledged the Rule would increase subsidized consumers' net costs. *See* 90 Fed. Reg. at 27,176-77 (this change to the actuarial-value regulation will result in a "burden" of increased net costs for consumer); *see also City of Columbus*, 796 F. Supp. 3d at 144 (discussing same); *City of Columbus*, 2026 WL 1707125 at *12 (discussing same). And as the plans become less generous, consumers are exposed to higher deductibles and cost-sharing, making coverage even more costly, and putting additional downward pressure on enrollment.

Adding these effects together, enrollment—and, therefore, enrollment fee revenue collected—via the States' exchanges will decline if these provisions take effect. In Connecticut, the Rule overall was expected to cause losses of "approximately $4 [million] in assessment revenue." Michel Decl., ECF 10-6 at ¶¶ 14-15. Losses were also expected to be $4 million in Maryland, Eberle Decl., ECF 10-13 at ¶¶ 12-14, while in Illinois, the number was $1.8 million. Winters

[10] McGough *et al.*, *supra* note 5, at Figure 4 and accompanying text.

Decl., ECF 10-10 at ¶¶ 9-12. Similarly, Maine, Minnesota, New Jersey, Pennsylvania, and Rhode Island have all also attested to lost enrollment fee revenue attributable to the enrollment losses due to the 2025 Rule's provisions. *See* Schneider Decl., ECF 10-11 at ¶¶ 14-17 (Maine); Caulum Decl., ECF 10-17 at ¶¶ 14-17 (Minnesota); Zimmerman Decl., ECF 10-19 at ¶¶ 18-22 (New Jersey); Humphreys Decl., ECF 10-22 at ¶¶ 24-29 (Pennsylvania); and Lang Decl., ECF 10-23 at ¶¶ 13-15 (Rhode Island).

As the court below twice recognized, Appellees pointed to specific current ACA enrollees who would likely no longer be able to afford coverage if the 2025 Rule were to go into effect and thus would likely be forced to disenroll. *City of Columbus*, 796 F. Supp. at 141-45; *City of Columbus*, 2026 WL 1707125 at *4. In the aggregate, such disenrollment works additional harms to Amici States by depriving them of a significant portion of the revenue they use to run their exchanges.

## III. THE 2025 RULE INCREASES UNCOMPENSATED CARE COSTS

In addition to harming individual consumers, the lower court found that the 2025 Rule would harm municipalities by forcing them to shoulder increased uncompensated care costs. *See* 796 F. Supp. 3d at 147. Specifically, the court found "sufficient record evidence to establish that the rate of uninsured people will go up as a direct result of the implementation of the Rule, a fact confirmed in the

Rule itself," which, as acknowledged by the Rule, would cause uninsured people to "'face higher costs for care and medical debt if care is needed,'" and which "'may, in turn, be incurred by hospitals and municipalities in the form of uncompensated care.'" *Id.* (quoting 90 Fed. Reg. at 27,192). These harms affect Amici States.

When uninsured individuals eventually need healthcare they cannot afford, the cost of providing that care falls on the public fisc. "It is important to highlight that a reduction in marketplace enrollment directly contributes to a rise in the uninsured rate, which in turn increases the burden of uncompensated care on the healthcare system." Altman Decl., ECF 10-4 at ¶ 24. Because "uninsured individuals are less likely to seek preventive care or attend routine health screenings," they may experience "negative health outcomes, such as emergency medical care with longer hospital stays and increased mortality rates" which "ultimately result[s] in increased costs to the State through uncompensated hospital emergency costs." Brown Decl., ECF 10-16 at ¶ 41. Other "downstream consequences" of lower rates of insurance coverage could include "increased absenteeism in the workplace," increasing a State's expenditures on unemployment insurance. *Id.* at ¶ 43; *see also id.* at ¶¶ 21-42 (describing New Jersey's Uncompensated Care Fund); Huck Decl., ECF 10-18 at ¶ 10 (detailing uncompensated care costs incurred by a public hospital in New Jersey). Additional

comment letters submitted during rulemaking by Covered California,[11] the Massachusetts Health Connector,[12] the State Marketplace Network,[13] experts,[14] and several others all warn of the high costs that States will incur providing reimbursement for uncompensated care.

As noted above, CMS acknowledges that those who lose coverage as a result of the provisions in the 2025 Rule "may go uninsured," which would "impose greater burdens on the health care system" through "increased emergency care utilization," "uncompensated care," and "additional costs" such as "strain on emergency departments" and "charity care." 90 Fed. Reg. at 27,190, 27,213-14. And as the lower court correctly found, these costs directly impact the municipal Appellants. *See City of Columbus*, 796 F. Supp. 3d at 147. So, too, Amici States.

In sum, these various harms of the 2025 Rule that ripple outward from consumers, to municipalities, to States across the country only confirm that the lower court's stay and vacatur of the Rule was not only necessary to avoid harm to Appellees here, but also broadly in the public interest.

---

[11] Comment Letter of Covered California at 1 (Apr. 14, 2025). (https://www.regulations.gov/comment/CMS-2025-0020-25629).

[12] Comment Letter of Massachusetts Health Connector, *supra* note 9, at 1.

[13] Comment Letter of State Marketplace Network, *supra* note 8, at 3.

[14] Comment Letter of Jason Levitis, Christen Linke Young, and Sabrina Corlette at 23 (Apr. 14, 2025) (https://www.regulations.gov/comment/CMS-2025-0020-25047).

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: September 8, 2026

Respectfully Submitted,

**JENNIFER DAVENPORT**
Attorney General of New Jersey
MAYUR P. SAXENA
*Assistant Attorney General*

By: */s/ Mayur P. Saxena*
AMANDA I. MOREJÓN
BRYCE K. HURST
ESTEFANIA PUGLIESE-SAVILLE
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625

*Counsel for Amicus Curiae*
*State of New Jersey*

**ROB BONTA**
Attorney General of California
NELI N. PALMA
*Senior Assistant Attorney General*
NIMROD PITSKER ELIAS
*Supervising Deputy Attorney General*

By: */s/ Sean C. McGuire*
SEAN C. MCGUIRE
HILARY BURKE CHAN
*Deputy Attorneys General*
Office of the Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: (619) 738-9543
Email: Sean.McGuire@doj.ca.gov

*Counsel for Amicus Curiae*
*State of California*

*[additional counsel listed on subsequent pages]*

**ADDITIONAL COUNSEL**

KRIS K. MAYES
*Attorney General*
*State of Arizona*
2005 N. Central Avenue
Phoenix, AZ 85004

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 0610

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 S. LaSalle Street
Chicago, IL 60603

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, Maryland 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

JEFF JACKSON
*Attorney General*
*State of North Carolina*
114 W. Edenton St.
Raleigh, NC 27603

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

JOSH SHAPIRO
*Governor*
*Commonwealth of Pennsylvania*
501 North 3rd Street
508 Main Capitol Building
Harrisburg, PA 17120

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

JAY JONES
*Attorney General*
*Commonwealth of Virginia*
202 North Ninth Street
Richmond, VA 23219

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,569 words. It complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

Dated: September 8, 2026

*/s/ Sean C. McGuire*
SEAN C. MCGUIRE

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: September 8, 2026

*/s/ Sean C. McGuire*
SEAN C. MCGUIRE