No. 26-1938

In The
United States Court of Appeals for the Fourth Circuit

CITY OF COLUMBUS, *et al.*,
*Plaintiffs-Appellees*,
v.
ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the United States Department of Health and Human Services, et al.*,
*Defendants-Appellants.*

On Appeal from the U.S. District Court
for the District of Maryland
Case No. 1:25-cv-02144-BAH

**[PROPOSED] BRIEF OF *AMICI CURIAE* NATIONAL HEALTH LAW PROGRAM, KENNY CAPPS, RAVEN BONNIWELL, KIERNAN MCGOWAN, VICTORIA BAGGOT, JASON PIPERBERG, BAINCA MAHMOOD, JACOB MARGOLIN, NICHOLAS VAUGHAN, MARIAH ADEEKO, ROBERT WOOD JOHNSON FOUNDATION, AMERICAN CANCER SOCIETY, AMERICAN CANCER SOCIETY CANCER ACTION NETWORK, BLOOD CANCER UNITED, LEGAL COUNCIL FOR HEALTH JUSTICE, AiARTHRITIS, AMERICAN LUNG ASSOCIATION, FAMILIES USA, MUSCULAR DYSTROPHY ASSOCIATION, AND NATIONAL MULTIPLE SCHLEROSIS SOCIETY IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE OF THE DISTRICT COURT'S SUMMARY JUDGMENT ORDER**

Martha Jane Perkins
National Health Law Program
1512 East Franklin Street, Suite 110
Chapel Hill, North Carolina 27514
Tel: (919) 968-6308 (x101)
perkins@healthlaw.org

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1938 Caption: City of Columbus et al. v. Kennedy et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

National Health Law Program
(name of party/amicus)

______________________________________________

who is amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Martha Jane Perkins Date: 09/04/2026

Counsel for: Amicus Curiae National Health Law Program



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1938 Caption: City of Columbus et al. v. Kennedy et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Robert Wood Johnson Foundation
(name of party/amicus)

who is amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Martha Jane Perkins Date: 09/04/2026

Counsel for: Amicus Curiae Robert Wood Johnson Foundation



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1938 Caption: City of Columbus et al. v. Kennedy et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

American Cancer Society
(name of party/amicus)

who is amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Martha Jane Perkins Date: 09/04/2026

Counsel for: Amicus Curiae American Cancer Society



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1938 Caption: City of Columbus et al. v. Kennedy et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

American Cancer Society Cancer Action Network (ACS CAN)
(name of party/amicus)

who is amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Martha Jane Perkins Date: 09/04/2026

Counsel for: Amicus Curiae ACS CAN



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1938 Caption: City of Columbus et al. v. Kennedy et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Blood Cancer United
(name of party/amicus)

who is amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Martha Jane Perkins Date: 09/04/2026

Counsel for: Amicus Curiae Blood Cancer United



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1938 Caption: City of Columbus et al. v. Kennedy et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

LEGAL COUNCIL FOR HEALTH JUSTICE
(name of party/amicus)

who is amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Martha Jane Perkins Date: 09/04/2026

Counsel for: Amicus Curiae Legal Council for Health Justice



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1938 Caption: City of Columbus et al. v. Kennedy et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

AiArthritis
(name of party/amicus)

who is amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Martha Jane Perkins Date: 09/04/2026

Counsel for: Amicus Curiae AiArthritis



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1938 Caption: City of Columbus et al. v. Kennedy et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

American Lung Association
(name of party/amicus)

who is amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Martha Jane Perkins Date: 09/04/2026

Counsel for: Amicus Curiae American Lung Association



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1938 Caption: City of Columbus et al. v. Kennedy et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Families USA
(name of party/amicus)

who is amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Martha Jane Perkins Date: 09/04/2026

Counsel for: Amicus Curiae Families USA



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

# DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1938 Caption: City of Columbus et al. v. Kennedy et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Muscular Dystrophy Association
(name of party/amicus)

who is amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Martha Jane Perkins Date: 09/04/2026

Counsel for: Amicus Curiae Muscular Dystrophy Association



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1938 Caption: City of Columbus et al. v. Kennedy et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

National Multiple Sclerosis Society
(name of party/amicus)

who is amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Martha Jane Perkins Date: 09/04/2026

Counsel for: Amicus Curiae National Multiple Sclerosis Society



Print to PDF for Filing

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF AMICI CURIAE ........................................................................1

ARGUMENT ........................................................................................................2

I. CONGRESS PASSED THE AFFORDABLE CARE ACT TO ADDRESS SERIOUS BARRIERS TO PEOPLE'S ABILITY TO OBTAIN HEALTH CARE ........................................................................2

A. Before the ACA ........................................................................2

B. After the ACA ........................................................................4

II. HEALTH INSURANCE SAVES LIVES, BUT THE FINAL RULE ERECTS BARRIERS TO COVERAGE, AND PEOPLE WILL BE HURT. ........................................................................6

A. Individual Amici ........................................................................7

B. Organizational Amici ........................................................................17

III. CONCLUSION........................................................................25

CERTIFICATE OF COMPLIANCE……………………………………...25

## TABLE OF AUTHORITIES

### CASES

*Nat'l Fed'n of Indep. Bus.* (*NFIB*) *v. Sebelius*, 567 U.S. 519 (2012)........................4

### STATUTES

26 U.S.C. § 36B ....................................................................................4

42 U.S.C. § 300gg....................................................................................5

42 U.S.C. § 300gg-1....................................................................................5

42 U.S.C. § 300gg-2....................................................................................5

42 U.S.C. § 300gg-3....................................................................................5

42 U.S.C. § 300gg-4....................................................................................5

42 U.S.C. § 300gg-6....................................................................................5

42 U.S.C. § 300gg-11....................................................................................5

42 U.S.C. 18022....................................................................................5

42 U.S.C. § 18083....................................................................................5

Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat 1818 (2022) ......................4

### OTHER AUTHORITIES

Am. Cancer Soc'y, Cancer Action Network, *Bans on Lifetime and Annual Cost Caps Protect Cancer Patients* (2017), https://www.fightcancer.org/sites/default/files/Lifetime%20and%20Annual%20Caps%20Factsheet%2001-06-17.pdf ............................................3

Am.'s Health Ins. Plans Ctr. for Pol'y & Rsch., *Individual Health Insurance 2009: A Comprehensive Survey of Premiums, Availability, and Benefits* (2009), https://www.kff.org/wp-content/uploads/sites/2/2011/08/2009individualmarketsurveyfinalreport.pdf....................................................................................3

Dania Palanker et al., *Eliminating Essential Health Benefits Will Shift Financial Risk Back to Consumers*, The Commonwealth Fund Blog (Mar. 24, 2017), https://www.commonwealthfund.org/blog/2017/eliminating-essential-health-benefits-will-shift-financial-risk-back-consumers ..................... 3

David U. Himmelstein et al., *Medical Bankruptcy in the United States, 2007: Results of a National Study*, 122 Am. J. Med. 741 (2009), https://pubmed.ncbi.nlm.nih.gov/19501347/ ..................... 4

Families USA, *Dying for Coverage: The Deadly Consequences of Being Uninsured* (2012), https://familiesusa.org/wp-content/uploads/2019/09/Dying-for-Coverage.pdf ..................... 4

Jingxuan Zhao et al., *Health Insurance Status and Cancer Stage at Diagnosis and Survival in the United States*, 72 CA: Cancer J. Clinicians 542 (2022), https://doi.org/10.3322/caac.21732 ..................... 18

Jingxuan Zao et al., *Immune Checkpoint Inhibitors and Survival Disparities by Health Insurance Coverage Among Patients with Metastatic Cancer,* 8 JAMA Network Open e2519274 (July 7, 2025), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2836042 ..................... 17

Kewei Sylvia Shi, *Association of Health Insurance Coverage Disruptions and Colorectal Cancer Screening*, 131 Cancer e35584 (Jan. 1, 2025), https://www.ovid.com/journals/canc/abstract/10.1002/cncr.35584~association-of-health-insurance-coverage-disruptions-and ..................... 18

Letter from Elizabeth G. Taylor, Exec. Dir., Nat'l Health Law Program, to Sec'y Robert F. Kennedy, Jr. (Apr. 10, 2025), https://www.regulations.gov/comment/CMS-2025-0020-19541 ..................... 5

Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074 (June 25, 2025) ..................... 1

Rachel Garfield et al., KFF, *The Uninsured and the ACA: A Primer – Key Facts about Health Insurance and the Uninsured amidst Changes to the Affordable Care Act* (2019), https://www.kff.org/report-section/the-uninsured-and-the-aca-a-primer-key-facts-about-health-insurance-and-the-uninsured-amidst-changes-to-the-affordable-care-act-how-have-health-insurance-coverage-options-and-availability-changed/ ........................................2

U.S. Dep't of Com., Census Bureau, *Income, Poverty, and Health Insurance Coverage in the United States: 2009* (2010), https://www2.census.gov/library/publications/2010/demo/p60-238/p60-238.pdf ........................................2

## INTEREST OF AMICI CURIAE[1]

The *amici* are individuals enrolled in the ACA Marketplace—Kenny Capps, Raven Bonniwell, Kiernan McGowan, Victoria Baggot, Jason Piperberg, Bianca Mahmood, Jacob Margolin, Nicholas Vaughan, and Mariah Adeeko—and the following organizations: Robert Wood Johnson Foundation, American Cancer Society, American Cancer Society Cancer Action Network, Blood Cancer United, Legal Council for Health Justice, AiArthritis, American Lung Association, Families USA, Muscular Dystrophy Association, National Multiple Sclerosis Society, and National Health Law Program.

Although each *amicus* has its own particular interests, the ability of people to obtain and maintain quality, affordable health care coverage through the Affordable Care Act (ACA) is essential to them all. As such, *amici* have an interest in the Final Rule being challenged in this case, U.S. Department of Health and Human Services (HHS) Final Rule, Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074 (June 25, 2025). The Final Rule will increase health care costs for millions of families and introduce significant barriers to coverage that, according to HHS's own estimates, will cause up to 1.8 million people to lose their health insurance in 2026 alone. *See* JA108.

[1] No counsel for a party authored this brief in whole or in part, and no persons other than *amici curiae* made a monetary contribution to its preparation or submission. The parties consented to the filing of this brief.

*Amici* will provide brief background on the ACA. *Amici* then will share with the Court stories of why affordable Marketplace coverage is critical. *Amici* hope these snapshots will provide the Court with helpful insights into how the Final Rule will affect individuals and communities and their path to health and wellbeing.

## ARGUMENT

### I. CONGRESS PASSED THE AFFORDABLE CARE ACT TO ADDRESS SERIOUS BARRIERS TO PEOPLE'S ABILITY TO OBTAIN HEALTH CARE.

#### A. Before the ACA

Prior to the enactment of the ACA, over 50 million people in the United States (roughly 17 percent of the population) did not have health insurance. U.S. Dep't of Com., Census Bureau, *Income, Poverty, and Health Insurance Coverage in the United States: 2009*, at 23 (2010), https://www2.census.gov/library/publications/2010/demo/p60-238/p60-238.pdf. This was due in part to the fact that many lower-income Americans not eligible for Medicaid were unable to purchase insurance on the individual market because it was too expensive or unavailable to them. Rachel Garfield et al., KFF, *The Uninsured and the ACA: A Primer – Key Facts about Health Insurance and the Uninsured amidst Changes to the Affordable Care Act* (2019), https://www.kff.org/report-section/the-uninsured-and-the-aca-a-primer-key-facts-about-health-insurance-and-the-uninsured-amidst-changes-to-the-affordable-care-

act-how-have-health-insurance-coverage-options-and-availability-changed/.

Nearly 13 percent of people who applied for coverage in the individual market and went through the medical underwriting process were denied insurance due to pre-existing conditions. Am.'s Health Ins. Plans Ctr. for Pol'y & Rsch., *Individual Health Insurance 2009: A Comprehensive Survey of Premiums, Availability, and Benefits* 10 (2009), https://www.kff.org/wp-content/uploads/sites/2/2011/08/2009individualmarketsurveyfinalreport.pdf.

Even when people were able to purchase insurance, the coverage was often inadequate. It did not include important services such as prescription drugs, maternity care, and mental health care. *See* Dania Palanker et al., *Eliminating Essential Health Benefits Will Shift Financial Risk Back to Consumers*, The Commonwealth Fund Blog (Mar. 24, 2017), https://www.commonwealthfund.org/blog/2017/eliminating-essential-health-benefits-will-shift-financial-risk-back-consumers. And, plans capped lifetime and annual benefits. *See* Am. Cancer Soc'y, Cancer Action Network, *Bans on Lifetime and Annual Cost Caps Protect Cancer Patients* (2017), https://www.fightcancer.org/sites/default/files/Lifetime%20and%20Annual%20Caps%20Factsheet%2001-06-17.pdf (noting that prior to 2014, more than 105 million Americans were enrolled in plans with a lifetime limit).

Lacking coverage, or having inadequate coverage, has grave financial and health consequences. In 2007, more than 62 percent of all personal bankruptcies were related to medical costs. David U. Himmelstein et al., *Medical Bankruptcy in the United States, 2007: Results of a National Study*, 122 Am. J. Med. 741 (2009), https://pubmed.ncbi.nlm.nih.gov/19501347/. What is more, in 2010 alone, inadequate health coverage caused 26,100 premature deaths among individuals between the ages of 25 and 64. Families USA, *Dying for Coverage: The Deadly Consequences of Being Uninsured* 2 (2012), https://familiesusa.org/wp-content/uploads/2019/09/Dying-for-Coverage.pdf.

**B. After the ACA**

With the enactment of the ACA in March 2010, Congress "aim[ed] to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

The ACA provides people with incomes between 100 and 400 percent of the Federal Poverty Level (FPL) with premium tax credits to help them purchase health insurance. 26 U.S.C. § 36B. (During the COVID pandemic, Congress increased premium tax credits and extended eligibility to people above 400 percent FPL until the end of 2025. *See*, *e.g*., Inflation Reduction Act, § 12001, Pub. L. No. 117-169, 136 Stat 1818, 1905 (2022)). In addition, the law prevents insurers from: charging

higher premiums based on sex, health status, or medical condition, *see* 42 U.S.C. §§ 300gg, 300gg-4; imposing annual or lifetime dollar limits on benefits, *id*. § 300gg-11; and excluding coverage of benefits related to preexisting conditions, *id*. § 300gg-3. Perhaps most critically, it provides for guaranteed availability and renewability of coverage. *Id*. §§ 300gg-1, 300gg-2.

To facilitate enrollment, the ACA establishes a single streamlined application process for multiple insurance programs, including the ACA Marketplaces, Medicaid, and the Children's Health Insurance Program. 42 U.S.C. § 18083; *see* Letter from Elizabeth G. Taylor, Exec. Dir., Nat'l Health Law Program, to Sec'y Robert F. Kennedy, Jr., at 11 (Apr. 10, 2025), https://www.regulations.gov/comment/CMS-2025-0020-19541 (comment noting that streamlined enrollment "procedures—including automatic re-enrollment—have become the standard to which people living in the United States who obtain their health care through the marketplaces are accustomed"). The ACA assures coverage of essential health benefits, such as maternity and newborn care, prescription drugs, mental health services, and preventive care. 42 U.S.C. §§ 300gg-6, 18022. Finally, the ACA set standardized levels of coverage for bronze, silver, gold, and platinum plans to both ensure minimum coverage levels and help consumers understand and compare health plans based on benefit generosity. *See* 42 U.S.C. § 18022(d).

## II. HEALTH INSURANCE SAVES LIVES, BUT THE FINAL RULE ERECTS BARRIERS TO COVERAGE, AND PEOPLE WILL BE HURT.

ACA Marketplace coverage saves lives. But without question, the Final Rule will create barriers to obtaining this coverage and reverse progress achieved under the ACA. Among other things, the Final Rule will increase consumer premiums and out-of-pocket costs. The Rule's changes to the actuarial value ranges will cause a consumer's share of premiums to rise and allow bronze, silver, and gold plans to have higher deductibles, copayments, and coinsurance costs. Individuals and families who are affected by this change would be forced to (1) pay the same premium but face higher out-of-pocket costs through higher deductibles, copays, or coinsurance, or (2) pay higher premiums for a new plan with the same level of generosity.

The Final Rule will shorten the open enrollment period. Although the open enrollment period for the federal Marketplace, HealthCare.gov, extended from November 1 to January 15 for the past five years, this enrollment period will end on December 15 beginning with the 2027 plan year. By shortening the open enrollment period, the Final Rule will make it harder for consumers to do so—especially those in rural areas, with limited English proficiency, or with disabling conditions who might need more time to enroll. The Final Rule also requires state-based Marketplaces to end their open enrollment periods by December 31. HHS imposes

this policy even though these Marketplaces have long had flexibility to extend their annual open enrollment period into January based on state-specific needs.

The Final Rule will also disproportionately harm people with fluctuating incomes and those with relatively low health literacy, who will have less time to resolve verification issues for advance premium tax credits. These changes will be especially hard-hitting for the self-employed. From artists to hairdressers, ride-share drivers, consultants, and adjunct professors, their incomes are often sporadic with months of plenty and months with little work or income. Finding acceptable proof of income can be difficult, and those who are unable to produce this evidence may be unable to enroll at all. The Final Rule also cuts in half the time permitted for people to file their taxes and reconcile their earned income with the amount they received in ACA premium assistance based on their projected income. Many low-income, self-employed adults are able to remain in the Marketplace specifically because they have had two years for reconciliation. The Final Rule's change to yearly reconciliation will lead to many self-employed individuals losing access to financial help and, with it, their only health coverage option, the Marketplace.

**A. Individual Amici**

The provisions of the Final Rule are going to hurt people, as illustrated by these individuals' stories:

**Kenny Capps** is 54 years old and a father and stepfather of seven. He lives in Black Mountain, North Carolina. Nearly ten years ago, Kenny was busy running a small marketing and printing business, taking care of his family, and training for ultra-marathons, when he began to experience extreme fatigue. He went to see his primary care provider. A few months later, in January 2015, he was diagnosed with multiple myeloma, a cancer that affects bone marrow. Kenny had lesions on bones throughout his body, including his skull, spine, hips, and ribs. He had two compression fractures in his back.

Shortly after he was diagnosed, Kenny was able to purchase health insurance through the ACA Marketplace, which allowed him to begin treatment. He underwent chemotherapy followed by an autologous stem cell transplant in August 2015. Without health insurance, the various statements of benefits showed that his first year of cancer treatment would have cost almost $700,000. That amount would have been completely unaffordable for Kenny.

Since 2015, Kenny has maintained his enrollment in a Marketplace plan. The coverage has enabled him to receive ongoing monitoring, testing, and treatment for his condition. In 2023, his multiple myeloma relapsed, and he has required ongoing treatment since then. Because multiple myeloma currently has no cure, he will likely need to continue treatment for the rest of his life. Even with his health insurance, Kenny has significant out-of-pocket health costs, including cost sharing for

appointments, lab work, and medications. These expenses put a strain on his family budget. Kenny is the founder and Executive Director of Cancer Active, Inc., a small nonprofit, He also coaches endurance athletes. If his premiums or cost-sharing increase substantially, he is going to struggle to afford the care that he needs to be present for his children, work, and give back to his community. He is worried that he and his family will be forced to make an impossible choice—pay their mortgage and other basic expenses or pay for the medical care that keeps him alive.

**Raven Bonniwell**, age 40, and **Kiernan McGowan**, age 39, have been married for 10 years. They live in Midlothian, Virginia with their daughter, who just entered the first grade.

Ms. Bonniwell and Mr. McGowan have been self-employed for many years. Raven operates a business as a life and leadership coach. Kiernan works as an application coach assisting individuals who are applying to medical school. Over the years, they have worked various jobs, including gig work, teaching in public schools, and teaching theater classes. Ms. Bonniwell and Mr. McGowan are also theater artists. When they have theater work, they receive pay, but that work is decided by the casting director and, when they are not getting parts, they do not have that income.

Ms. Bonniwell and Mr. McGowan have a monthly budget that they use to pay the mortgage, utilities, groceries, gasoline, and other daily expenses, including for

their daughter. They share a 14-year-old car. The couple does not live lavishly.

Over the years, all of their various jobs have been rewarding to them and helpful to others, but none of these jobs has come with employer-sponsored health insurance. As a result, they rely on Marketplace coverage.

Raven and Kiernan are thankful that they are healthy, as is their daughter. Marketplace coverage is nevertheless extremely important to them. It allows them to obtain annual physical exams, and it is there for them when problems arise. Just last year, Raven was working in the basement of her home when a ladder fell and hit her on the head. Her neck seized, and she was in pain. The advice nurse told her to go to the emergency room. Even then, she and Kiernan had to make the calculation whether they could afford to go. They did seek emergency care, a visit that left them with a $1,000 bill. Without Marketplace coverage, they would have owed thousands upon thousands of dollars.

Last year, Raven and Kiernan lost the enhanced Marketplace premium subsidy. After looking at their coverage options, they decided to downgrade from a silver to a bronze plan; yet, that plan is still four times more expensive than what they were previously paying. They are covering this increase by using savings they had set aside for a college fund for their daughter and retirement for themselves. If the cost of this insurance increases again, they do not know how they will be able to

afford it. They are concerned. As Kiernan summed it up, “We are at the mercy of the Marketplace.”

**Victoria (Tori) Baggot** is a 34-year-old woman who lives in Pittsburgh, Pennsylvania. She considers herself to be a typical American. Tori is in the midst of launching her own small letterpress printing business, making greeting cards, prints, and other paper goods.

When she was 13 years old, Tori began to have joint problems. She was eventually diagnosed with Hypermobility Spectrum Disorder (HSD), a chronic condition that is part of a spectrum of disorders that includes Ehlers-Danlos Syndrome. The condition has major effects on her joints and connective tissues. She experiences mobility problems and pain. The cause of HSD is not yet understood, so treatment focuses on controlling symptoms, which can appear and shift quickly. Tori requires regular specialist visits, testing, and medications.

Because of HSD, it is essential for Tori to have a health care plan that meets her needs. Tori is entering her second year of Marketplace coverage (called Pennie in Pennsylvania). Her husband’s employer-based coverage would cost more than triple what she now pays—$600 a month. Tori qualifies for premium tax credits through Pennie that allow her to save $164 a month, nearly $2,000 a year.

Tori and her husband live frugally, but money is quite tight as she works to get the printing business off the ground. If the Final Rule’s increases in premiums

and cost sharing occur, she will likely have to choose less than the full coverage she needs to treat her HSD symptoms. The financial burden of having to pay more for health coverage would present a significant challenge to her ability to have the printing business and would certainly involve taking a second job.

Tori and her husband hope to start a family soon. Knowing that prenatal care and family planning care would be covered through Pennie is a huge relief; however, Tori is concerned that significant increases in the cost of coverage will mean that she cannot afford to have children.

**Jason Piperberg** is 37 years old. He lives in Philadelphia, Pennsylvania and works as a freelance illustrator, earning roughly $30,000 a year. He has used the ACA Marketplace to enroll in health insurance since 2017.

During a routine check-up in October 2022, Jason asked his primary care provider about a lump in his neck. After a series of tests, he was diagnosed with thyroid cancer, which had spread to the surrounding lymph nodes. He has undergone a total of four surgeries (removing his entire thyroid and dozens of lymph nodes) and one round of radioactive iodine therapy since 2022. With his silver-tier Marketplace plan, Jason was able to receive care from some of the best doctors in the country. The treatment was successful, and although the cancer is not officially in remission, all of his current scans and test results are in a good place.

Despite being enrolled in a silver-tier plan, Jason still incurred several thousand dollars out-of-pocket for the treatment. Those out-of-pocket expenses were on top of his monthly premiums, which are currently approximately $126 per month. Jason eventually qualified for financial aid through the hospital, and that helped to relieve some of the financial stress of the situation.

Jason needs ongoing monitoring, including regular checkups, ultrasounds, and blood work to make sure his condition remains stable. His most recent surgery was in November of 2025; due to the ongoing monitoring, Jason's cancer was detected early and the surgery was therefore less invasive. In addition, he must take thyroid hormone daily for the rest of his life to remain healthy.

If his premiums increase under the Final Rule, he will have to switch to a lower-tier plan with higher out-of-pocket costs and potentially a different network of doctors. He has good relationships with his doctors and does not want to lose access to them. He is even more concerned that a significant increase in premiums and cost sharing requirements under the Final Rule will put coverage and care out of reach, which would be catastrophic for his health.

**Bianca Mahmood**, 41 years old, lives in Los Angeles, California. She is enrolled in the ACA Marketplace, called Covered California, for health coverage. Bianca enrolled in Covered California when she lost employer-sponsored insurance three years ago.

Covered California has given Bianca access to high-quality plans at a fraction of the cost compared to buying directly from the insurance companies. The ability to purchase affordable and adequate health insurance independent of an employer is critical to allowing her to remain self-employed while pursuing her goals. Bianca completed a certificate in Data Analytics in June 2025 and is preparing to attend graduate school part-time while continuing to work for herself.

Covered California gives Bianca the security of knowing that she will have the opportunity to enroll in plans vetted by individuals who understand both the state health infrastructure and the health care needs of Californians. Although Bianca is an avid researcher and educated consumer, she finds navigating the notoriously opaque and confusing health insurance landscape as an individual purchaser overwhelming. Covered California has provided her with a centralized, transparent, and easy-to-navigate platform for obtaining resources to meet her health care needs.

Bianca is in good health—she primarily uses her health insurance for preventive care like annual checkups and vaccinations—but her Covered California insurance gives her peace of mind; she knows she will be able to get additional care as health challenges arise. When she injured her knee last year, her plan covered the necessary imaging, treatment, and physical therapy. Bianca is concerned that the premium and cost sharing increases contained in the Final Rule will make it

financially burdensome for her to pay for high-quality, comprehensive health insurance and that her coverage and health care access will suffer as a result.

**Jacob Margolin** is 45 years old, and **Nicholas Vaughan** is 43 years old. They live in Houston, Texas and work as freelance artists, primarily in Houston and the surrounding area. Jacob and Nicholas are enrolled in Marketplace coverage through the ACA. Both use their coverage for preventive care and health maintenance.

Prior to enactment of the ACA, Jacob and Nicholas were only able to afford catastrophic insurance coverage. The deductible was very high, and the benefits were quite limited. The coverage did not feel to them like it was health insurance.

By contrast, with Marketplace coverage, Jacob and Nicholas are currently meeting all their health care needs, and the coverage is affordable. The ability to purchase affordable and adequate health insurance has been critical to enabling them to pursue their work as artists. Indeed, Marketplace coverage is allowing them to have the financial resources to live what they see as the American dream—to start their own nonprofit community arts organization.

Jacob and Nicholas run a tight ship financially, and it would be quite difficult to maintain their Marketplace coverage if their premiums were to increase markedly. They would face a serious dilemma: As they age, health insurance has become more important, and a return to only catastrophic coverage would be inadequate. However,

having to pay increased premiums to maintain adequate health coverage would likely put an end to their career plans and goals.

**Mariah Adeeko** lives in Houston, Texas. She will turn 23 in September. Mariah is enrolled in family Marketplace coverage alongside their parents and sister. Thanks to the Affordable Care Act, Mariah can continue to be covered as a dependent until they turn 26 and will obtain their own health insurance. Mariah's family has long relied on Marketplace coverage as an affordable option, turning to the Marketplace when employer-sponsored insurance has not been available or affordable.

As a long-time Marketplace enrollee, Mariah knows that plan-specific coverage details—from provider networks to cost-sharing levels—can make a big difference in the care they are able to receive and the amount they must pay for that care. In some years, Mariah's Marketplace coverage included high-quality clinical networks that helped them manage their health needs and very low cost sharing for prescription drugs. In other years, Mariah faced higher out-of-pocket costs for the same care, and their health insurance covered less care than they expected. These plan design details matter because Mariah has a condition that requires regular care from a specialist, lab tests, and prescription drugs. Under the Final Rule, health insurers will have more flexibility to erode the actuarial value of Marketplace coverage, forcing Mariah to dive even deeper to understand new benefits and

limitations. These and other changes under the Final Rule will also lead to higher premiums and cost-sharing for Mariah and their family.

Informed by these experiences navigating health insurance and care, Mariah's work includes offering training and consumer education to help other young adults understand their coverage options, improve their health insurance literacy, and use their coverage. Mariah is deeply concerned that the Final Rule's administrative burdens will deter young adults from enrolling in Marketplace coverage by making it even harder for them to navigate complex coverage decisions—often without the help they need to fully understand their options.

**B. Organizational Amici**

The **American Cancer Society** mission is to improve the lives of people with cancer and their families through advocacy, research, and patient support, to ensure everyone has an opportunity to prevent, detect, treat, and survive cancer. For over a decade, ACS research has demonstrated that access to comprehensive, affordable health insurance saves lives. The **American Cancer Society Cancer Action Network** (ACS CAN) is the nonprofit, nonpartisan advocacy affiliate of the American Cancer Society. ACS CAN advocates for evidence-based public policies to reduce the cancer burden for everyone. Health insurance is crucial for advanced stage cancer patients to gain access to the newest lifesaving treatments and makes it more likely that people will survive. Jingxuan Zao et al., *Immune*

*Checkpoint Inhibitors and Survival Disparities by Health Insurance Coverage Among Patients with Metastatic Cancer,* 8 JAMA Network Open e2519274 (July 7, 2025), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2836042.

Research from the American Cancer Society has shown that uninsured Americans are less likely to be screened for cancer and thus more likely to have their cancers diagnosed at an advanced stage when survival is less likely and the cost of care, more expensive. Jingxuan Zhao et al., *Health Insurance Status and Cancer Stage at Diagnosis and Survival in the United States*. 72 CA: Cancer J. Clinicians 542 (2022), https://doi.org/10.3322/caac.21732. Moreover, disruptions in health insurance coverage—even if the individual re-gains coverage eventually—are associated with missed cancer screenings. Kewei Sylvia Shi, *Association of Health Insurance Coverage Disruptions and Colorectal Cancer Screening*, 131 Cancer e35584 (Jan. 1, 2025), https://www.ovid.com/journals/canc/abstract/10.1002/cncr.35584~association-of-health-insurance-coverage-disruptions-and. W.B.'s story illustrates the essential role of ACA Marketplace coverage for cancer patients.

**W.B.** is 47 years old and lives in Ashland, Illinois. W.B. has multiple health conditions, including cancer and multiple autoimmune diseases. Because of her conditions, it is important for her to have ongoing treatments and close monitoring from her health care providers, including second opinions.

W.B. worked at her desk job and through debilitating fatigue while on an oral chemotherapy regime. Following surgery and treatment, her right kidney and the cancerous tumor are gone, and her cancer is in remission. Her energy is restored. She is taking daily walks with her dog and 11-year-old stepson, who recently came to live with her after losing his mother to cancer in 2026.

W.B. depends on the Marketplace for her health insurance coverage. The coverage enables her to obtain health care, which includes regular visits to her doctors. And while W.B. is now cancer free, she is not debt free. In 2026, the cost of her Marketplace coverage increased. The deductible increased from $300 in 2025 to $10,000, an amount she hit at the end of February and that she now holds as medical debt. She has spent hours working out payment plans with creditors from the hospital, clinic, and other providers. W.B.'s monthly premiums also increased from $117 in 2025 to, initially, $169 in 2026. However, her monthly premium has increased to $497, an increase she was told is based on her stepson's receipt of Social Security death benefits. W.B.'s husband works as a sanitation worker; his employer does not provide health insurance. He is uninsured because the family can only afford a Marketplace plan for W.B. As W.B. noted, "Living in the moment can be difficult with mounting debt and uncertainty of insurance."

**Blood Cancer United** is the world's largest voluntary health agency dedicated to fighting blood cancer and ensuring that the more than 1.6 million blood

cancer patients and survivors in the United States have access to the care they need. Blood Cancer United's mission is to cure blood cancer and to improve the quality of life of patients and their families. Blood Cancer United advances that mission by advocating for blood cancer patients to have sustainable access to quality, affordable, coordinated health care, regardless of the source of their coverage. In addition to research, policy, and advocacy, Blood Cancer United provides one-on-one patient support to guide people with blood cancer and their families through treatment and financial and social challenges, including navigating insurance coverage and medical debt. The Final Rule would create barriers to Blood Cancer United's mission and, most importantly, for the patients and survivors it works for, as the following examples illustrate:

***K.F-S.*** is 51 years old and lives in Maine. For the past 15 years, she and her husband have been the primary caregivers for her father, who has chronic lymphocytic leukemia and is now in hospice care. In 2017, while running a fundraising race for The Leukemia & Lymphoma Society (now, Blood Cancer United), K.F-S. became ill. She lost vision in her right eye and mobility on the right side of her body. She was diagnosed with multiple sclerosis—specifically, multiple demyelinating lesions in the brain and dangerously elevated brain pressure. K.F-S. had to stop working at the University of Southern Maine.

K.F-S. is able to obtain the health care she needs because she is insured through the ACA Marketplace. Her annual household income is about $40,000, which qualifies her for a significant ACA subsidy and reduced out-of-pocket deductible. K.F-S. needs consistent, complex care: regular neurologist visits, twice-yearly MRIs and spinal taps, and consultations with eye specialists. She takes medication to reduce pressure in her brain. With her ACA plan, she pays $10 a month. Without it, the medication would cost $64 a month. K.F-S. has a medication regimen to support her care that costs $230 with insurance. That regimen, while supportive, causes leeching of essential vitamins and minerals—necessitating routine supplements and quarterly IV treatments. Without insurance, a single spinal tap would cost K.F-S $2,300; an MRI, $4,800.

If the level of support she receives from the Marketplace decreases, K.F-S. will face difficult choices, including whether and when to delay or forgo health care. Without health care, K.F-S. would lose vision, mobility, and independence and live in constant pain. She would not be able to care for her family or her father in his final days.

***N.S.*** and ***B.S.*** live in Dubuque, Iowa with their two sons, S.S. and L.S. In 2022, S.S. was diagnosed with a rare cancer, rhabdomyosarcoma, at just three and a half years old. S.S. underwent 66 weeks of cancer therapy. The treatment included many rounds of chemotherapy in Iowa City (a two-hour drive from home), dozens

of radiation treatments, some of which S.S. needed to receive in Rochester, Minnesota (a more than three-hour drive from home), and nearly 20 prescriptions. This care saved his life. His doctors say his body now has no evidence of disease.

When S.S.'s treatment began, the family had health insurance through N.S.'s employer. But N.S. was forced to leave her job to care for S.S. B.S. was self-employed, so he did not have access to employer-sponsored coverage. A hospital social worker helped enroll the two boys in Medicaid, allowing B.S. and N.S. to breathe easier knowing their children had access to essential health care.

N.S. and B.S. were able to find a high-quality plan for themselves on the ACA Marketplace. They were able to afford the coverage due to the ACA's premium tax credits. Maintaining coverage is especially important for B.S., who has a lifelong chronic illness. To keep his condition under control, he needs regular imaging and specialty medication that comes with its own high out-of-pocket costs.

The family is still facing the devastating economic consequences of illness and disease. Throughout S.S.'s care, N.S. and B.S. pursued grants from charities that paid for hospital parking, gas, and some out-of-pocket fees for medications. They negotiated with hospitals, found deals on hotel rooms, and got prescriptions from lower-cost pharmacies. Yet, they fell $20,000 into debt. B.S. continues to work full-time, and N.S. helps with his business and works part-time at the children's school. If their premiums increase, N.S. and B.S. are worried that they will not be able to

afford their own health insurance, pay off their medical bills, and create a more stable and secure financial future for their family.

For over 30 years, **Legal Council for Health Justice** (Legal Council) has served individuals, children, and families impacted by chronic, disabling, and stigmatizing health conditions through medical-legal partnership programs. Legal Council is based in Chicago, Illinois. Legal Council has assisted thousands of Illinoisans in obtaining, maintaining, and re-establishing eligibility for health insurance, including coverage through the Marketplace. Legal Council's Marketplace clients tend to be people living with chronic medical conditions, including AIDS; people who were terminated from Medicaid for being just over income; and people who work a variety of jobs, often more than one, but whose employers do not offer affordable health benefits or any health benefits at all. As illustrated by the examples of people whom Legal Council has helped, the Final Rule will create significant barriers to care:

**A.A**. is a 39-year-old working parent of three whose Medicaid eligibility properly ended due to an increase in income. A.A. signed up for a Marketplace plan on their own. Their key medical providers were not in-network, and A.A. had not understood that the Marketplace offers health plan options. A.A. contacted Legal Council on December 17, 2024. Legal Council was able to help A.A. switch to a plan with key providers in-network, thus enabling affordable access to continuous

care with trusted doctors. Without the flexibility to enroll in late December 2024, A.A. would have faced potential disruption in care as a result of loss of access to trusted providers for an entire year. A.A. continues to carry Marketplace coverage.

**B.B.**, a 57-year-old single adult, worked full-time at a small employer that did not offer health benefits. After being diagnosed with cancer, B.B. was able to obtain treatment under the hospital financial assistance program. That program did not provide access to all the treatment that B.B. needed. With Legal Council's support, B.B. signed up for a health plan on January 14, 2025, with coverage effective as of February 1, 2025. Lack of access to employer-based insurance in spite of full-time work, the timing of the cancer diagnosis, and the access to medically necessary specialty care, all led to B.B.'s need for enrollment during the extended open enrollment period. Had B.B. been forced to wait another year for access to cancer treatment, a positive health outcome would likely have been jeopardized. Legal Council helped B.B. enroll in Marketplace coverage in 2026. B.B. remains in remission and is able to work.

**E.E.**, age 44, moved to Illinois from another state and was not aware of the health benefits available in Illinois. More than six months after arriving in Illinois, E.E. learned about Marketplace coverage. Legal Council worked with the client in January 2025, to sign up for a health plan. Waiting a year for access to health coverage and healthcare could have been disastrous. Shortly after E.E.'s benefits

were active, a dermatologist diagnosed skin cancer. Because of Marketplace coverage, E.E. could afford to get the skin lesions removed.

## CONCLUSION

The Court should affirm the district court's summary judgment order.

Dated: September 8, 2026

Respectfully submitted,

/s/ *Martha Jane Perkins*
Martha Jane Perkins
National Health Law Program
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27516
Tel: (919) 968-6308 (x101)
perkins@healthlaw.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I certify that the foregoing brief complies with the requirements of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5), and that the total number of words in this brief is 5,491 according to the count of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

/s/ *Martha Jane Perkins*
Martha Jane Perkins