No. 26-1938

**IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

CITY OF COLUMBUS, *et al.*,
*Plaintiffs-Appellees*,

v.

ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the United States Department of Health and Human Services, et al.*,
*Defendants-Appellants.*

On Appeal from the U.S. District Court for the District of Maryland

# BRIEF OF ECONOMISTS AND SCHOLARS OF HEALTH POLICY AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

*Of Counsel:*

Aaron R. Cooper
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ ii

INTRODUCTION AND INTERESTS OF AMICI CURIAE ........ 1

ARGUMENT ........ 4

I. The Rule drives disenrollment and increases consumer health care costs through well-documented financial and non-financial channels. ........ 4

  A. Administrative red tape and the shortened open enrollment period will deter eligible people from enrolling in Marketplace coverage, leading to higher premiums. ........ 5

  B. The Rule will further increase consumer health care costs through less generous coverage and higher premiums. ........ 12

II. Coverage losses and high out-of-pocket costs will financially burden localities and safety-net providers. ........ 14

III. The Rule attempts to justify new administrative burdens by unduly relying on flawed analysis from the Paragon Health Institute. ........ 19

CONCLUSION ........ 22

APPENDIX ........ 23

CERTIFICATE OF COMPLIANCE ........ 25

# TABLE OF AUTHORITIES

Page(s)

## Statutes

Patient Protection and Affordable Case Act, Pub. L. 111-148, 124 Stat. 119 (2010) (codified at 42 U.S.C.A. § 18001)......................... 1

## Other Authorities

Adrianna McIntyre et al., *Can Automatic Retention Improve Health Insurance Market Outcomes?*, 111 AEA PAPERS & PROC. 560 (2021) ...................................................................... 7

Adrianna McIntyre, Comment Letter on Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability CMS-9884-P (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-23519.... 11, 21

Am. Hosp. Ass'n, Comment Letter on Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-25407 ......................................................................... 17

Am. Pub. Health Ass'n, Comment Letter on Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability CMS-9884-P (Apr. 7, 2025), https://www.regulations.gov/comment/CMS-2025-0020-10622.......... 18

Amy Finkelstein & Matthew J. Notowidigdo, *Take-Up and Targeting: Experimental Evidence from SNAP*, 134 Q. J. ECON. 1505 (2019)....................................................................... 6

Amy Finkelstein et al., *Subsidizing Health Insurance for Low-Income Adults: Evidence from Massachusetts*, 109 AM. ECON. REV. 1530 (2019) ............................................................... 7, 14

Ausmita Ghosh et al., *The Effect of Health Insurance on Prescription Drug Use Among Low-Income Adults: Evidence from Recent Medicaid Expansions*, 63 J. HEALTH ECON. 64 (2019) ........................................................................................ 15

Benjamin D. Sommers et al., *Closing Gaps or Holding Steady? The Affordable Care Act, Medicaid Expansion, and Racial Disparities in Coverage, 2010–2021*, 50 J. HEALTH POL. POL'Y LAW 253 (2025)........................................................................ 16

Brigitte C. Madrian & Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. ECON. 1149 (2001) ............................................... 6

Coleman Drake & David M. Anderson, *Association Between Having an Automatic Reenrollment Option and Reenrollment in the Health Insurance Marketplaces*, 179 JAMA INT. MED. 1725 (2019)........................................................................................ 5

Coleman Drake et al., *Financial Transaction Costs Reduce Benefit Take-Up Evidence From Zero-Premium Health Insurance Plans In Colorado*, 89 J. HEALTH ECON. 102752 (2023) ............................................................................................ 10

Covered California, *Data Snapshot: Covered California Open and Special Enrollment Periods* (Apr. 3, 2025), https://hbex.coveredca.com/data-research/library/CoveredCA_OE_SEP_Data_Snapshot_20250403.pdf.................................................................................. 11

Ctr. on Budget and Pol'y Priorities, Comment Letter on Proposed Rule, Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability CMS-9884-P (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-24058......................................................................................... 9, 21

Drew Calvert, *Who Bears the Cost of the Uninsured? Nonprofit Hospitals.*, Kellogg Insight (June 22, 2015), https://insight.kellogg.northwestern.edu/article/who-bears-the-cost-of-the-uninsured-nonprofit-hospitals.................................. 16

Eric Giannella et al., *Administrative Burden and Procedural Denials: Experimental Evidence from SNAP*, 16 AM. ECON. J. ECON. POL'Y 316 (2024) ........................................................................ 6

Eric P. Bettinger et al., *The Role of Application Assistance and Information in College Decisions: Results from the H&R Block FAFSA Experiment*, 127 Q. J. ECON. 1205 (2012) ................................ 6

Gabriella Aboulafia et al., *The Past and Future of Medicaid and the Affordable Care Act—Support or Sabotage?*, 334 JAMA 115 (2025) ................................................................................ 4

Gabriella Aboulafia et al., *The Rise and Fall (and Rise) of the Affordable Care Act: Varying Impacts on Coverage Over Time and Place* (Nat'l Bureau of Econ. Rsch., Working Paper No. 33615, 2025) ........................................................................... 4

Geena Kim et al., *Why Some Nonelderly Adult Medicaid Enrollees Appear Ineligible Based on Their Annual Income*, 49 J. HEALTH POL., POL'Y AND LAW 1051 (2024) ...................................... 21

Gideon Lukens & Elizabeth Zhang, *Administration's ACA Marketplace Rule Will Raise Health Care Costs for Millions of Families*, Ctr. on Budget and Pol'y Priorities (Aug. 1, 2025) ............ 14

Gracie Himmelstein, *Effect of the Affordable Care Act's Medicaid Expansions on Food Security, 2010–2016*, 109 AM. J. PUB. HEALTH 1243 (2019) ................................................................ 15

Helen Levy & Thomas C. Buchmueller, *The Impact of Health Insurance on Mortality*, 46 ANN. REV. PUB. HEALTH 541 (2025) .. 15, 18

Hiroshi Gotanda et al., *Out-of-Pocket Spending and Financial Burden Among Low Income Adults After Medicaid Expansions in the United States: Quasi-Experimental Difference-in-Difference Study*, 368 BRITISH MED. J. 40 (2020) ......... 15

Jason Levitis et al., Comment Letter on Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-25047 ..................................................................... 21

Jennifer Tolbert et al., Key Facts about the Uninsured Population, Kaiser Family Foundation (June 16, 2026), https://www.kff.org/uninsured/key-facts-about-the-uninsured-population/ .......... 14

Jesse C. Baumgartner et al., *Racial and Ethnic Inequities in Health Care Coverage and Access, 2013-2019*, The Commonwealth Fund (2021).......... 16

Jessica Banthin, Urban Inst., Comment Letter on Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-24021.......... 20

Julia Paradise et al., *Community Health Centers: Recent Growth and the Role of the ACA*, KFF (Jan. 18, 2017).......... 17

Keith M. Marzilli Ericson & Amanda Starc, *How Product Standardization Affects Choice: Evidence from the Massachusetts Health Insurance Exchange*, 50 J. HEALTH ECON. 71 (2016).......... 13

Keith Marzilli Ericson et al., *Reducing Administrative Barriers Increases Take-Up of Subsidized Health Insurance Coverage: Evidence from a Field Experiment*, REV. ECON. STATS. 1–32 (2025) .......... 5

Kenneth Brevoort et al., *The Credit Consequences of Unpaid Medical Bills*, 187 J. PUB. ECON. 104203 (2020) .......... 15

Laura R. Wherry & Sarah Miller, *Early Coverage, Access, Utilization, and Health Effects Associated With the Affordable Care Act Medicaid Expansions: A Quasi-Experimental Study*, 164 ANN. INTERN. MED. 795 (2016) .......... 15

Luojia Hu et al., *The Effect of the Affordable Care Act Medicaid Expansions on Financial Wellbeing*, 163 J. PUB. ECON. 99 (2018) .......... 15

Mark Duggan et al., *The Impact of the Affordable Care Act: Evidence from California's Hospital Sector*, 14 AM. ECON. J. 111 (2022) .......... 15

Mark Shepard & Myles Wagner, *Do Ordeals Work for Selection Markets? Evidence from Health Insurance Auto-Enrollment*, 115 AM. ECON. REV. 772 (2025) .......... 5, 7

Martin B. Hackmann et al., *Adverse Selection and an Individual Mandate: When Theory Meets Practice*, 105 AM. ECON. REV. 1030 (2015) .......... 7

Matthew Fiedler, The Brookings Institution, Comment Letter on Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-24920 .......... 21

Michael Geruso et al., *The Two-Margin Problem in Insurance Markets*, 105 REV. OF ECON. & STATS. 237 (2023) .......... 14

N.Y. State of Health et al., Comment Letter on Patient Protection and Affordable Care Act; Market Stabilization (Mar. 7, 2017), https://www.regulations.gov/comment/CMS-2017-0021-3014 .......... 11

Naomi Zewde et al., *The Effects of the ACA Medicaid Expansion on Nationwide Home Evictions and Eviction-Court Initiations: United States, 2000–2016*, 109 AM. J. PUB. HEALTH 1379 (2019) .......... 15

Patient Protection and Affordable Care Act Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074 (June 25, 2025) (to be codified at 45 C.F.R. pts. 147, 155-56) .......... 2, 9, 17, 19

Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2024, 88 Fed. Reg. 25,740 (Apr. 27, 2023) .......... 8

Raj Chetty et al., *Active vs. Passive Decisions and Crowd-Out in Retirement Savings Accounts: Evidence from Denmark*, 129 Q. J. ECON. 1141 (2014) .......... 6

Richard G. Frank, *Medicaid Reforms in the One Big Beautiful Bill Act and Mental Health Care*, 77 PSYCH. SERVS. 880 (2026) ........ 10

Samantha Artiga et al., *Changes in Health Coverage by Race and Ethnicity Since the ACA, 2010-2018*, KFF (2020)....................... 16

Susan L. Hayes et al., *Reducing Racial and Ethnic Disparities in Access to Care: Has the Affordable Care Act Made a Difference?*, The Commonwealth Fund (2017) .................................. 16

Teresa A. Coughlin et al., *Sources of Payment for Uncompensated Care for the Uninsured*, KFF (Apr. 6, 2021)........... 17

Thomas C. Buchmueller & Helen G. Levy, *The ACA's Impact on Racial and Ethnic Disparities in Health Insurance Coverage and Access to Care*, 39 HEALTH AFF. 395 (2020)................................ 16

U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, *Health Insurance Coverage and Access to Care for American Indians and Alaska Natives: Current Trends and Key Challenges*, HP-2021-18 (2021)............................................................................ 16

U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, *Health Insurance Coverage Changes Since Implementation of the Affordable Care Act: Asian Americans and Pacific Islanders*, HP-2021-11 (2021) ........................................................................ 16

## INTRODUCTION AND INTERESTS OF AMICI CURIAE[1]

*Amici curiae* are 19 leading economists and health policy scholars with extensive expertise and knowledge of health insurance markets and health care costs. The undersigned *amici* have taught and researched the economic forces operating in the health care and health insurance markets and published research and analysis on the effects of the Affordable Care Act[2] at both the federal and state levels. Several have served in senior government roles across multiple administrations, including at the White House Council of Economic Advisors, the Department of Health and Human Services (HHS) Office of the Assistant Secretary for Planning and Evaluation, and the Office of Management and Budget. A complete list of *amici* can be found in the Appendix.

---

[1] The parties consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* state that no party or counsel for a party authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than *amici* or their counsel contributed money that was intended to fund preparing or submitting this brief. Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, none of the *amici* is required to make a corporate disclosure.

[2] Patient Protection and Affordable Case Act, Pub. L. 111-148, 124 Stat. 119 (2010) (codified at 42 U.S.C.A. § 18001).

*Amici* do not directly address the parties' legal arguments. Instead, they submit this brief to assist the Court in understanding the context in which those arguments arise—context concerning the economics of health insurance markets; the relationship between premiums, enrollment, and market outcomes; how the Rule at issue in this appeal[3] will impact consumers, localities, and other safety-net health care providers; and the Rule's flawed analysis of improper enrollment.

The Rule will impose new barriers and higher costs on consumers that obtain their own health insurance through the Marketplace. Consumers will have less time to resolve eligibility disputes, an arduous process that can require consumers to locate and submit difficult-to-find documentation. The Rule's shortened open enrollment period will lead to consumer confusion and make enrolling harder. And the Rule's lower actuarial value standards will lead to higher out-of-pocket costs, or higher premiums for consumers who want to maintain the same level of coverage that they had in the past.

[3] Patient Protection and Affordable Care Act Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074 (June 25, 2025) (to be codified at 45 C.F.R. pts. 147, 155-56) (hereinafter referred to as the "Rule").

A large body of empirical evidence implies that the Rule's new financial and non-financial burdens will reduce enrollment, especially among younger and healthier people. As younger and healthier people drop their coverage, the Marketplace risk pool will deteriorate, causing premiums to rise. Higher premiums, in turn, cause additional people to become uninsured.

At the same time, uninsured people do not stop needing health care. Instead, these patients rely more heavily on safety-net health care providers, which are often obligated to see patients regardless of their income or insurance status. When patients cannot afford to pay their medical bills, safety-net providers—often financed by localities and states—bear the burden of higher uncompensated care costs. Several *amici* warned HHS of these highly predictable and empirically grounded effects in comments on the proposed Rule.

*Amici* also want the Court to understand that HHS relied on a flawed external analysis to justify many of the Rule's policies. As the district court found and as *amici* made clear in comments to HHS, the Paragon Health Institute's apples-to-oranges analysis suffers from serious methodological defects that prevent it from reliably measuring

improper enrollment in Marketplace coverage. HHS declined to grapple with these concerns and, rather, relied on this flawed analysis to justify sweeping policy changes that will deter eligible consumers from enrolling in coverage.

## ARGUMENT

### I. The Rule drives disenrollment and increases consumer health care costs through well-documented financial and non-financial channels.

The Affordable Care Act was designed to expand and improve access to health care coverage for individuals and families that purchase their own health insurance and encourage broad participation in Marketplace plans. To help achieve this outcome, the law included, among other reforms, premium subsidies that make health insurance more affordable for low- and middle-income individuals and families; a dedicated annual open enrollment period where individuals and families can enroll in Marketplace coverage; and standardized actuarial value tiers where consumers can select the level of coverage that suits their health needs and their budget. The Rule's changes, like prior similar changes,[4] erode these essential protections and will cause

[4] *See* Gabriella Aboulafia et al., *The Rise and Fall (and Rise) of the Affordable Care Act: Varying Impacts on Coverage Over Time and Place*

consumers to forgo coverage. Uninsured consumers, in turn, will seek uncompensated care from safety-net health care providers, which will impose substantial costs on localities.

### A. Administrative red tape and the shortened open enrollment period will deter eligible people from enrolling in Marketplace coverage, leading to higher premiums.

The Rule's administrative burdens will deter eligible people from enrolling in Marketplace coverage, thereby reducing insurance coverage and increasing health insurance premiums. Multiple high-quality studies have shown that adding steps to the health insurance enrollment process, as the Rule will do, substantially reduces enrollment.[5] One study found that the addition of a single step to the Marketplace reenrollment process decreased enrollment by 33 percent.[6]

---

(Nat'l Bureau of Econ. Rsch., Working Paper No. 33615, 2025); *see also* Gabriella Aboulafia et al., *The Past and Future of Medicaid and the Affordable Care Act—Support or Sabotage?*, 334 JAMA 115 (2025).

[5] *See* Mark Shepard & Myles Wagner, *Do Ordeals Work for Selection Markets? Evidence from Health Insurance Auto-Enrollment*, 115 AM. ECON. REV. 772 (2025); Keith Marzilli Ericson et al., *Reducing Administrative Barriers Increases Take-Up of Subsidized Health Insurance Coverage: Evidence from a Field Experiment*, REV. ECON. STATS. 1–32 (2025).

[6] Shepard & Wagner, *supra* note 5, at 819; *see also* Coleman Drake & David M. Anderson, *Association Between Having an Automatic Reenrollment Option and Reenrollment in the Health Insurance Marketplaces*, 179 JAMA INT. MED. 1725 (2019).

This phenomenon—that administrative burdens deter enrollment—is not unique to health insurance, and has also been demonstrated for employer retirement programs, student aid programs, and food assistance programs.[7] The evidence that even seemingly modest administrative burdens can have large effects on enrollment is robust and pervasive.

Administrative burdens are most likely to deter those who use less health care, on average, than those who overcome barriers to maintain their health insurance. Economic theory implies that health insurance is most valuable to those with greater health care needs and, in turn, that enrollees with lesser health care needs—i.e., those who are

---

[7] Brigitte C. Madrian & Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. ECON. 1149 (2001); Raj Chetty et al., *Active vs. Passive Decisions and Crowd-Out in Retirement Savings Accounts: Evidence from Denmark*, 129 Q. J. ECON. 1141 (2014); Eric P. Bettinger et al., *The Role of Application Assistance and Information in College Decisions: Results from the H&R Block FAFSA Experiment*, 127 Q. J. ECON. 1205 (2012); Amy Finkelstein & Matthew J. Notowidigdo, *Take-Up and Targeting: Experimental Evidence from SNAP*, 134 Q. J. ECON. 1505 (2019); Eric Giannella et al., *Administrative Burden and Procedural Denials: Experimental Evidence from SNAP*, 16 AM. ECON. J. ECON. POL'Y 316 (2024).

younger and healthier—are most likely to leave the market when the financial or non-financial cost of enrolling rises.

This is borne out empirically. Some of the studies of increased administrative burdens described above directly estimate the health care use of people deterred by greater burdens; they find that the deterred enrollees do indeed use less care, potentially markedly less.[8] Similarly, increasing the financial cost of enrollment also disproportionately deters enrollees who use less care.[9] These data imply that the loss of eligible enrollees in response to increased administrative burdens will disproportionately deter healthier would-be enrollees, which will worsen the Marketplace risk pool and, thus, increase premiums.

The Rule imposes several administrative burdens that will have this effect on enrollment and the risk pool. First, the Rule shortens the

---

[8] Shepard & Wagner, *supra* note 5, at 776; Adrianna McIntyre et al., *Can Automatic Retention Improve Health Insurance Market Outcomes?*, 111 AEA PAPERS & PROC. 560 (2021).

[9] Martin B. Hackmann et al., *Adverse Selection and an Individual Mandate: When Theory Meets Practice*, 105 AM. ECON. REV. 1030 (2015); Amy Finkelstein et al., *Subsidizing Health Insurance for Low-Income Adults: Evidence from Massachusetts*, 109 AM. ECON. REV. 1530 (2019).

grace period that consumers have to reconcile a prior year's advance premium tax credits, which are based on their *projected* annual income, with the consumer's *actual* annual income as reflected in their tax return. Without this grace period, consumers face a double burden of, first, discerning the reason that they may no longer be eligible for advance premium tax credits and, second, taking steps to quickly resolve any potential issues.[10] The former is difficult on its own because HHS, due to federal tax privacy rules, cannot directly inform consumers that they have not fulfilled the income reconciliation requirement, meaning consumers may never know *why* they are losing financial help let alone how to resolve the issue. For those somehow able to discern the steps they must take, they may lose eligibility anyway because of tax processing delays at the Internal Revenue Service. Only the most motivated and sophisticated consumers will successfully navigate these demands, leading to a worse overall risk pool and higher premiums.

---

[10] These burdens are among the reasons why HHS previously described the Rule's one-year policy as "overly punitive." *See* Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2024, 88 Fed. Reg. 25,740, 25,815 (Apr. 27, 2023) (to be codified at 45 C.F.R pts. 153, 155-56).

Second, the Rule eliminates a 60-day window for consumers to submit documentation needed to resolve eligibility issues. Consumers that fail to submit adequate documentation lose eligibility for advance premium tax credits. HHS previously acknowledged that this process is burdensome—and that healthier and younger consumers are less likely to take the multiple steps needed to locate and submit paperwork to confirm their income.[11] These burdens are exacerbated by the Rule's elimination of the 60-day window to complete this process.

Third, the Rule shortens the annual open enrollment period by one month for the federal Marketplace and even longer for many state-based Marketplaces. By contracting the time period that consumers have to enroll, the Rule requires consumers to review, consider, and select a plan in December of each year—a time when many individuals and families are facing financial or other stress that deters enrollment.[12] And individuals and families who make good faith errors

---

[11] 90 Fed. Reg. at 27,119 (citing 88 Fed. Reg. at 25,820 to explain that "consumers in the 25-35 age group were most likely to lose their [advance premium tax credit] eligibility due to an income [data matching issue], resulting in a loss of a population that, on average, has a lower health risk, thereby negatively impacting the risk pool").

[12] *See, e.g.*, Ctr. on Budget and Pol'y Priorities, Comment Letter on Proposed Rule, Patient Protection and Affordable Care Act;

in selecting and then starting their coverage will lose the opportunity to effectuate their preferred choice in January; *amici* have documented that this second chance is valuable to individuals facing increased administrative burdens.[13] The shortened open enrollment period will likely disproportionately impact those who simply need more time to complete the enrollment process, such as people living in rural areas, those with limited English proficiency, those with lower levels of education, or those with cognitive deficits (due to mental health or other conditions) that make it difficult to navigate complicated administrative processes.[14]

Data from state-based Marketplaces show that states with longer open enrollment periods see substantial enrollment activity later in the open enrollment period, especially among healthier, younger people. For example, Covered California data shows that those who enrolled in

---

Marketplace Integrity and Affordability CMS-9884-P (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-24058.

[13] *See* Coleman Drake et al., *Financial Transaction Costs Reduce Benefit Take-Up Evidence From Zero-Premium Health Insurance Plans In Colorado*, 89 J. HEALTH ECON. 102752 (2023).

[14] *See, e.g.*, Richard G. Frank, *Medicaid Reforms in the One Big Beautiful Bill Act and Mental Health Care*, 77 PSYCH. SERVS. 880 (2026).

January were about 5 percent healthier than those who enrolled prior to December 15.[15] New York State of Health found that those who enrolled in January tend to be younger on average than those who enrolled earlier.[16] Analysis of 2024 enrollment data from the Massachusetts Health Connector by one of the undersigned *amici* showed a similar result, with higher enrollment of younger people later in the Commonwealth's open enrollment period.[17] While some individuals who have historically enrolled during the latter part of these states' enrollment periods might enroll earlier if faced with an earlier deadline, it is likely that some will not and, thus, that the Rule will reduce enrollment—especially among healthier, younger people.

---

[15] Covered California, *Data Snapshot: Covered California Open and Special Enrollment Periods* (Apr. 3, 2025), https://hbex.coveredca.com/data-research/library/CoveredCA_OE_SEP_Data_Snapshot_20250403.pdf.
[16] N.Y. State of Health et al., Comment Letter on Patient Protection and Affordable Care Act; Market Stabilization (Mar. 7, 2017), https://www.regulations.gov/comment/CMS-2017-0021-3014.
[17] Adrianna McIntyre, Comment Letter on Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability CMS-9884-P at 16 (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-23519 (informing HHS that shortening the open enrollment period "will likely worsen the risk pool and increase gross premiums" (emphasis omitted)).

### B. The Rule will further increase consumer health care costs through less generous coverage and higher premiums.

The Affordable Care Act requires Marketplace plans to meet specified actuarial value standards, which is a measure of the percentage of expected medical costs that the health plan will cover. Bronze, silver, gold, and platinum plans must have an actuarial value of 60, 70, 80, and 90 percent, respectively. Bronze plans cover fewer medical expenses (meaning bronze plans have lower premiums but higher cost sharing in the form of deductibles, copays, and coinsurance) while platinum plans cover more medical expenses (meaning platinum plans have higher premiums but lower cost sharing). By standardizing these coverage tiers, the Affordable Care Act aims to allow consumers to more easily compare their plan options based on overall generosity—and select a plan that best meets their health and financial needs. Changes to actuarial value levels also affect the generosity of premium tax credits, which are based on the cost of the second lowest-cost silver plan available to a consumer.

The Rule will both erode the value of Marketplace coverage and reduce financial help for eligible enrollees. Under the Rule, insurers can offer plans that are as much as 4 percentage points below the

Affordable Care Act's statutorily set standards. This change will undermine Marketplace coverage in at least two ways.

First, the Rule will blur the clear distinction between coverage tiers, making it harder for consumers to meaningfully compare plans.[18] Under the Rule, some bronze plans can have an actuarial value of up to 65 percent while a silver plan could have an actuarial value as low as 66 percent. This all but erases the distinction between these two plan tiers, which are intended by law to vary in generosity by 10 percentage points.

Second, lower actuarial values for *silver* plans will result in lower premium tax credits for the millions of consumers who are eligible for financial help. By allowing silver Marketplace plans to reduce their actuarial value by up to 4 percentage points, the Rule will reduce the benchmark premium used to determine the value of the premium subsidies. This, in turn, will leave consumers with a choice between accepting higher out-of-pocket costs or paying higher net-of-subsidy premiums to retain coverage consistent with what they previously held;

---

[18] *See* Keith M. Marzilli Ericson & Amanda Starc, *How Product Standardization Affects Choice: Evidence from the Massachusetts Health Insurance Exchange*, 50 J. HEALTH ECON. 71 (2016).

one study estimated that a typical family of four could see their costs rise by up to $714 in 2026 alone.[19] Economic research has shown that higher premiums cause consumers—disproportionately those who are younger and healthier—to drop their Marketplace plan or not enroll, worsening the overall risk pool.[20]

## II. Coverage losses and high out-of-pocket costs will financially burden localities and safety-net providers.

The Affordable Care Act reduced the uninsured rate to historic lows. When the law was enacted in 2010, 46.5 million non-elderly Americans—nearly 18 percent of the population—were uninsured.[21] Fourteen years later, 26.7 million non-elderly Americans were uninsured, and the uninsured rate had declined to 9.8 percent.[22] Published research by *amici* and others shows that the Affordable Care

---

[19] Gideon Lukens & Elizabeth Zhang, *Administration's ACA Marketplace Rule Will Raise Health Care Costs for Millions of Families*, Ctr. on Budget and Pol'y Priorities (Aug. 1, 2025).

[20] *See, e.g.*, Michael Geruso et al., *The Two-Margin Problem in Insurance Markets*, 105 REV. OF ECON. & STATS. 237 (2023); Finkelstein, *supra* note 9.

[21] Jennifer Tolbert et al., Key Facts about the Uninsured Population, Kaiser Family Foundation (June 16, 2026), https://www.kff.org/uninsured/key-facts-about-the-uninsured-population/.

[22] *Id.*

Act's coverage expansions have improved families' access to care[23] and health outcomes[24] as well as their financial stability—as reflected in reduced out-of-pocket costs,[25] unpaid bills,[26] and evictions,[27] as well as increased food security.[28] The Act also narrowed racial, ethnic, and other health disparities in insurance coverage and access to care.[29]

---

[23] *See, e.g.*, Mark Duggan et al., *The Impact of the Affordable Care Act: Evidence from California's Hospital Sector*, 14 AM. ECON. J. 111 (2022); Ausmita Ghosh et al., *The Effect of Health Insurance on Prescription Drug Use Among Low-Income Adults: Evidence from Recent Medicaid Expansions*, 63 J. HEALTH ECON. 64 (2019); Laura R. Wherry & Sarah Miller, *Early Coverage, Access, Utilization, and Health Effects Associated With the Affordable Care Act Medicaid Expansions: A Quasi-Experimental Study*, 164 ANN. INTERN. MED. 795 (2016).

[24] *See, e.g.*, Helen Levy & Thomas C. Buchmueller, *The Impact of Health Insurance on Mortality*, 46 ANN. REV. PUB. HEALTH 541 (2025).

[25] *See, e.g.*, Hiroshi Gotanda et al., *Out-of-Pocket Spending and Financial Burden Among Low Income Adults After Medicaid Expansions in the United States: Quasi-Experimental Difference-in-Difference Study*, 368 BRITISH MED. J. 40 (2020).

[26] *See, e.g.*, Kenneth Brevoort et al., *The Credit Consequences of Unpaid Medical Bills*, 187 J. PUB. ECON. 104203 (2020); Luojia Hu et al., *The Effect of the Affordable Care Act Medicaid Expansions on Financial Wellbeing*, 163 J. PUB. ECON. 99 (2018).

[27] Naomi Zewde et al., *The Effects of the ACA Medicaid Expansion on Nationwide Home Evictions and Eviction-Court Initiations: United States, 2000–2016*, 109 AM. J. PUB. HEALTH 1379 (2019).

[28] Gracie Himmelstein, *Effect of the Affordable Care Act's Medicaid Expansions on Food Security, 2010–2016*, 109 AM. J. PUB. HEALTH 1243 (2019).

[29] *See e.g.*, Benjamin D. Sommers et al., *Closing Gaps or Holding Steady? The Affordable Care Act, Medicaid Expansion, and Racial Disparities in Coverage, 2010–2021*, 50 J. HEALTH POL. POL'Y LAW 253

While gaps remain, Marketplace enrollees across the country were able to use their coverage to see their doctor, fill a prescription, and seek emergency room treatment. For health care expenses big and small, patients and their providers relied on Marketplace coverage.

A robust research literature has shown that these coverage expansions sharply reduced providers' uncompensated care burdens. Nonprofit hospitals were major beneficiaries, as they deliver a disproportionate share of uncompensated care.[30] Expanded coverage

---

(2025); U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, *Health Insurance Coverage and Access to Care for American Indians and Alaska Natives: Current Trends and Key Challenges*, HP-2021-18 (2021); U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, *Health Insurance Coverage Changes Since Implementation of the Affordable Care Act: Asian Americans and Pacific Islanders*, HP-2021-11 (2021); Jesse C. Baumgartner et al., *Racial and Ethnic Inequities in Health Care Coverage and Access, 2013-2019*, The Commonwealth Fund (2021); Thomas C. Buchmueller & Helen G. Levy, *The ACA's Impact on Racial and Ethnic Disparities in Health Insurance Coverage and Access to Care*, 39 HEALTH AFF. 395 (2020); Samantha Artiga et al., *Changes in Health Coverage by Race and Ethnicity Since the ACA, 2010-2018*, KFF (2020); Susan L. Hayes et al., *Reducing Racial and Ethnic Disparities in Access to Care: Has the Affordable Care Act Made a Difference?*, The Commonwealth Fund (2017).

[30] Drew Calvert, *Who Bears the Cost of the Uninsured? Nonprofit Hospitals.*, Kellogg Insight (June 22, 2015), https://insight.kellogg.northwestern.edu/article/who-bears-the-cost-of-the-uninsured-nonprofit-hospitals.

also reduced strains on community health centers and other safety-net health care providers, which serve populations that have benefited greatly from the Affordable Care Act's coverage programs.[31] Much of the benefit of reduced uncompensated care ultimately flowed to state and local governments, which finance a sizeable amount of uncompensated care.[32]

The Rule erodes this progress. As detailed above, the Rule's policies will lead to higher uninsured and underinsured rates and thus more uncompensated care for health care providers. HHS recognizes as much. The agency's own analysis estimated that up to 1.8 million people could lose their coverage in 2026 alone and that an increase in uninsurance would increase uncompensated care costs.[33] The Rule will also contribute to worse health care outcomes as uninsured and

---

[31] Julia Paradise et al., *Community Health Centers: Recent Growth and the Role of the ACA*, KFF (Jan. 18, 2017).
[32] *See* Teresa A. Coughlin et al., *Sources of Payment for Uncompensated Care for the Uninsured*, KFF (Apr. 6, 2021).
[33] *See, e.g.*, 90 Fed. Reg. at 27,213, 27,219. *See also* Am. Hosp. Ass'n, Comment Letter on Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-25407 ("Coverage loss of this magnitude would have substantial consequences for patient access to care, as well as the financial stability of hospitals, health systems, and other providers." (emphasis omitted)).

underinsured people delay care, skip doses of prescription medication, or forego treatment altogether,[34] which may make the patients newly seeking uncompensated care costlier to treat.

Local governments, including Plaintiffs-Appellees, are especially vulnerable to uncompensated care costs. Many localities operate safety-net health clinics, support public hospitals and emergency departments, provide emergency transportation via ground ambulances, and offer public health screening and other services. Many, if not all, of these essential services must be offered regardless of a patient's ability to pay or insurance status. As a result, localities are disproportionately likely to treat uninsured and underinsured patients who will be affected by this Rule—and will be responsible for uncompensated care that those patients inevitably need.

---

[34] *See, e.g.*, Am. Pub. Health Ass'n, Comment Letter on Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability CMS-9884-P (Apr. 7, 2025), https://www.regulations.gov/comment/CMS-2025-0020-10622; *see also* Levy & Buchmueller, *supra* note 24.

## III. The Rule attempts to justify new administrative burdens by unduly relying on flawed analysis from the Paragon Health Institute.

To justify the Rule's new administrative burdens on consumers, HHS repeatedly invokes concerns about widespread improper enrollment as documented in analysis from the Paragon Health Institute.[35] But, as the district court found and as several commenters explained in comments to HHS, this analysis was fatally flawed and should not have been relied on by the agency, including to justify the Rule's failure to reconcile policy.

Paragon's analysis relied on comparing self-reported American Community Survey (ACS) data from 2023 to Marketplace enrollment data from 2024. But, as one commenter explained, this comparison has "three serious methodological flaws" by (1) failing to account for important differences in how income is measured in the ACS and in Marketplace enrollment records; (2) failing to account for changes in Medicaid enrollment in 2023 that contributed to far higher Marketplace enrollment in 2024 relative to 2023; and (3) failing to exclude children from Marketplace enrollment data, while excluding them from the ACS

[35] *See* 90 Fed. Reg. at 27,075, 27,122, 27,127, 27,141, 27,209.

analysis.[36] ACS data, the commenter explained, is self-reported by individuals who tend to underestimate their household's current income relative to tax data while Marketplace enrollment data is based on projected income for the next year.[37]

Another of the undersigned *amici* raised similar concerns in comments, explaining that:

> [T]his methodology has substantial limitations for measuring improper enrollments since its ACS-based measure of the eligible population has serious shortcomings. Perhaps the most fundamental problem is that eligibility for advance payments of the premium tax credits is based on a Marketplace applicant's *projected* income, not the enrollee's actual income for the year, which is what is measured in the ACS data. Considering the substantial income volatility experienced by low-income enrollees, the distribution of projected income need not neatly align with the distribution of actual income. Other significant problems include that HHS' analysis relies on the wrong measure of income and family size, that survey data like the ACS can be subject to

---

[36] Jessica Banthin, Urban Inst., Comment Letter on Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-24021.

[37] This commenter also disputed HHS's characterization of her own prior research as evidence of improper enrollment. She and her co-authors explicitly "refrain[ed] from estimating the exact number of people who enroll improperly" in part due to the "high income volatility among low-income families." *Id.* at 2. As such, the study did not support HHS's stated conclusions. In finding parts of the Rule to be arbitrary and capricious, the district court pointed to HHS's failure to "meaningfully contend with this comment," which called into question "the very justification for the Rule itself." JA57-58.

> significant measurement error, and that HHS is relying on ACS data that incorporates only part of the effects of Medicaid unwinding. Together with the other limitations of this methodology catalogued in the proposed rule, this implies that this analysis offers an unreliable basis for HHS' conclusion that improper enrollments are widespread.[38]

Still other commenters, including additional *amici*, raised methodological concerns.[39] Several of these commenters cited new analysis or published studies showing that income volatility, especially among low-income people, makes it difficult to reliably estimate income for a given month or year.[40] But HHS declined to grapple with any of these flaws or methodological concerns, relying instead on an adaptation of the Paragon analysis.

---

[38] Matthew Fiedler, The Brookings Institution, Comment Letter on Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability at 4-5 (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-24920 (internal citations omitted).

[39] McIntyre, Comment Letter, *supra* note 17; *see, e.g.*, Jason Levitis et al., Comment Letter on Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-25047; Ctr. on Budget and Pol'y Priorities, Comment Letter, *supra* note 12.

[40] *See, e.g.*, Geena Kim et al., *Why Some Nonelderly Adult Medicaid Enrollees Appear Ineligible Based on Their Annual Income*, 49 J. HEALTH POL., POL'Y AND LAW 1051 (2024).

This is no harmless error or an academic dispute over methodology. Rather, HHS used a deeply flawed analysis to conclude that improper enrollment is widespread in the Marketplaces—and then used that conclusion to justify sweeping changes that will deter eligible consumers from enrolling in coverage, leading to coverage losses, higher premiums, and more uncompensated care.

## CONCLUSION

The Court should affirm the judgment of the district court.

Dated: September 8, 2026

Respectfully submitted,

*<u>/s/ Aaron R. Cooper</u>*
Aaron R. Cooper
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

# APPENDIX

## List of *Amici Curiae*[41]

**David M. Anderson, Ph.D.,** Assistant Professor, Arnold School of Public Health, University of South Carolina;

**Gerard F. Anderson, Ph.D.,** Professor of Health Policy & Management, Johns Hopkins University Bloomberg School Public Health; Professor of Medicine, Johns Hopkins University School of Medicine;

**Linda J. Blumberg, Ph.D.,** Institute Fellow, Urban Institute; Research Professor, McCourt School of Public Policy, Georgetown University;

**Thomas C. Buchmueller, Ph.D.,** Waldo O. Hildebrand Professor of Risk Management and Insurance; Professor of Business Economics and Public Policy, Ross School of Business, University of Michigan;

**Sara Collins, Ph.D.,** Senior Scholar, Expanding Coverage and Access & Tracking Health System Performance, Commonwealth Fund;

**Coleman Drake, Ph.D.,** Associate Professor of Health Policy and Management, University of Pittsburgh School of Public Health;

**Judith Feder, Ph.D.,** Institute Fellow, Urban Institute; Professor and former Dean, Georgetown University McCourt School of Public Policy;

**Matthew Fiedler, Ph.D.,** Joseph A. Pechman Senior Fellow in Economic Studies; Senior Fellow, Center on Health Policy, Brookings Institution;

**Richard G. Frank, Ph.D.,** Margaret T. Morris Professor of Health Economics Emeritus, Harvard Medical School; Leonard D. Schaeffer Chair in Economic Studies, The Brookings Institution;

**Michael Geruso, Ph.D.,** Associate Professor of Economics, University of Texas at Austin;

---

[41] Institutional affiliations are provided for identification purposes only; this brief does not purport to represent the institutional views of any entity with which *amici* are affiliated.

**Sherry Glied, Ph.D.,** Professor of Public Service, Robert F. Wagner Graduate School of Public Service, New York University;

**Rebecca L, Haffajee, J.D., Ph.D., M.P.H.**, Professor in the Practice of Public Health (Health Policy), Yale School of Public Health;

**John Holahan, Ph.D.,** Institute Fellow, Urban Institute;

**Genevieve M. Kenney, Ph.D., M.A., M.A.,** Institute Fellow, Urban Institute;

**Leighton Ku, Ph.D, M.P.H.,** Professor, Department of Health Policy and Management; Director, Center for Health Policy Research, Milken Institute School of Public Health;

**John E. McDonough, Dr.P.H., M.P.A.,** Professor of Practice, Harvard T.H. Chan School of Public Health;

**Adrianna McIntyre, Ph.D., M.P.H., M.P.P.,** Assistant Professor of Health Policy and Politics, Harvard T.H. Chan School of Public Health;

**Benjamin Sommers, M.D., Ph.D.,** Huntley Quelch Professor of Health Care Economics, Harvard T.H. Chan School of Public Health; Professor of Medicine Medicine-Brigham and Women's Hospital, Harvard Medical School; and

**Stephen Zuckerman, Ph.D.,** Institute Fellow, Urban Institute.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief of *Amici Curiae* complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the brief contains 4,525 words. I further certify that this Brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 365 in Century 14-point font.

Dated: September 8, 2026

*/s/ Aaron R. Cooper*
Aaron R. Cooper

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2026, I caused the Brief of *Amici Curiae* Economists and Scholars of Health Policy in Support of Plaintiffs-Appellees to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Aaron R. Cooper*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

# APPEARANCE OF COUNSEL FORM

**BAR ADMISSION & ECF REGISTRATION:** If you have not been admitted to practice before the Fourth Circuit, you must complete and return an Application for Admission before filing this form. If you were admitted to practice under a different name than you are now using, you must include your former name when completing this form so that we can locate you on the attorney roll. Electronic filing by counsel is required in all Fourth Circuit cases. If you have not registered as a Fourth Circuit ECF Filer, please complete the required steps at Register for eFiling.

**THE CLERK WILL ENTER MY APPEARANCE IN APPEAL NO.** 26-1938 as

☐ Retained ☐ Court-appointed(CJA) ☐ CJA associate ☐ Court-assigned(non-CJA) ☐ Federal Defender

☑ Pro Bono ☐ Government

COUNSEL FOR: Economists and Scholars of Health Policy

______________________________ as the
(party name)

☐ appellant(s) ☐ appellee(s) ☐ petitioner(s) ☐ respondent(s) ☑ amicus curiae ☐ intervenor(s) ☐ movant(s)

/s/ Aaron R. Cooper
(signature)

**Please compare your information below with your information on PACER. Any updates or changes must be made through PACER's Manage My Account.**


Aaron R. Cooper
Name (printed or typed)

(202) 637-6333
Voice Phone

Jenner & Block LLP
Firm Name (if applicable)

(202) 639-6066
Fax Number

1099 New York Avenue NW Suite 900
Washington, DC 20001
Address

ACooper@gmail.com
E-mail address (print or type)


**CERTIFICATE OF SERVICE** *(required for parties served outside CM/ECF)*: I certify that this document was served on ____________ by ☐ personal delivery; ☐ mail; ☐ third-party commercial carrier; or ☐ email (with written consent) on the following persons at the addresses or email addresses shown:

| | |
|---|---|
| | |

/s/ Aaron R. Cooper
Signature

September 8, 2026
Date